1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SPS TECHNOLOGIES, LLC d/b/a/ PB FASTENERS,<br><br>                Plaintiff,<br><br>        v.<br><br>BRILES AEROSPACE, INC., MICHAEL BRILES, and ROBERT BRILES,<br><br>                Defendants. | Case No. 2:18-cv-09536-MWF-AS<br><br>**DECLARATION OF JOSEPH WOOD IN SUPPORT OF PLAINTIFF SPS TECHNOLOGIES, LLC'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>**First Amended Complaint Filed:** December 17, 2018<br><br>**Hearing:**<br><br>**Date:     August 12, 2019**<br>**Time:     10:00 a.m.**<br>**Place:     Courtroom 5A**<br>Before:  Hon. Michael W. Fitzgerald |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Joseph Q. Wood, hereby declare as follows:

1.      I am an attorney at the law firm of Williams & Connolly LLP, and I represent Plaintiff SPS Technologies, LLC d/b/a PB Fasteners ("Plaintiff" or "PB Fasteners") in this action.  I have personal knowledge of the facts set forth herein, and if called and sworn as a witness, I could and would testify competently thereto.

### Plaintiff's Production of Documents

2.      Defendants have propounded over 175 requests for the production of documents, over 50 interrogatories, 50 requests for admission, requests for inspection of tangible things, and a request to permit entry onto land.

3.      Plaintiff did not request a single extension from Defendants in responding to these requests.

4.      Plaintiff's production has required the use of 20 ESI custodians, several targeted ESI collections for specific documents, and hard-copy review of thousands of documents.

5.      To date, Plaintiff has collected more than 1.5 million documents, has reviewed about 200,000 documents, and has produced 33,799 documents, or 144,923 pages.

6.      Plaintiff's document production is now complete.

7.      Plaintiff offered to make its witnesses available for depositions starting June 12.  When Defendants indicated that they would not proceed with any individual deposition until 7 days after all documents from that witness had been produced, Plaintiff agreed to make its witnesses available after the June 28 discovery cut-off.  By that point, the parties already contemplated that discovery would continue after the cut-off.

### Space-Lok, Inc.

8.      Plaintiff served a document subpoena on Space-Lok, Inc. on March 28, 2019.

- 2 -

9.      Space-Lok resisted producing communications with Boeing for more than two months, and resisted producing any internal documents relating to development.

10.     Space-Lok ultimately agreed to produce communications with Boeing, and made a production of such communications on June 11.

11.     Attorneys for Plaintiff reviewed Space-Lok's production on June 12.

12.     The documents from Space-Lok reveal that ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████

13.     Attached hereto as **Exhibit 3** is a true and correct copy of a document with Bates numbers SPACE-LOK-000100–109, as produced by Space-Lok in this litigation.

14.     Attached hereto as **Exhibit 4** is a true and correct copy of a document with Bates number SPACE-LOK-000131, as produced by Space-Lok in this litigation.

15.     Attached hereto as **Exhibit 5** is a true and correct copy of a document with Bates number SPACE-LOK-000171, as produced by Space-Lok in this litigation.

16.     Attached hereto as **Exhibit 6** is a true and correct copy of a document with Bates number SPACE-LOK-0000464–466, as produced by Space-Lok in this litigation.

## The Boeing Company

17.     Plaintiff served a document subpoena on Boeing on March 7, 2019.

18.     Boeing asserted that the subpoena was unenforceable and refused to make a production in response to it.

19.     As a result, Plaintiff filed a motion to compel discovery in the Northern District of Illinois, which was granted in substantial part on June 7.

20.     Boeing produced 287 documents to Briles Aerospace on June 8, 6,925 documents to PB Fasteners on June 12, 7,580 documents to PB Fasteners on June 18, and 7,521 documents to Briles Aerospace on June 21.

21.    Boeing's June 12 production was the first to disclose ████████

██████████████████████

22.    Attached hereto as **Exhibit 7** is a true and correct copy of the Memorandum Opinion and Order issued by Magistrate Judge Sunil R. Harjani in Case No. 19-cv-3365 (N.D. Ill., June 7, 2019).

23.    Attached hereto as **Exhibit 8** is a true and correct copy of a document with Bates numbers BOEING_SPS_00048313–314, as produced by Boeing in this litigation.

24.    Attached hereto as **Exhibit 9** is a true and correct copy of a document with Bates numbers BOEING_SPS_00035496–498, as produced by Boeing in this litigation.

**Lisi Aerospace**

25.    In September 2018, Boeing disclosed that Lisi Aerospace Canada Corp. ("Lisi Canada"), an entity headquartered near Montreal, had qualified to manufacture "protruding head" tapered sleeve bolts.

26.    At this time, Plaintiff understood that personal jurisdiction over Lisi Canada was uncertain in California.

27.    Plaintiff filed suit against Lisi Canada in Montreal Superior Court on November 20, 2018, shortly after it filed the complaint in this action.

28.    On March 4, 2019, Plaintiff learned that Blanc Aero Industries SAS ("Lisi France"), another Lisi Aerospace entity headquartered in Paris, had qualified to manufacture "flush head" tapered sleeve bolts for Boeing.

29.    Plaintiff undertook an investigation and, based on the information available to it at the time, was unable to identify sufficient facts to allege personal jurisdiction over Lisi France in either Canada or California.

30.    On June 12 and 18, Boeing produced documents that revealed sufficient evidence to ██████████████████████████████

████████████████

31.    Plaintiff served a subpoena on Lisi Aerospace North America.   Lisi Aerospace North America has asserted that no responsive documents exist.

- 4 -

32.     Attached hereto as **Exhibit 10** is a true and correct copy of a document with Bates numbers PBF00983825–836, as produced by Plaintiff in this litigation.

33.     Attached hereto as **Exhibit 11** is a true and correct copy of a document with Bates numbers PBF0149913–923, as produced by Plaintiff in this litigation.

34.     Attached hereto as **Exhibit 12** is a true and correct copy of a document with Bates numbers BOEING_SPS_00000008–10, as produced by Boeing in this litigation.

35.     Attached hereto as **Exhibit 13** is a true and correct copy of a document with Bates numbers BOEING_SPS_00000075–79, as produced by Boeing in this litigation.

36.     Attached hereto as **Exhibit 14** is a true and correct copy of a document with Bates numbers BOEING_SPS_00003556–558, as produced by Boeing in this litigation.

37.     Attached hereto as **Exhibit 15** is a true and correct copy of a document with Bates numbers BOEING_SPS_00048813–817, as produced by Boeing in this litigation.

38.     Attached hereto as **Exhibit 16** is a true and correct copy of a document with Bates number BOEING_SPS_00057063, as produced by Boeing in this litigation.

39.     Attached hereto as **Exhibit 17** is an excerpt of a spreadsheet with Bates number BOEING_SPS_00057553, as produced by Boeing in this litigation.   The spreadsheet has been filtered to only those purchase orders issued to Lisi Aerospace North America and only those fields relevant to the instant Motion.

## **Meet and Confer Efforts**

40.     On June 18, counsel for Plaintiff informed counsel for Defendants that Plaintiff planned to seek leave to amend the FAC to add new parties and claims, and provided counsel for Defendants with documents reflecting the basis of such claims against Space-Lok and Montgomery Machine.

41.     Also on June 18, counsel for plaintiff informed Defendants of the discovery of the Employee Agreement signed by Robert Briles.

42.     During meet-and-confer calls with counsel for Defendants on July 8 and 9, counsel for Plaintiff provided the detailed factual basis for all of the new claims in the Second Amended Complaint.  Counsel for Plaintiff also cited specific documents in support of each new claim against Robert Briles.

### Additional Supporting Materials

43.     Attached hereto as **Exhibit 2** is a true and correct excerpt of the transcript of the hearing on Plaintiff's Motion for a Preliminary Injunction, held on February 21, 2019.

44.     Attached hereto as **Exhibit 18** is a true and correct copy of Defendant Robert Briles's interrogatory responses served on June 28, 2019.

45.     Plaintiff has produced records from a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and representatives of the Federal Trade Commission on June 7, 2011 with Bates numbers PBF0005676–694.

46.     During the June 7, 2011 teleconference, Robert Briles represented that Paul R. Briles, Inc. owned trade secrets, including specifically the processes used in the manufacture of the SLEEVbolt®:

"e.   Rob confirmed there is no current patent on the sleevbolts.  The old patents were on sleevbolt but they are no longer in effect and they were prior to composite airframes.

f.   Technology licensed by PCC is trade secrets, know-how and technical information.  Information conveyed to PCC included: manufacturing methods, tooling, design, drawings (Boeing drawing as well as PB sub-component design which included more detail than the Boeing drawing).  Ownership of the licensed IP stayed with PB."

1
2
3

47.     Plaintiff has produced the License Agreement between Paul R. Briles, Inc. and SPS Technologies, LLC dated November 21, 2015 with Bates numbers PBF0005799–807.

4

48.     At PBF0005800, the License Agreement provides that:

5
6
7

"'<u>Proprietary Information'</u> means the trade secrets, know-how, technical information and expertise of [Paul R. Briles, Inc.] that is used and useful in manufacturing and/or testing Sleevbolt Products. . . .

8
9
10
11
12

Subject to the terms, conditions, and limitations set forth herein, Licensor hereby grants to Licensee a non-exclusive license . . . to use the Proprietary Information only at its factory(ies) located in the United States of America . . . and only to manufacture Sleevbolt Products for use in the Field (or for associated testing and certification."

13
14

49.     Attached hereto as **Exhibit 19** is a true and correct copy of a document with Bates numbers RB002079–80, as produced by Robert Briles in this litigation.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF JOSEPH WOOD IN SUPPORT OF MOTION FOR LEAVE TO AMEND

1         I declare under penalty of perjury that the foregoing is true and correct to the best

2    of my knowledge and belief.  Executed in Washington, D.C. on July 15, 2019.

3

4    _____

5         Joseph Wood

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH WOOD IN SUPPORT OF MOTION FOR LEAVE TO AMEND

# EXHIBIT 1

**[REDACTED]**

*UNREDACTED VERSION TO BE
FILED UNDER SEAL
APPLICATION PENDING*

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
1990 S. Bundy Drive, Suite 705
Los Angeles, CA 90025
Telephone:  (310) 826-4700
Facsimile:  (310) 826-4711
matthew@spertuslaw.com
emitchell@spertuslaw.com

WILLIAMS & CONNOLLY LLP
Bruce R. Genderson (*pro hac vice*)
Thomas H.L. Selby (*pro hac vice*)
Daniel P. Shanahan (*pro hac vice*)
Edward C. Reddington (*pro hac vice*)
Joseph Q. Wood (*pro hac vice*)
Michelle L. Hood (*pro hac vice*)
William B. Snyderwine (*pro hac vice*)
Miranda R. Petersen (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
bgenderson@wc.com
tselby@wc.com
dshanahan@wc.com
ereddington@wc.com
jwood@wc.com
mhood@wc.com
wsnyderwine@wc.com
mpetersen@wc.com

*Attorneys for SPS Technologies, LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| SPS TECHNOLOGIES, LLC d/b/a/ PB FASTENERS, <br><br> Plaintiff, <br><br> v. <br><br> BRILES AEROSPACE, INC., MICHAEL BRILES, ROBERT BRILES as an individual and as Trustee of the ROB BRILES REVOCABLE FAMILY TRUST DATED MARCH 28, 1991, RICHARD BRILES as an | Case No. 2:18-cv-09536-MWF-AS <br><br> **SECOND AMENDED COMPLAINT** <br><br> **1. VIOLATION OF DEFEND TRADE SECRETS ACT** <br> **2. VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT** <br> **3. VIOLATION OF LANHAM ACT** <br> **4. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW** <br> **5. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW** |

individual and as Trustee of the RICK AND KEANNA A. BRILES FAMILY REVOCABLE TRUST DATED DECEMBER 12, 1990, HI-SHEAR CORP., LISI AEROSPACE NORTH AMERICA, INC., LISI AEROSPACE CANADA CORP., BLANC AERO INDUSTRIES SAS, SPACE-LOK, INC., and MONTGOMERY MACHINE CO., INC.,

Defendants.

**6. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**7. INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**
**8. BREACH OF CONTRACT**
**9. INTENTIONAL MISREPRESENTATION**
**10. CONCEALMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff SPS Technologies, LLC d/b/a PB Fasteners ("PB Fasteners" or "Plaintiff"), by and through its attorneys, and for its Second Amended Complaint against Briles Aerospace, Inc. ("Briles Aerospace"), Michael Briles, Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991), Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), HI-SHEAR Corp., Lisi Aerospace North America, Inc. (together with HI-SHEAR Corp., "Lisi USA"), Lisi Aerospace Canada Corp. ("Lisi Canada"), Blanc Aero Industries SAS ("Lisi France"), Space-Lok, Inc. ("Space-Lok"), and Montgomery Machine Co., Inc. ("Montgomery Machine") (collectively, "Defendants"), hereby alleges as follows:

# I.   INTRODUCTION

1.      PB Fasteners is a leader in the design and manufacture of high-strength aerospace fasteners, with more than fifty years of experience in the industry.  PB Fasteners' marquee product is the SLEEVbolt®, which is an advanced-concept fastening system with critical applications in commercial and military aircraft.  This case arises from the wrongful acts of the Defendants pertaining to that SLEEVbolt® system, which have resulted in trade secret misappropriation, false advertisement, unfair competition, intentional interference with contractual and prospective business relations, breach of contract, intentional misrepresentation, and concealment.

2.      The SLEEVbolt® system consists of a tapered bolt made of titanium or nickel superalloy combined with a tapered stainless steel sleeve that the bolt slides into.  During the manufacturing process, the bolt is pushed partially into the sleeve and the assembly is delivered to the customer in that state.  This is referred to as the semi-expanded state of the SLEEVbolt®.

3.      During installation, the SLEEVbolt® is placed into a hole drilled through the aircraft components that need to be joined together.  The hole is drilled to precisely match the outer diameter of the SLEEVbolt® in the semi-expanded state.  The tapered bolt is then driven fully through the sleeve, causing a precise amount of uniform

expansion throughout the sleeve.  The expansion of the sleeve creates a uniform force, referred to as interference, between the hole and the SLEEVbolt®.

4.     The SLEEVbolt® system offers significant benefits over competing aerospace fasteners.   As one example, the SLEEVbolt® provides a uniform interference fit with constant radial compression between the fastener and secured aircraft components, which reduces structural fatigue.   As another example, the uniform expansion of the SLEEVbolt® provides critical lightning strike protection in composite structures.

5.     The tapered bolt and sleeve are made and assembled with confidential and proprietary dimensions, formulae, and processes, which are essential to the proper manufacture and functioning of the SLEEVbolt®.  These dimensions, formulae, and processes are not generally known or readily ascertainable.

6.     PB Fasteners developed its confidential and proprietary dimensions, formulae, and processes through many years of research and testing.   This development required significant engineering expertise, industry experience and know-how, and investment of resources.  PB Fasteners also was required to refine its dimensions, formulae, and processes over time as it developed new models of the SLEEVbolt®, including large-diameter SLEEVbolts® starting in 2013.  Given the value of this information, PB Fasteners has made extensive efforts to maintain its secrecy.

7.     The primary consumer of the SLEEVbolt® system is The Boeing Company ("Boeing"), which has been a customer of PB Fasteners for more than forty years.  Boeing has contracted with PB Fasteners for the production of SLEEVbolts® for Boeing's composite 787 aircraft and has placed short-term purchase orders for the production of SLEEVbolts® for Boeing's composite 777X aircraft.  The contract for the 787 aircraft runs through December 31, 2021.  As part of their contractual and ongoing business relationship, PB Fasteners gave Boeing access to its proprietary SLEEVbolt® information.  Boeing required this information to be able to properly

1  inspect and approve the SLEEVbolts® and to integrate them into the aircraft assembly

2  process.   PB Fasteners provided proprietary information to Boeing in documents

3  describing  specific  dimensions  and  processes;  during  in-person  meetings  and

4  telephone calls with Boeing engineers; and in conjunction with inspections conducted

5  by Boeing at PB Fasteners' factory.   PB Fasteners communicated all proprietary

6  information  to  Boeing  on  the  condition  that  the  information  would  remain

7  confidential.    Boeing  understood  that  it  had  an  obligation  to  maintain  the

8  confidentiality of PB Fasteners' proprietary information.

9       8.    In 2011, Plaintiff SPS Technologies, LLC purchased the assets of Paul

10  R. Briles d/b/a PB Fasteners, which included the proprietary information and trade

11  secrets necessary to make the SLEEVbolt®.   For several years after the acquisition,

12  Plaintiff was the exclusive manufacturer of SLEEVbolts® for Boeing.

13       9.    Before Plaintiff's acquisition of the assets of PB Fasteners, Robert Briles

14  was the President of PB Fasteners, and Michael Briles worked as its Director of Sales

15  and Marketing.   In conjunction with their employment at PB Fasteners after the asset

16  acquisition, Robert and Michael Briles each entered into confidentiality agreements

17  with Plaintiff.   Shortly after the asset acquisition, Michael Briles left PB Fasteners

18  and  founded  Briles  Aerospace.    Initially,  Briles  Aerospace  manufactured  and

19  provided  only  standard  products  and  services  for  the  aerospace  industry.   When

20  standard  products  and  services  failed  to  yield  sufficient  profits,  however,  Briles

21  Aerospace began working to misappropriate the SLEEVbolt®.   Robert Briles was a

22  principal facilitator and financier of these efforts.

23       10.    To develop a copy of the SLEEVbolt®, Briles Aerospace relied on PB

24  Fasteners'  confidential,  proprietary,  and  trade  secret  information,  which  Briles

25  Aerospace acquired and used through improper means.   As one example, Briles

26  Aerospace  obtained  PB  Fasteners'  confidential,  proprietary,  and  trade  secret

27  information from former PB Fasteners employees with detailed knowledge of that

28  information, including Michael Briles, Robert Briles, and others.   These employees

were subject to confidentiality agreements that prohibited the disclosure or use of PB Fasteners' confidential, proprietary, and trade secret information.  As another example, Briles Aerospace began to work with Boeing to obtain qualifications to produce the SLEEVbolt®.  In doing so, Briles Aerospace gained access to PB Fasteners' trade secret and proprietary information through documents exchanged with Boeing, as well as through in-person meetings and telephone calls with representatives from Boeing.  As a result of this improper conduct, Briles Aerospace was able to qualify to produce the SLEEVbolt® in far less time than would have been possible without PB Fasteners' confidential, proprietary, and trade secret information. Indeed, Briles Aerospace lacked the capital and independent manufacturing expertise to re-create the SLEEVbolt® when it began its efforts to qualify with Boeing.

11.     Lisi USA, Lisi Canada, and Lisi France (collectively, "Lisi Aerospace") also misappropriated PB Fasteners' trade secret information related to the SLEEVbolt®.  Like Briles Aerospace, Lisi Aerospace acquired PB Fasteners' trade secrets through improper means to develop its copy of the SLEEVbolt®.  As one example, Lisi Aerospace gained access to these trade secrets through a former employee of Plaintiff, Larry Kline, who had detailed knowledge of that information. Mr. Kline was subject to a confidentiality agreement that prohibited the disclosure or use of Plaintiff's confidential, proprietary, and trade secret information.  As another example, Lisi Aerospace began to work with Boeing to obtain qualifications to produce the SLEEVbolt® through a process similar to the process that Briles Aerospace had pursued with Boeing to develop its copy of the SLEEVbolt®.  During this qualification process,

4

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5       12.     Space-Lok and Montgomery Machine also misappropriated PB

6 Fasteners' trade secrets to develop a copy of the SLEEVbolt®.  Like Briles Aerospace

7 and Lisi Aerospace, Space-Lok and Montgomery Machine obtained these trade

8 secrets through the qualification process with Boeing.  ████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 █████████████████████████████████████   ████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████

26       13.     Briles Aerospace and Lisi Aerospace were able to qualify to produce the

27 SLEEVbolt® for Boeing only because they acquired PB Fasteners' trade secret

28 information through improper means and/or improperly used that information.

1 ██████████████████████████████████████████████████████████

2 ███████████████████   only because they acquired PB Fasteners' trade secret

3 information through improper means and/or improperly used that information.

4      14.    In September 2018, Boeing issued a new Request for Proposal ("RFP")

5 for a SLEEVbolt® with a minor machined "notch" on the head of the tapered bolt.

6 Before issuing this new RFP, Briles Aerospace and Lisi Aerospace had worked with

7 Boeing to develop the "notched" design revision, thereby encouraging Boeing to

8 breach its contractual obligations to PB Fasteners and interfering with Boeing and PB

9 Fasteners' ongoing and prospective contractual and business relations.

10      15.    In connection with that RFP, Boeing disclosed to PB Fasteners for the

11 first time that it had qualified Briles Aerospace and Lisi Aerospace as additional

12 manufacturers of the SLEEVbolt®.   Neither of these manufacturers could have

13 obtained the necessary qualifications without misappropriating PB Fasteners'

14 proprietary information. ████████████████████████████████

15 ██████████████████████████████████████████████████████████

16 ██████████████████████

17      16.    Instead of promoting legitimate competition in the market for aerospace

18 fasteners, Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine

19 stole PB Fasteners' trade secrets.  The trade secret and proprietary information stolen,

20 misused, and misappropriated by Defendants was the result of many years of

21 investment, research, and development.  In response to Defendants' misconduct, PB

22 Fasteners brings this Complaint to prevent any further misuse of its proprietary

23 information, to prevent Defendants from undermining its business and reputation, and

24 to obtain compensation for its damages and for Defendants' unjust enrichment

25 resulting from their unlawful conduct.

26 **II.   PARTIES**

27      17.    SPS Technologies, LLC is a limited liability company organized and

28 existing under the laws of Pennsylvania.  Its principal place of business is at 4650 SW

Macadam Ave., Portland, Oregon 97239.  As set forth below, SPS Technologies, LLC owns all of the proprietary, confidential, and trade secret information that Defendants misappropriated.  SPS Technologies, LLC owns and operates a manufacturing facility at 1700 W. 132nd St., Gardena, California 90249, under the name PB Fasteners.

18.     Briles Aerospace, Inc. is a California corporation with its principal place of business at 1559 West 135th St., Gardena, California 90249.

19.     Michael Briles is a resident, domiciliary, and citizen of California. Michael Briles is the founder and President of Briles Aerospace, Inc., the nephew of Robert Briles, and the son of Richard Briles.  Before founding Briles Aerospace, Inc., Michael Briles was an employee of PB Fasteners.

20.     Robert Briles is a resident, domiciliary, and citizen of California.  He is the former President of PB Fasteners, the uncle of Michael Briles, and the brother of Richard Briles.  Robert Briles is the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991.

21.     Richard Briles is a resident, domiciliary, and citizen of California.  He is a former Director of PB Fasteners, the father of Michael Briles, and the brother of Robert Briles.  He is the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990.

22.     HI-SHEAR Corp. is a Delaware corporation with its principal place of business at 2600 Skypark Drive, Torrance CA 90509.

23.     Lisi Aerospace North America, Inc. is a Delaware corporation with its principal place of business at 2600 Skypark Drive, Torrance CA 90509.

24.     Lisi Aerospace Canada Corp. is a Canadian company with its principal place of business at 2000 Place Transcanadienne, Dorval, Quebec, H9P 2X5, Canada.

25.     Blanc Aero Industries SAS is a French company with its principal place of business at 45/52 Quai de la Râpée, 75012 Paris 12, France.

26.     Space-Lok, Inc. is a California corporation with its principal place of business at 6300 Ridglea Place Suite 914, Fort Worth TX 76116.  Space-Lok, Inc.

owns and operates a manufacturing facility at 13306 Halldale Ave., Gardena CA 90249.

27.     Montgomery Machine Co., Inc. is a Texas corporation with its principal place of business at 1005 Mae Drive, Houston TX 77015.

## III.    JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over PB Fasteners' federal trade secret claims pursuant to 18 U.S.C. §§ 1836 *et seq.* and 28 U.S.C. § 1331.  The Court has subject matter jurisdiction over PB Fasteners' federal Lanham Act claim pursuant to 15 U.S.C. §§ 1051 *et seq.* and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law claims alleged in this Second Amended Complaint pursuant to 28 U.S.C. § 1367.

29.     The Court has personal jurisdiction over Briles Aerospace because Briles Aerospace resides in California and/or does business in California.

30.     The Court has personal jurisdiction over Michael Briles because he is a resident, domiciliary, and citizen of California, and/or because he does business in California.

31.     The Court has personal jurisdiction over Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) because he is a resident, domiciliary, and citizen of California, and/or because he has done business in California.

32.     The Court has personal jurisdiction over Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990) because he is a resident, domiciliary, and citizen of California, and/or because he has done business in California.

33.     The Court has personal jurisdiction over HI-SHEAR Corp. because HI-SHEAR Corp. resides in California and/or does business in California.

34.     The Court has personal jurisdiction over Lisi Aerospace North America, Inc. because Lisi Aerospace North America, Inc. resides in California and/or does business in California.

35.     The Court has personal jurisdiction over Lisi Aerospace Canada Corp. because Lisi Aerospace Canada Corp. has committed and continues to commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and, upon information and belief, ships infringing products into the State of California, including this District. The acts of Lisi Aerospace Canada Corp. cause deliberate injury to PB Fasteners within this District.   Upon information and belief, Lisi Aerospace Canada Corp. derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

36.     The Court has personal jurisdiction over Blanc Aero Industries SAS because Blanc Aero Industries SAS has committed and continues to commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and, upon information and belief, ships infringing products into the State of California, including this District. The acts of Blanc Aero Industries SAS cause deliberate injury to PB Fasteners within this District.   Upon information and belief, Blanc Aero Industries SAS derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

37.     The Court has personal jurisdiction over Space-Lok, Inc. because Space-Lok, Inc. resides in California and/or does business in California.

38.     The Court has personal jurisdiction over Montgomery Machine Co., Inc. because, upon information and belief, Montgomery Machine Co., Inc. has committed and continues to commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and ships infringing products into the State of California, including this District.   The acts of Montgomery Machine Co., Inc. cause deliberate injury to PB Fasteners within this District.   Upon information and belief, Montgomery Machine

Co., Inc. derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

39.     Venue is proper within this District under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims alleged in this Second Amended Complaint occurred in this judicial district and because Lisi Aerospace Canada Corp. and Blanc Aero Industries SAS are not resident in the United States.

## IV.    FACTUAL ALLEGATIONS

### A.    PB Fasteners Develops the SLEEVbolt® System.

40.     PB Fasteners specializes in the manufacture of high-strength aerospace fasteners.  The company was founded in 1967, and now maintains a 100,000 square foot manufacturing facility in Gardena, California, where it has about 250 employees.

41.     Aerospace fasteners are subject to demanding specifications relating to temperature, corrosion, weight, geometry, fatigue, and conductivity.  As a result, the aerospace fastener industry requires significant engineering expertise.

42.     PB Fasteners is a leader in the design and manufacture of high-strength aerospace fasteners.

43.     One of the earliest inventions covered by a PB Fasteners trademark was the Taper-Lok®, which is an integrated fastening system used specifically for applications requiring precise levels of interference fit between the bolt and the materials being joined.

44.     The Taper-Lok® system is comprised of a tapered, conical-shank fastener, which is installed into a precision tapered hole.  The interference fit between the Taper-Lok® and the tapered hole induces static radial compression.

45.     The benefit of the Taper-Lok® system is that it effectively reduces fatigue and enhances the life of the joint.  The requirement of drilling a precisely

tapered hole to exact dimensions requires additional expertise and cost during aircraft assembly.

46.    PB Fasteners developed the SLEEVbolt® system to capture the benefits of the Taper-Lok® system without incurring the additional cost at installation.

47.    The SLEEVbolt® system is an advanced-concept fastening system with critical applications in commercial and military aircraft.  The SLEEVbolt® system combines a tapered bolt made of titanium or nickel superalloy with a stainless steel sleeve.

48.    Because the SLEEVbolt® is delivered in a semi-expanded state and the outside diameter of the sleeve is straight, not tapered, the assembly process is easier and less expensive than the Taper-Lok® system.  With the SLEEVbolt® system the assembler can drill a straight hole instead of a tapered hole.  Because the diameter of that straight hole is very close to the outer diameter of the sleeve in its semi-expanded state, the assembler simply drops the SLEEVbolt® into the hole and drives the bolt the rest of the way into the sleeve, which expands the outer diameter of the sleeve to create the exact amount of necessary radial compression and interference between the SLEEVbolt® and the components that it joins.

49.    For the SLEEVbolt® system to function properly, the outer diameter of the sleeve must expand in a precise, uniform, and consistent way as the bolt is fully driven into the sleeve.  The dimensions, formulae, and processes for manufacturing and assembling the bolt and sleeve that were developed by PB Fasteners are necessary to make that expansion happen correctly in the SLEEVbolt® system.

50.    The SLEEVbolt® comes in two forms: a protruding head version, used to fasten structural components such as the wing box of the aircraft, and a flush head version, used to fasten surface components such as the skins to the wings of the aircraft.

51.    The SLEEVbolt® system offers significant benefits over competing aerospace fasteners:

a.    It provides a uniform interference fit with radial compression between the fastener and secured aircraft components, which reduces structural fatigue at the joint;

b.    It provides critical lightning strike protection in composite structures by ensuring that there are no gaps in the conductive electrical circuits of the aircraft;

c.    It provides superior joint strength through more even load distribution, thus requiring fewer fasteners than conventional methods; and

d.    It does not delaminate composite structures.

52.    The tapered bolt and sleeve are made and assembled with confidential and proprietary dimensions, formulae, and processes, which are essential to the proper manufacture and functioning of the SLEEVbolt® system.

53.    These confidential and proprietary dimensions, formulae, and processes are not generally known or readily ascertainable.

54.    PB Fasteners developed its dimensions, formulae, and processes through many years of research and testing, which required significant engineering expertise, the invention of manufacturing tools and machinery, recruitment and training of specialized employees, investment in certifications, and industry experience and know-how.

55.    PB Fasteners has made extensive efforts to maintain the secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary dimensions, formulae, and processes, and performing exit interviews with departing employees.

56.    Although PB Fasteners has disclosed some of its proprietary dimensions, formulae, and processes to authorized business customers, vendors, or licensees, it has informed recipients of such information that the information is proprietary, has

required recipients of such information to maintain its confidentiality, and the recipients of such information have understood that they must maintain the confidentiality of this information.

### B.    Boeing Depends on the SLEEVbolt® System.

57.    PB Fasteners has been a major supplier of aerospace fasteners to Boeing for more than forty years.

58.    The relationship between PB Fasteners and Boeing assumed greater significance with the development of composite aircraft in the late 2000s.  Unlike conventional metal airframes that readily conduct electricity, composite aircraft require the manufacturer to engineer conductive electrical circuits to withstand lightning strikes.  The SLEEVbolt® system plays an important role in ensuring lightning strike protection for Boeing's composite 787 and 777X aircraft.

59.    Boeing and PB Fasteners operate under a contract that requires Boeing to purchase 90% of the SLEEVbolt® requirements for its 787 aircraft from PB Fasteners through December 31, 2021.

60.    Before September 2018, no other manufacturer of aerospace fasteners had ever supplied SLEEVbolts® to Boeing without first obtaining a license to use PB Fasteners' proprietary information.

61.    As part of its relationship with PB Fasteners, Boeing has required that it be allowed to "qualify" PB Fasteners by visiting its facilities to verify that the facilities and its processes are adequate.  Boeing representatives performed in-person inspections at PB Fasteners, where they had access to PB Fasteners' confidential and proprietary dimensions and processes.

62.    In addition, in connection with qualifications of specific fasteners, including SLEEVbolts®, Boeing has required the exchange of part specification documents with PB Fasteners.  Such documents include PB Fasteners' confidential and proprietary dimensions and processes.

63.     Although PB Fasteners has provided Boeing access to its dimensions and processes, PB Fasteners has insisted that such information is proprietary and must remain confidential, PB Fasteners and Boeing have contractually agreed to maintain the confidentiality of such information, and Boeing has understood that it must maintain the confidentiality of such information.

**C.      SPS Jenkintown Is Unable to Re-create the SLEEVbolt® System.**

64.     In the 2000s, Boeing recognized that the SLEEVbolt® system was critical to its manufacture of composite aircraft.  As a result, Boeing identified SPS Jenkintown as a potential SLEEVbolt® manufacturer to diversify its supply chain.

65.     SPS Jenkintown is a premier manufacturer of high-strength aerospace fasteners with nearly a century of engineering experience and industry know-how.

66.     PB Fasteners granted SPS Jenkintown a license to use its proprietary information, including specifically its trade secrets.  PB Fasteners also provided SPS Jenkintown with in-person training and support as it attempted to manufacture the SLEEVbolt® system.  Those efforts lasted for more than eighteen months.

67.     Despite SPS Jenkintown's extensive engineering expertise, industry know-how, and access to PB Fasteners' proprietary information, it was unable to consistently manufacture the SLEEVbolt® system for Boeing using its own parts. Instead, Jenkintown could consistently manufacture the SLEEVbolt® system for Boeing only by purchasing the sleeves from PB Fasteners, which SPS Jenkintown continued to do for the duration of its license.

**D.      Plaintiff Purchases the SLEEVbolt® System, and Briles Aerospace Steals It Back.**

68.     SPS Technologies, LLC purchased the assets of Paul R. Briles, Inc. d/b/a PB Fasteners in October 2011.

69.     Before the acquisition, Robert Briles was the President of, and a shareholder in, PB Fasteners for many years.  As a result, Robert Briles had access to, and detailed knowledge of, all of PB Fasteners' confidential and proprietary

1  information, including without limitation the trade secret dimensions, formulae, and

2  processes that are essential to the manufacture of the SLEEVbolt®.

3      70.    During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets

4  by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc.

5  represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets,

6  including specifically the processes used in the manufacture of the SLEEVbolt®

7  system.  Robert Briles made this representation on behalf of, and as authorized by,

8  the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an

9  individual and as the Trustee of the Rob Briles Revocable Family Trust dated March

10  28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and

11  Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles

12  made this representation to Plaintiff, among other occasions, on June 7, 2011 during

13  a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and

14  representatives of the Federal Trade Commission.

15      71.    In the Asset Purchase Agreement ("APA") with SPS Technologies, LLC,

16  the Directors and shareholders of Paul R. Briles, Inc. further represented (i) that Paul

17  R. Briles, Inc.'s intellectual property rights included trade secrets, *see, e.g.*, APA

18  definition of Intellectual Property Rights, (ii) that Paul R. Briles, Inc. owned such

19  trade secrets free and clear, *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc.

20  was aware of no improper use of such trade secrets by others, *see, e.g.*, APA Section

21  4.8.3, and (iv) that the assets acquired by SPS Technologies, LLC included all such

22  trade secrets, *see, e.g.*, APA Section 2.1.5.  Robert Briles made this representation on

23  behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc.,

24  including Robert Briles (as an individual and as the Trustee of the Rob Briles

25  Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual

26  and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated

27  December 12, 1990).  Robert Briles made this representation to Plaintiff, among other

28

1   occasions, on May 4, 2011 (the date of the APA), September 27, 2011 (the date of

2   Amendment No. 1 to the APA), and October 4, 2011 (the APA closing date).

3          72.    During this litigation, in Robert Briles's Responses (served June 28,

4   2019) to Plaintiff's First Set of Interrogatories, Robert Briles asserted that he has no

5   knowledge of confidential, proprietary, and/or trade secret information relating to the

6   SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies,

7   LLC in connection with the APA.  Thus, in effect, Robert Briles now asserts that,

8   before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions,

9   formulae, and processes that Plaintiff has identified in this lawsuit and/or that such

10   dimensions, formulae, and processes are not trade secret or proprietary information.

11   This assertion is false.

12          73.    If Robert Briles's assertion is correct—and Plaintiff maintains that it is

13   clearly false—then, in the alternative, (i) the representation of the Directors and

14   shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as

15   the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and

16   Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles

17   Family Revocable Trust dated December 12, 1990), that Paul R. Briles, Inc. owned

18   trade secrets was false; (ii) the Directors and shareholders of Paul R. Briles, Inc. knew

19   that the representation that Paul R. Briles, Inc. owned trade secrets was false when

20   they made it, or they made such representation recklessly and without regard for its

21   truth; (iii) the Directors and shareholders of Paul R. Briles, Inc. intended that Plaintiff

22   rely on the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff

23   entered into, amended, and closed on the APA; and (iv) Plaintiff reasonably relied on

24   the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff entered

25   into, amended, and closed on the APA.

26          74.    In addition, if Robert Briles's assertion is correct—and again Plaintiff

27   maintains that it is clearly false—then in the alternative, (i) the Directors and

28   shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as

the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), intentionally failed to disclose to Plaintiff that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or did not take reasonable measures to protect the secrecy of its trade secrets, such that the representation about Paul R. Briles, Inc.'s ownership of trade secrets was deceptive; (ii) Plaintiff could not have discovered this material information, which was in the exclusive control of Paul R. Briles, Inc., Robert Briles, and Richard Briles; (iii) Plaintiff did not know that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, or closed on the APA; (iv) the Directors and shareholders of Paul R. Briles, Inc. intended to deceive Plaintiff by concealing that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA; and (v) had Plaintiff known that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets, Plaintiff reasonably would not have entered into, amended, or closed on the APA.

75.     Plaintiff paid Paul R. Briles, Inc. ▮▮▮▮▮▮▮ for its assets pursuant to the APA (benefitting the former Directors and shareholders of Paul R. Briles, Inc., including Robert Briles and Richard Briles).  This purchase price could not be justified by the value of Paul R. Briles, Inc.'s non-trade secret assets or its non-SLEEVbolt® sales at the time of the APA.  To the contrary, at that purchase price, Plaintiff understood, and was led to believe by the Directors and shareholders of Paul R. Briles, Inc., that Paul R. Briles, Inc. possessed, had maintained, and was transferring valuable trade secrets relating to the SLEEVbolt®.

76.     In consideration for the purchase of the assets of Paul R. Briles, Inc., Robert Briles was party to the APA, which is valid and enforceable.

77.     In Paragraph 6.6.5 of the APA, Robert Briles agreed to "keep confidential . . . all non-public information relating to the Acquired Business, the Acquired Assets [including all trade secrets and other proprietary rights] and Assumed Liabilities, unless and to the extent that (i) the aforementioned information becomes known or available for use by the public other than as a result of disclosure by . . . [Robert Briles], (ii) any disclosure is . . . required by Law . . . or (iii) any disclosure is requested or otherwise made in connection with Tax Returns, or pursuing and defending claims . . . ."

78.     SPS Technologies, LLC performed all material terms required under the APA.

79.     On information and belief, Robert Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace in violation of the APA.

80.     In consideration for his employment by PB Fasteners after the assets were acquired by SPS Technologies, LLC, Robert Briles entered into a valid and enforceable Employee Patent & Confidentiality Agreement ("Employee Agreement") with PB Fasteners in September 2011.

81.     In Paragraph 5 of the Employee Agreement, Robert Briles agreed "[n]ot to disclose directly or indirectly, publish or in any other way reveal to any unauthorized person at any time during or subsequent to [his] employment, or to utilize subsequent to [his] employment by the Company any knowledge not already available to the public respecting the Company's Inventions or other private or confidential matters of the Company and its business acquired or developed by [him] during the course of [his] employment, without first obtaining the Company's permission in a writing signed on behalf of the Company by its President."

82.    In Paragraph 6 of the Employee Agreement, Robert Briles also agreed that on leaving PB Fasteners, he would "promptly hand over all drawings and copies thereof, tables, notes, notebooks, correspondence and other written, printed or photographed material in [his] possession or control relating to . . . private or confidential matters of the Company and its business, and not retain any such document or writing."

83.    In Paragraph 8 of the Employee Agreement, Robert Briles also agreed (a) "to hold [PB Fasteners'] Confidential Information in strict confidence, (b) not to disclose the Confidential Information to any person (other than in the regular business of the Company), and (c) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of the Company."

84.    In Paragraph 11 of the Employee Agreement, Robert Briles also agreed "that the Company possesses a proprietary interest in all of the information described [] herein and the Company has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of [him] . . . ."

85.    PB Fasteners performed all material terms required under the Employee Agreement.

86.    Robert Briles retained PB Fasteners' confidential and proprietary information in violation of the Employee Agreement.

87.    On information and belief, Robert Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace in violation of the Employee Agreement.

88.    On information and belief, Briles Aerospace is using PB Fasteners' confidential and proprietary information that it obtained from Robert Briles to manufacture  SLEEVbolts®.

89.    In May 2011, Michael Briles was PB Fasteners' Director of Sales and Marketing.  In consideration for his employment by PB Fasteners, Michael Briles

19

SECOND AMENDED COMPLAINT

entered into a valid and enforceable Employee Patent & Confidentiality Agreement ("Employee Agreement") with PB Fasteners in September 2011.

90.     In Paragraph 5 of the Employee Agreement, Michael Briles agreed "[n]ot to disclose directly or indirectly, publish or in any other way reveal to any unauthorized person at any time during or subsequent to [his] employment, or to utilize subsequent to [his] employment by the Company any knowledge not already available to the public respecting the Company's Inventions or other private or confidential matters of the Company and its business acquired or developed by [him] during the course of [his] employment, without first obtaining the Company's permission in a writing signed on behalf of the Company by its President."

91.     In Paragraph 6 of the Employee Agreement, Michael Briles also agreed that on leaving PB Fasteners, he would "promptly hand over all drawings and copies thereof, tables, notes, notebooks, correspondence and other written, printed or photographed material in [his] possession or control relating to . . . private or confidential matters of the Company and its business, and not retain any such document or writing."

92.     In Paragraph 8 of the Employee Agreement, Michael Briles also agreed (a) "to hold [PB Fasteners'] Confidential Information in strict confidence, (b) not to disclose the Confidential Information to any person (other than in the regular business of the Company), and (c) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of the Company."

93.     In Paragraph 11 of the Employee Agreement, Michael Briles also agreed "that the Company possesses a proprietary interest in all of the information described [] herein and the Company has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of [him] . . . ."

94.     PB Fasteners performed all material terms required under the Employee Agreement.

95.     Shortly after the acquisition of the assets of PB Fasteners, Michael Briles left the company and later founded Briles Aerospace.

96.     In violation of the Employee Agreement, Michael Briles retained PB Fasteners' confidential and proprietary information, ████████ ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

97.     Michael Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Briles Aerospace, Robert Briles, and others in violation of the Employee Agreement.

98.     Briles Aerospace is using PB Fasteners' confidential and proprietary information that it obtained from Michael Briles to manufacture SLEEVbolts®.

99.     Briles Aerospace initially manufactured and provided only standard products and services for the aerospace industry.  At this time, Briles Aerospace lacked the capital, manpower, and manufacturing expertise to develop a copy of the SLEEVbolt®.

100.   When standard products and services failed to yield sufficient profits, however, Briles Aerospace began working to misappropriate the SLEEVbolt®.

101.   To develop a copy of the SLEEVbolt®, Briles Aerospace relied on former PB Fasteners employees, including Michael Briles, Robert Briles, and multiple others.

102.   Each of these former employees had detailed knowledge of PB Fasteners' proprietary information, as well as PB Fasteners' contractual and ongoing business relationship with Boeing.  These former employees are using PB Fasteners' confidential and proprietary information to manufacture SLEEVbolts® for Briles Aerospace.

103.   Consistent with PB Fasteners' standard practice, each of the former employees signed a confidentiality agreement in which they agreed they would not

1  disclose any proprietary information outside PB Fasteners and that they would not use
2  any proprietary information except as necessary in connection with their work for PB
3  Fasteners.

4       104.   Briles Aerospace also acquired PB Fasteners' trade secret information
5  through improper means during the qualification process with Boeing.

6       105.   The qualification process required Briles Aerospace to complete two
7  steps. First, it had to qualify its facilities.  On information and belief, Briles Aerospace
8  received PB Fasteners' proprietary information during this qualification process
9  through documents exchanged with Boeing, as well as through in-person visits and
10 inspections and telephone calls with the same Boeing representatives who previously
11 had gained access to the confidential, proprietary, and trade secret information of PB
12 Fasteners (including Joseph Hinton and Todd Hubbell).

13      106.   Second, Briles Aerospace had to qualify its manufacture of the
14 SLEEVbolt®.   On information and belief, Briles Aerospace also received PB
15 Fasteners proprietary information during this qualification.

16      107.   Briles Aerospace was able to obtain these qualifications from Boeing
17 only by acquiring and/or using PB Fasteners' proprietary information through
18 improper means.  Briles Aerospace does not have a license from PB Fasteners to use
19 its proprietary information.

20      108.   Briles Aerospace has attempted, and continues to attempt, to conceal its
21 misappropriation.  As one example, Michael Briles has claimed that ████████

22 ████████████████████████████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████
25 ████████████████████████████████████████████████
26 ████████████████████████████████████████████████
27 ████████████████████████████████████████████████
28 ████████████████████████████████████████████████

1

2

3

4       109.   As another example,

5

6

7

8

9

10       110.   For several years after Briles Aerospace was founded, it provided only

11   standard products and services for the aerospace industry.  During the qualification

12   process, however, Briles Aerospace claims that it reorganized its business to sell

13   SLEEVbolts® to Boeing and that such sales are now Briles Aerospace's only source

14   of revenue.   On information and belief, Briles Aerospace made such significant

15   changes only because it had taken deliberate steps to cause a disruption in the

16   contractual and ongoing business relationship between Boeing and PB Fasteners,

17   including by agreeing to sell SLEEVbolts® to Boeing in violation of Boeing's

18   contract with PB Fasteners and by working with and encouraging Boeing to breach

19   its contractual obligations to PB Fasteners.

20       **E.**    **Lisi Aerospace Steals the SLEEVbolt®.**

21       111.   To develop a copy of the SLEEVbolt®, Lisi Aerospace gained improper

22   access to Plaintiff's trade secret information from Larry Kline, who had worked

23   previously at SPS Jenkintown.  Mr. Kline was SPS Jenkintown's Director of Quality

24   before taking a position with Lisi USA in 2016.  During his employment at SPS

25   Jenkintown, Mr. Kline worked extensively on SPS Jenkintown's qualification to

26   manufacture SLEEVbolts® for Boeing, and thus had detailed knowledge of PB

27   Fasteners' trade secrets.

28

SECOND AMENDED COMPLAINT

1   ██████████████████████████████████ Mr. Kline was subject to a
2 confidentiality agreement that prohibited the disclosure or use of Plaintiff's
3 confidential, proprietary, and trade secret information. Lisi Aerospace also acquired
4 PB Fasteners' trade secret information through improper means during the
5 qualification process with Boeing. On information and belief, Lisi Aerospace
6 received PB Fasteners' proprietary information during this qualification process
7 through documents exchanged with Boeing, as well as through in-person visits and
8 inspections and telephone calls with the same Boeing representatives who had gained
9 access to the confidential, proprietary, and trade secret information of PB Fasteners
10 and who also had worked to qualify Briles Aerospace (including Joseph Hinton and
11 Todd Hubbell).

12     112. ███████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ███████████

26     113. Lisi Aerospace was able to qualify to produce SLEEVbolts® for Boeing
27 only by acquiring and/or using PB Fasteners' proprietary information through
28

SECOND AMENDED COMPLAINT

improper means.  Lisi Aerospace does not have a license from PB Fasteners to use its proprietary information.

**F.     Space-Lok and Montgomery Machine Steal the SLEEVbolt®.**

114.   Like Briles Aerospace and Lisi Aerospace, Space-Lok and Montgomery Machine acquired PB Fasteners' trade secret information through improper means during the qualification process with Boeing.  On information and belief, Space-Lok and Montgomery Machine received PB Fasteners' proprietary information during this qualification process through documents exchanged with Boeing, as well as through in-person visits and inspections and telephone calls with the same Boeing representatives who previously had gained access to the confidential, proprietary, and trade secret information of PB Fasteners and who also had worked to qualify Briles Aerospace and Lisi Aerospace (including Joseph Hinton and Todd Hubbell).

115.   ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████   ██████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████

116.   ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████

3 117. ████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 █████████ █████████████████████████████████████████████

6 ███████████████████████████████ only because they acquired PB Fasteners' trade

7 secret information through improper means and/or improperly used that information.

8 Neither Space-Lok nor Montgomery Machine has a license from PB Fasteners to use

9 its proprietary information.

10 **G.    Boeing Issues a New RFP for SLEEVbolts®.**

11 118.   Boeing issued a new RFP for SLEEVbolts® on September 21, 2018.

12 The new RFP called for a minor revision to the protruding head SLEEVbolt® by

13 including a small machined "notch" in the head of the tapered bolt.  The shape of the

14 head of the protruding bolt is irrelevant to the actual functioning of the SLEEVbolt®

15 because it plays no role in the sleeve expansion.  The "notched" product is exactly the

16 same as the SLEEVbolt® produced for Boeing by PB Fasteners that does not contain

17 the notch, with the exception of one additional cut in the side of the bolt head.  That

18 cut requires mere seconds of additional run time during the machining process.

19 119.   PB Fasteners had no advance notice of the "notched" design revision,

20 despite the fact that PB Fasteners was the creator of the SLEEVbolt® and Boeing's

21 sole supplier at the time.  Instead, Briles Aerospace and Lisi Aerospace worked with

22 Boeing to develop the "notched" design revision to encourage Boeing to breach its

23 contractual obligations to PB Fasteners and in interference with Boeing and PB

24 Fasteners' ongoing and prospective contractual and business relations.

25 120.   Because the "notched" SLEEVbolt® is essentially the same as the

26 SLEEVbolt® that does not contain the notch, the work contemplated by the RFP

27 remains subject to Boeing's contract with PB Fasteners.  As a result, Boeing is still

28 required to purchase 90% of its SLEEVbolt® requirements, including any "notched"

SLEEVbolt® requirements, for its 787 aircraft from PB Fasteners through December 31, 2021.  Nevertheless, upon information and belief, Briles Aerospace has agreed to sell more than 10% of Boeing's SLEEVbolt® requirements for Boeing's 787 aircraft, using the "notched" design as a pretext for avoiding Boeing's contractual obligations to PB Fasteners.

121.   Briles Aerospace knew of the contractual and ongoing business relationship between Boeing and PB Fasteners.

122.   Briles Aerospace worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than under Boeing's existing contract with PB Fasteners.

123.   On information and belief, Briles Aerospace intended its efforts with Boeing to result in a disruption of the contractual and ongoing business relationship between Boeing and PB Fasteners, and these efforts have caused an actual disruption of that relationship.

124.   In addition, PB Fasteners learned, for the first time, in connection with the new RFP that it had qualified Briles Aerospace and Lisi Aerospace as two new manufacturers of the SLEEVbolt®.  Neither of these manufacturers could have obtained the necessary qualifications without misappropriating PB Fasteners' proprietary information.

125.   ████████████████████████████████████████ ████████████████████████████████████████ ██████████   Before September 2018, neither Briles Aerospace nor Lisi Aerospace had sold SLEEVbolts®.

126.   Briles Aerospace and Lisi Aerospace were able to ████████ ██████████████ only by acquiring and using PB Fasteners' proprietary information through improper means.

127.   Without improper acquisition and use of PB Fasteners' trade secret and proprietary information, Briles Aerospace, Lisi Aerospace, Space-Lok, and

Montgomery Machine would not have been able to independently develop the essential dimensions and processes given their respective level of expertise and timeline for qualification.  As noted above, SPS Jenkintown was unable to re-create the SLEEVbolt® system for over eighteen months even though it had extensive engineering expertise and industry know-how, in addition to a license for PB Fasteners' proprietary information.

**H.**     **Briles Aerospace Uses Misleading Advertising to Take Business from PB Fasteners.**

128.   PB Fasteners and Briles Aerospace are competitors in the aerospace fastener market.

129.   Briles Aerospace has maintained a website on which it has advertised its products to consumers in the aerospace fasteners industry.

130.   On this website, Briles Aerospace has made the following statement in connection with the sale of its fasteners:  "Briles companies have been valued Manufacturers of High Strength Aerospace Fasteners for over half a century."

131.   This statement is misleading and has the tendency to deceive a substantial segment of its audience because it implies that Briles Aerospace has existed in some form for over fifty years.

132.   In reality, Briles Aerospace was founded in May 2012.

133.   By implying that Briles Aerospace has existed in some form for over fifty years, this statement misappropriates the industry reputation and goodwill of PB Fasteners, which was owned by relatives of Michael Briles before its assets were acquired by SPS Technologies, LLC.

134.   PB Fasteners has no relation to Briles Aerospace or Michael Briles.

135.   On information and belief, Briles Aerospace has made additional advertisements that similarly imply that Briles Aerospace has existed in some form for over fifty years.

136.   Such advertisements are likely to influence the purchasing decision of customers in the aerospace fastener market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

137.   On information and belief, Briles Aerospace made such statements for the purpose of causing a disruption in the contractual and ongoing business relationship between Boeing and PB Fasteners.

138.   On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace rather than PB Fasteners, which has resulted in a disruption in the contractual and ongoing business relationship between Boeing and PB Fasteners.

**I.     PB Fasteners Has Been, and Will Be, Severely Harmed by Defendants' Wrongful Conduct.**

139.   Defendants' wrongful conduct has caused PB Fasteners serious harm:

    a.   It has caused competitive injury to PB Fasteners by giving Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine an unfair head start in manufacturing the SLEEVbolt® system;

    b.   It has caused competitive injury to PB Fasteners by diminishing the value associated with exclusive manufacture of the SLEEVbolt®;

    c.   It has reduced the value of the proprietary information by diminishing its secrecy;

    d.   It has misappropriated the industry reputation and goodwill of PB Fasteners;

    e.   It has resulted in Boeing diverting orders for SLEEVbolts® away from PB Fasteners, which constitutes a disruption of the contractual and ongoing business relationship between PB Fasteners and Boeing;

29

1        f.     It has resulted in breach of the contractual relationship between Plaintiff, on the one hand, and Robert and Michael Briles, on the other hand.

140. The misappropriation of PB Fasteners' trade secrets by Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine will cause severe and irreparable harm to PB Fasteners if these Defendants are not enjoined. As one example, the SLEEVbolt® generates the vast majority of PB Fasteners' revenue. If these Defendants are permitted to misappropriate PB Fasteners' trade secrets, it will compel irreversible and highly detrimental changes to PB Fasteners' business. As another example, PB Fasteners has preserved the secrecy of its proprietary information for many years. If these Defendants are allowed to utilize this improperly obtained proprietary information, there is a significant threat that the value of the trade secrets would be destroyed altogether.

## FIRST CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Briles Aerospace only)

141. PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

142. PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

143. PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

SECOND AMENDED COMPLAINT

144.  PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

145.  PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

146.  In violation of PB Fasteners' rights, Briles Aerospace misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment and use of current and former PB Fasteners employees with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Briles Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Briles Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

147.  As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

148.  In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

149.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## SECOND CAUSE OF ACTION

**Violation of California Uniform Trade Secrets Act,**

**Cal. Civ. Code §§ 3426 *et seq.***

**(Alleged against Briles Aerospace only)**

150.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

151.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

152.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

153.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

154.   In violation of PB Fasteners' rights, Briles Aerospace misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment and use of current and former PB Fasteners employees with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Briles Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing,

willful, malicious, fraudulent, and oppressive.  Briles Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

155.   As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

156.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

157.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## THIRD CAUSE OF ACTION

### Violation of Lanham Act,

### 15 U.S.C. §§ 1051 *et seq.*

### (Alleged against Briles Aerospace only)

158.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

159.   Briles Aerospace has made the following statement of fact on its website in connection with the sale of its aerospace fasteners: "Briles companies have been valued Manufacturers of High Strength Aerospace Fasteners for over half a century."

160.   This statement is misleading and has the tendency to deceive a substantial segment of its audience because it implies that Briles Aerospace has existed in some form for over fifty years when in fact Briles Aerospace was founded in May 2012.  Although PB Fasteners was founded by relatives of Michael Briles, PB Fasteners has no relationship with Briles Aerospace or Michael Briles.

161.   The statement is material, as it is likely to influence the purchasing decision of customers in the aerospace fasteners market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

162.   Briles Aerospace placed this statement in interstate commerce by posting it on its website.

163.   PB Fasteners has been injured, and is likely to be injured in the future, as a result of this statement because PB Fasteners and Briles Aerospace are direct competitors in the aerospace fastener industry and Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

164.   On information and belief, Briles Aerospace has made other statements in connection with the sale of aerospace fasteners that similarly imply that Briles Aerospace has existed in some form for over fifty years.

165.   Briles Aerospace's statement was knowingly and intentionally misleading.

166.   As a direct and proximate result of Briles Aerospace's statement, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

167.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks injunctive relief to protect its legitimate business interests.

168.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of treble damages and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Violation of California False Advertising Law,

### Cal. Civ. Code § 17500

### (Alleged against Briles Aerospace only)

169.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

170.    Briles Aerospace has made the following statement of fact on its website in connection with the sale of its aerospace fasteners: "Briles companies have been valued Manufacturers of High Strength Aerospace Fasteners for over half a century."

171.    This statement is misleading because it implies that Briles Aerospace has existed in some form for over fifty years when in fact Briles Aerospace was founded in May 2012.  Although PB Fasteners was founded by relatives of Michael Briles, PB Fasteners has no relationship with Briles Aerospace or Michael Briles.

172.    Briles Aerospace knew or should have known that this statement was misleading because it was founded in May 2012.

173.    The statement is material, as it is likely to influence the purchasing decision of customers in the aerospace fasteners market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

174.    PB Fasteners has been injured and has lost money or property as a result of this statement because Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

175.    On information and belief, Briles Aerospace has made other statements in connection with the sale of aerospace fasteners that similarly imply that Briles Aerospace has existed in some form for over fifty years.

176.    On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace.

177.    As a direct and proximate result of Briles Aerospace's false advertising, PB Fasteners has sustained and will continue to sustain significant harm.  PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its false advertising, and (2) an injunction restraining Briles Aerospace from engaging in additional false advertising.

35

**FIFTH CAUSE OF ACTION**

**Violation of California Unfair Competition Law (False Advertising),**

**Cal. Civ. Code § 17200**

**(Alleged against Briles Aerospace only)**

178.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

179.   Briles Aerospace engaged in unlawful business acts and practices, as well as unfair, deceptive, untrue, or misleading advertising.  Such wrongful conduct includes without limitation the use of false and misleading advertising in violation of the Lanham Act and the California False Advertising Law, as set forth above.

180.   This wrongful conduct constitutes Briles Aerospace's business practice, as the false and misleading statement on Briles Aerospace's website has been made in connection with the sale of aerospace fasteners.

181.   PB Fasteners has been injured and has lost money and property as a result of this statement because Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

182.   On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace.

183.   As a direct and proximate result of Briles Aerospace's false advertising, PB Fasteners has sustained and will continue to sustain significant harm.   PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its false advertising, and (2) an injunction restraining Briles Aerospace from engaging in additional false advertising.

SECOND AMENDED COMPLAINT

## SIXTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (Alleged against Briles Aerospace only)

184.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

185.   Boeing and PB Fasteners operate under a valid and enforceable contract that requires Boeing to purchase 90% of the SLEEVbolt® requirements for its 787 aircraft from PB Fasteners through December 31, 2021.

186.   Briles Aerospace was aware of this contract between Boeing and PB Fasteners because it hired multiple former PB Fasteners employees with detailed knowledge of the contract and because it is well known in the industry that PB Fasteners is a major contractual supplier of aerospace fasteners, including the SLEEVbolt®, to Boeing.

187.   Although Briles Aerospace was aware of the contract between Boeing and PB Fasteners, on information and belief, Briles Aerospace agreed to sell SLEEVbolts® to Boeing in violation of Boeing's contract with PB Fasteners and worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than under Boeing's contract with PB Fasteners, all with the intent to disrupt the contractual relationship between Boeing and PB Fasteners.  On information and belief, Briles Aerospace made significant changes to its business only because it had taken such steps with the intent to cause a disruption in the contractual relationship between Boeing and PB Fasteners.

188.   Although Briles Aerospace was aware of the contract between Boeing and PB Fasteners, on information and belief, Briles Aerospace made false advertisements, as described above, with the intent to disrupt the contractual relationship between Boeing and PB Fasteners.

189.   Briles Aerospace knew that these intentional acts would result in a disruption in the contractual relationship between Boeing and PB Fasteners.

190.   These intentional acts by Briles Aerospace have disrupted the contractual relationship between Boeing and PB Fasteners.  ████████████████████████████████████████████████████████████████████████████████ Because the "notched" SLEEVbolt® at issue in the RFP is essentially the same as the SLEEVbolt® that does not contain the notch, the work contemplated by the RFP remains subject to Boeing's contract with PB Fasteners.  As a result, Boeing is required to purchase a certain percentage of its "notched" SLEEVbolt® requirements from PB Fasteners through December 31, 2021.  Rather than upholding that contractual term, however, on information and belief, Briles Aerospace has negotiated a long-term contract with Boeing for SLEEVbolts® that are subject to the contract with PB Fasteners.

191.   As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

192.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to restrain Briles Aerospace from engaging in additional intentional interference.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

## SEVENTH CAUSE OF ACTION

**Violation of California Unfair Competition Law (Interference),**

**Cal. Civ. Code § 17200**

**(Alleged against Briles Aerospace only)**

193.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

194.   Briles Aerospace engaged in unlawful business acts and practices.  Such conduct includes without limitation the intentional interference with the contractual relationship between Boeing and PB Fasteners, as set forth above.

195.   This unlawful conduct constitutes Briles Aerospace's business practice, as the intentional interference has been inflicted by Briles Aerospace as a business strategy to disrupt the contractual relationship between Boeing and PB Fasteners, which is Briles Aerospace's direct competitor in the aerospace fasteners industry.

196.   PB Fasteners has been injured and has lost money and property as a result of this interference because Briles Aerospace has caused Boeing to divert sales from PB Fasteners.

197.   As a direct and proximate result of Briles Aerospace's intentional interference, PB Fasteners has sustained and will continue to sustain significant harm. PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its intentional interference, and (2) an injunction restraining Briles Aerospace from engaging in additional intentional interference.

## EIGHTH CAUSE OF ACTION

### Intentional Interference with Prospective Business Relations

### (Alleged against Briles Aerospace only)

198.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

199.   PB Fasteners has been a major supplier of aerospace fasteners to Boeing for more than forty years.  In fact, before September 2018, the only qualified suppliers of SLEEVbolts® to Boeing were PB Fasteners and its licensee, SPS Jenkintown.  SPS Jenkintown was unable to consistently manufacture the sleeve portion of the assembly and instead used sleeves manufactured by PB Fasteners.

200.   Based on this ongoing business relationship, there was a high probability of future economic benefit to PB Fasteners from the manufacture of SLEEVbolts®

for Boeing's composite aircraft, including in connection with the RFP issued by Boeing in September 2018.

201. Briles Aerospace was aware of this ongoing business relationship between Boeing and PB Fasteners because it hired multiple former PB Fasteners employees with detailed knowledge of the ongoing relationship and because it is well known in the industry that PB Fasteners is a major supplier of aerospace fasteners, including the SLEEVbolt®, to Boeing.

202. Although Briles Aerospace was aware of the ongoing business relationship between Boeing and PB Fasteners, on information and belief, Briles Aerospace agreed to sell SLEEVbolts® to Boeing and worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than with PB Fasteners, all with the intent to disrupt the ongoing business relationship between Boeing and PB Fasteners. On information and belief, Briles Aerospace made significant changes to its business only because it had taken such steps with the intent to cause a disruption in the ongoing business relationship between Boeing and PB Fasteners.

203. Although Briles Aerospace was aware of the ongoing business between Boeing and PB Fasteners, on information and belief, Briles Aerospace made false advertisements, as described above, with the intent to disrupt the ongoing business relationship between Boeing and PB Fasteners.

204. This misconduct was independently wrongful, as it violated the Lanham Act, the California Unfair Competition Law, and California common law.

205. Briles Aerospace knew that this misconduct would result in a disruption in the ongoing business relationship between Boeing and PB Fasteners.

206. This intentional misconduct by Briles Aerospace has disrupted the ongoing business relationship between Boeing and PB Fasteners. ███████

████████████████████████████████████████████

Boeing began limited SLEEVbolt® orders to Briles Aerospace in late 2018, and, on

information and belief, Briles Aerospace has negotiated a long-term contract with Boeing based on its RFP response.  But for Briles Aerospace's intentional misconduct, PB Fasteners would have filled such orders for Boeing.

207.  As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

208.  In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to restrain Briles Aerospace from engaging in additional intentional interference.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

## NINTH CAUSE OF ACTION

### Breach of Contract (Employee Agreement)

### (Alleged against Michael Briles only)

209.  PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

210.  In September 2011, Michael Briles entered into the Employee Agreement with PB Fasteners in consideration for his employment.

211.  The Employee Agreement is valid and enforceable.

212.  PB Fasteners performed all material terms required under the Employee Agreement, including by continuing to employ Michael Briles until he voluntarily left the company.

213.  Michael Briles breached the Employee Agreement by, among other things, (1) retaining PB Fasteners' confidential and proprietary information, (2) sharing PB Fasteners' confidential and proprietary information with Briles Aerospace and others, and (3) using PB Fasteners' confidential and proprietary information at Briles Aerospace to manufacture SLEEVbolts®.

214.   As a direct and proximate result of Michael Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### Breach of Contract (APA)

### (Alleged against Robert Briles only)

215.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

216.   In May 2011, Robert Briles was party to the APA with SPS Technologies, LLC in consideration for the purchase of the assets of PB Fasteners.

217.   The APA is valid and enforceable.

218.   SPS Technologies, LLC performed all material terms required under the APA, including by purchasing the assets of PB Fasteners.

219.   On information and belief, Robert Briles breached the APA by, among other things, sharing PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace.

220.   As a direct and proximate result of Robert Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of Contract (Employee Agreement)

### (Alleged against Robert Briles only)

221.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

222.   In September 2011, Robert Briles entered into the Employee Agreement with PB Fasteners in consideration for his employment.

223.   The Employee Agreement is valid and enforceable.

224.   PB Fasteners performed all material terms required under the Employee Agreement, including by continuing to employ Robert Briles until he voluntarily left the company.

225.   On information and belief, Robert Briles breached the Employee Agreement by, among other things, (1) retaining PB Fasteners' confidential and proprietary information, (2) sharing PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace, and (3) using PB Fasteners' confidential and proprietary information at Briles Aerospace to manufacture SLEEVbolts®.

226.   As a direct and proximate result of Robert Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Intentional Misrepresentation

**(Alleged against Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990) only)**

227.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

228.   SPS Technologies, LLC purchased the assets of Paul R. Briles, Inc. d/b/a PB Fasteners in October 2011.

229.   During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets, including specifically the processes used in the manufacture of SLEEVbolt®. Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as

the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990). Robert Briles made this representation to Plaintiff, among other occasions, on June 7, 2011 during a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and representatives of the Federal Trade Commission.

230. In the APA with SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. further represented (i) that Paul R. Briles, Inc.'s intellectual property rights included trade secrets, *see, e.g.*, APA definition of Intellectual Property Rights, (ii) that Paul R. Briles, Inc. owned such trade secrets free and clear, *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc. was aware of no improper use of such trade secrets by others, *see, e.g.*, APA Section 4.8.3, and (iv) that the assets acquired by SPS Technologies, LLC included all such trade secrets, *see, e.g.*, APA Section 2.1.5. Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990). Robert Briles made this representation to Plaintiff, among other occasions, on May 4, 2011 (the date of the APA), September 27, 2011 (the date of Amendment No. 1 to the APA), and October 4, 2011 (the APA closing date).

231. During this litigation, in Robert Briles's Responses to Plaintiff's First Set of Interrogatories (served June 28, 2019), Robert Briles asserted that he has no knowledge of confidential, proprietary, and/or trade secret information relating to the SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies, LLC in connection with the APA. Thus, in effect, Robert Briles now asserts that, before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions,

formulae, and processes that Plaintiff has identified in this lawsuit and/or that such dimensions, formulae, and processes are not trade secret or proprietary information.

232.   If Robert Briles's assertion is correct then:

    a.   The representation of the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), that Paul R. Briles, Inc. owned trade secrets was false;

    b.   The Directors and shareholders of Paul R. Briles, Inc. knew that the representation that Paul R. Briles, Inc. owned trade secrets was false when they made it, or they made such representation recklessly and without regard for its truth;

    c.   The Directors and shareholders of Paul R. Briles, Inc. intended that Plaintiff rely on the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff entered into, amended, and closed on the APA; and

    d.   Plaintiff reasonably relied on the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff entered into, amended, and closed on the APA.

233.   As a direct and proximate result of this intentional misrepresentation and Plaintiff's reasonable reliance thereon, Plaintiff has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### Concealment

**(Alleged against Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an**

1   **individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable**

2   **Trust dated December 12, 1990) only)**

3       234.   PB Fasteners incorporates all of the above paragraphs as though fully set

4   forth herein.

5       235.   SPS Technologies, LLC purchased the assets of PB Fasteners Paul R.

6   Briles, Inc. d/b/a in October 2011.

7       236.   During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets

8   by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc.

9   represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets,

10   including specifically the processes used in the manufacture of the SLEEVbolt®.

11   Robert Briles made this representation on behalf of, and as authorized by, the

12   Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an

13   individual and as the Trustee of the Rob Briles Revocable Family Trust dated March

14   28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and

15   Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles

16   made this representation to Plaintiff, among other occasions, on June 7, 2011 during

17   a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and

18   representatives of the Federal Trade Commission.

19       237.   In the APA with SPS Technologies, LLC, the Directors and shareholders

20   of Paul R. Briles, Inc. further represented (i) that Paul R. Briles, Inc.'s intellectual

21   property rights included trade secrets, *see, e.g.*, APA definition of Intellectual

22   Property Rights, (ii) that Paul R. Briles, Inc. owned such trade secrets free and clear,

23   *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc. was aware of no improper

24   use of such trade secrets by others, *see, e.g.*, APA Section 4.8.3, and (iv) that the assets

25   acquired by SPS Technologies, LLC included all such trade secrets, *see, e.g.*, APA

26   Section 2.1.5.  Robert Briles made this representation on behalf of, and as authorized

27   by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as

28   an individual and as the Trustee of the Rob Briles Revocable Family Trust dated

March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles made this representation to Plaintiff on May 4, 2011 (the date of the APA), September 27, 2011 (the date of Amendment No. 1 to the APA), and October 4, 2011 (the APA closing date).

238.   During this litigation, in Robert Briles's Responses to Plaintiff's First Set of Interrogatories (served June 28, 2019), Robert Briles asserted that he has no knowledge of confidential, proprietary, and/or trade secret information relating to the SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies, LLC in connection with the APA.  Thus, in effect, Robert Briles now asserts that, before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions, formulae, and processes that Plaintiff has identified in this lawsuit and/or that such dimensions, formulae, and processes are not trade secret or proprietary information.

239.   If Robert Briles's allegation is correct then:

    a.   The Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), intentionally failed to disclose that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or did not take reasonable measures to protect the secrecy of its trade secrets, such that the representation about Paul R. Briles, Inc.'s ownership of trade secrets was deceptive;

    b.   Plaintiff could not have discovered this material information, which was in the exclusive control of Paul R. Briles, Inc., Robert Briles, and Richard Briles;

    c.   Plaintiff did not know that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures

to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA;

d. The Directors and shareholders of Paul R. Briles, Inc. intended to deceive Plaintiff by concealing that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA; and

e. Had Plaintiff known that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets, Plaintiff reasonably would not have entered into, amended, or closed on the APA.

240.   As a direct and proximate result of this concealment, Plaintiff has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Lisi USA, Lisi Canada, and Lisi France only)

241.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

242.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

243.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

244.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

245.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

246.   In violation of PB Fasteners' rights, Lisi USA, Lisi Canada, and Lisi France (collectively "Lisi Aerospace") misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the hiring of a former employee with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Lisi Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Lisi Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

247.   As a direct and proximate result of Lisi Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

248.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

249.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## FIFTEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Lisi USA, Lisi Canada, and Lisi France only)

250.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

251.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

252.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

253.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

254.   In violation of PB Fasteners' rights, Lisi USA, Lisi Canada, and Lisi France (collectively "Lisi Aerospace") misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the hiring of a former employee with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Lisi Aerospace's misappropriation of PB Fasteners' trade secret information was

intentional, knowing, willful, malicious, fraudulent, and oppressive.  Lisi Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

255.   As a direct and proximate result of Lisi Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

256.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

257.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## SIXTHTEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Space-Lok only)

258.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

259.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

260.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

261.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

262.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

263.   In violation of PB Fasteners' rights, Space-Lok misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Space-Lok's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Space-Lok has attempted, and continues to attempt, to conceal its misappropriation.

264.   As a direct and proximate result of Space-Lok's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

265.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury.

266.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## SEVENTEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Space-Lok only)

267.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

268.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

269.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

270.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

271.   In violation of PB Fasteners' rights, Space-Lok misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Space-Lok's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Space-Lok has attempted, and continues to attempt, to conceal its misappropriation.

272.   As a direct and proximate result of Space-Lok's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

273.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Absent such relief, PB Fasteners will continue to suffer irreparable injury.

274.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## EIGHTEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Montgomery Machine only)

275.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

276.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.   This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

277.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

278.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

279.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

280.   In violation of PB Fasteners' rights, Montgomery Machine misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Upon information and belief, Montgomery Machine's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Upon information and belief, Montgomery Machine has attempted, and continues to attempt, to conceal its misappropriation.

281.   As a direct and proximate result of Montgomery Machine's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

282.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury.

283.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## NINETEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Montgomery Machine only)

284.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

285.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

286.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

287.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

288.   In violation of PB Fasteners' rights, Montgomery Machine misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Upon information and belief, Montgomery Machine's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Upon information and belief, Montgomery Machine has attempted, and continues to attempt, to conceal its misappropriation.

289.   As a direct and proximate result of Montgomery Machine's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

290.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Absent such relief, PB Fasteners will continue to suffer irreparable injury.

291.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, PB Fasteners respectfully requests the following relief:

292.   Judgment in PB Fasteners' favor and against Defendants on all causes of action alleged herein;

293.   For damages in an amount to be further proven at trial, including trebling of all damages awarded with respect to the Third Cause of Action;

294.   For preliminary and permanent injunctive relief;

295.   For judgment that this is an exceptional case;

296.   For exemplary or punitive damages;

297.   For restitution;

298.   For costs of suit incurred herein;

299.   For prejudgment interest;

300.   For attorneys' fees and costs; and

301.   For such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

PB Fasteners hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: _____, 2019

_/s/_ _____

WILLIAMS & CONNOLLY LLP
Bruce R. Genderson (*pro hac vice*)
Thomas H.L. Selby (*pro hac vice*)
Daniel P. Shanahan (*pro hac vice*)
Edward C. Reddington (*pro hac vice*)
Joseph Q. Wood (*pro hac vice*)
Michelle L. Hood (*pro hac vice*)
William B. Snyderwine (*pro hac vice*)
Miranda R. Petersen (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
bgenderson@wc.com
tselby@wc.com
dshanahan@wc.com
ereddington@wc.com
jwood@wc.com
mhood@wc.com
wsnyderwine@wc.com
mpetersen@wc.com

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
1990 S. Bundy Drive, Suite 705
Los Angeles, CA 90025
Telephone:  (310) 826-4700
Facsimile:  (310) 826-4711
matthew@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for SPS Technologies, LLC*

58

# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

6      SPS TECHNOLOGIES, LLC,          )
                                       )
7              Plaintiff,              )
                                       )
8                  vs.                 )
                                       )   2:18-CV-9536-MWF (ASx)
9      BRILES AEROSPACE, INC., et al., )
                                       )
10             Defendants.             )
       _____)

11

12

13                   REPORTER'S TRANSCRIPT OF HEARING

14                      Los Angeles, California

15                   Thursday, February 21, 2019

16

17

18          _____

19

20

21

22                    AMY DIAZ, RPR, CRR, FCRR
                      Federal Official Reporter
23                    350 West 1st Street, #4455
                      Los Angeles, CA 90012
24

25       *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1          APPEARANCES OF COUNSEL:

 2
            For the Plaintiff:
 3

 4                        WILLIAMS & CONNOLLY LLP
                          By:  Daniel P. Shanahan, Attorney at Law
 5                             William B. Snyderwine, Attorney at Law
                               Joseph Q. Wood, Attorney at Law
 6                        725 Twelfth Street N.W.
                          Washington, D.C. 20005
 7
                          SPERTUS LANDES & UMHOFER LLP
 8                        By:  Matthew Umhofer, Attorney at Law
                          1990 South Bundy Drive, Suite 705
 9                        Los Angeles, California 90025

10

11
            For Defendants:
12
                          QUINN EMANUEL
13                        By:  Christopher A. Mathews, Attorney at Law
                               Duane R. Lyons, Attorney at Law
14                             Tigran Guledjian, Attorney at Law
                          865 South Figueroa Street, 10th Floor
15                        Los Angeles, California 90017

16
                          ATKINSON ANDELSON LOYA RUUD & ROMO
17                        By:  Jon Setoguchi, Attorney at Law
                               Brian M. Wheeler, Attorney at Law
18                        12800 Center Court Drive Suite 300
                          Cerritos, California 90703
19

20

21

22

23

24

25
```

1          And the case law is very clear that if you can

2     continue to work in the industry, there is really no harm

3     that is happening to you in the balance of harms.

4          So in our view, the people that stole our

5     information to compete with us, should be the ones that bear

6     the burden of the harm there.

7          THE COURT:  All right.  Thank you, counsel.

8          In regard to the trial date, this was just my flat

9     out mistake where I issued the second -- just the second

10    trial setting order, but basically -- so I'm vacating all

11    that.

12         So basically what I want us to do if we can right

13    now, to figure out a Tuesday -- what is the earliest Tuesday

14    in which it makes sense to try this case?  And if counsel

15    want to confer on that and then give a suggestion.  Look, it

16    clearly can't happen before July.  That doesn't make any

17    sense.  But in July there is the Ninth Circuit conference.

18    In August I'm on vacation.  In September, I have a criminal

19    case starting on September 10th.  It will go at least a week.

20    I think it will probably end up going more than that.  It's

21    very, very likely to go on that date.  I don't expect there

22    will be a further continuance, and I don't expect that there

23    will be a change of plea.

24         So what that leaves us, then, is sometime in October

25    to try this case.  So if you want to talk to each other about

1    what Tuesday in October works, then let Ms. Sanchez know,

2    then that is fine, and then I can issue a Scheduling Order.

3            If it turns out one of those dates is just a real

4    problem for one of you, we can have a telephonic conference

5    and work it out.  If you can't agree on just -- on that date

6    or some of the other dates that are important, you know, such

7    as there is the worksheet, you've seen it.  I mean, what I

8    would like is that you could agree on that and just submit it

9    to me.  If you can't, then we can have a telephonic hearing

10   when you are available and figure out what the dates are

11   going to be.

12           But is there any -- right now, just a bit of a

13   bigger picture, is there anybody who thinks, given all the

14   work that you have already put into the case, that this case

15   would not be ready to try in October?

16           MR. SHANAHAN: Your Honor, I actually think we could

17   be ready to try this case in July.

18           THE COURT:  Yeah, but then there is the issue of

19   the -- there is the issue of the Ninth Circuit conference,

20   so -- and ordinarily I would even consider missing it, except

21   I'm the chair of the Attorney Liaison Committee, so I really

22   have to go, you know.

23           MR. SHANAHAN: Is that the whole month?

24           THE COURT:  No, it's just -- it's the week of the

25   23rd.  But then you've got, earlier than that, there is

1      July 4th.  It just doesn't seem like it's real -- how long,

2      in your view, how long is the case going to take to try?

3              MR. SHANAHAN: Eight to ten days.

4              THE COURT:  Okay.  All right.  Does anybody want to

5      be heard on the defense side?

6              MR. LYONS: If I can have just a moment, Your Honor?

7              THE COURT:  You may.

8              (Pause in proceedings.)

9              MR. SHANAHAN: Your Honor, October 1st would work

10     with our schedule if October is the first available.

11             THE COURT:  Have there formally been the initial

12     disclosures, or has all of that kind of gotten subsumed into

13     the --

14             MR. SHANAHAN: I think all of that got subsumed.

15     Initially there was an order for a status conference today,

16     so we were starting under that, and then it moved to a month

17     from now.  We put them on hold a little bit to get through

18     today and do the initial disclosures.

19             THE COURT:  I understand.  I'm not complaining, I'm

20     just asking.

21             MR. LYONS: Your Honor, I mean, just informal, we

22     haven't talked to the client, I think looking at our

23     calendar, I think the 22nd or 29th of October would be better

24     for us.

25             THE COURT:  Well, that is close enough.  Just talk

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    to each other and see if you can resolve it.  I'm obviously,

2    even regardless of what the issue, what the decision I make

3    about the equitable relief, there is a reason to have the

4    trial be earlier instead of later.  I mean, whoever is going

5    to be on the losing end of this decision should want an

6    earlier trial date.

7           So talk to each other and see if you can agree on a

8    trial date, and use the worksheet that you got in my prior

9    orders, and see if you can agree on the dates.  If you can't,

10   then just, you know, submit your separate proposals with your

11   own worksheet, and maybe a couple of pages of text to explain

12   why you think you want your proposal and why you think it's

13   superior.  And if need be, we'll have a telephonic conference

14   and talk about it.

15          Beyond that, let me then set for by March 11th,

16   formally make the Rule 26 disclosures, so there is a record

17   as to what was disclosed.  And obviously, don't spend a lot

18   of money, you know, to the extent you just want to say, All

19   documents that were used, produced in the earlier discovery,

20   or all documents that were exhibits at a deposition, you

21   know, just whatever makes it easy on you.  But in case there

22   is later an argument that something was not disclosed, I want

23   there to be a piece of paper that I can look at to see

24   whether that argument makes sense or not.  And clearly,

25   regardless of in addition to whoever already has been

1     deposed, the case has to go forward, and there is going to be

2     a business dispute in damages regardless.  So that all means

3     that the -- I want there to be very robust, you know, Rule 26

4     disclosures.

5              All right.  Counsel, any other questions, then,

6     about how we are proceeding from today?

7              MR. SHANAHAN: Not from us, Your Honor.  Thank you.

8              MR. LYONS: Nothing, Your Honor.

9              THE COURT:  All right.  Thank you, counsel.  Thank

10    you for coming out.  The weather is not much better here than

11    it is in D.C., but at least it's not snowing.

12             Mr. Umhofer, a pleasure to see you.  Mr. Lyons, a

13    pleasure to see you.  I'm sure I will be seeing all of you

14    many times in the future.  Thank you, counsel.

15                      *****     *****     *****

16

17    I certify that the foregoing is a correct transcript from the

18    record of proceedings in the above-titled matter.

19

20

21

22    --------------------------

23

24    Amy C. Diaz, RPR, CRR            March 1, 2019

25    S/  Amy Diaz


AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

# EXHIBIT 3

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 4

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 5

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 6

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SPS TECHNOLOGIES, LLC d/b/a<br>PB FASTENERS,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>THE BOEING COMPANY,<br><br>　　　　　Respondent. | Case No. 19 C 3365<br><br>Magistrate Judge Sunil R. Harjani |

**MEMORANDUM OPINION AND ORDER**

Petitioner SPS Technologies, LLC d/b/a PB Fasteners ("PB Fasteners") moves to enforce a subpoena directed to The Boeing Company, a non-party in a trade secrets case being litigated in the United States District Court for the Central District of California. After PB Fasteners' motion was fully briefed, the Court heard oral argument on May 28, 2019. For the reasons explained below, Petitioner's Motion to Enforce Subpoena for the Production of Documents Issued to The Boeing Company [1] is granted in part and denied in part. The Boeing Company shall comply with this Opinion by June 18, 2019. A status hearing is set for June 20, 2019 at 9:15 a.m.

**BACKGROUND**

PB Fasteners is a designer and manufacturer of high-strength aerospace fasteners "with more than fifty years of experience in the industry." (Doc. 1-1 at 71, First Am. Cmplt. ¶ 1). PB Fasteners' website says that it "is best known for [its] developed Taper-Lok® and SLEEVbolt® fastening systems, which are used to enhance structural performance and manage electromagnetic effects in composite and multi-metal structure." https://www.pccfasteners.com/companies/pcc-fasteners/pb-fasteners.html. PB Fasteners alleges that its "tapered bolt and sleeve are made and assembled with confidential and proprietary specifications, dimensions, and processes, which are

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 84 of 131   Page ID
#:9550
Case 1:19-cv-03365   Document #: 21   Filed: 06/04/19   Page 2 of 49   PageID #:137

essential to the proper manufacture and functioning of the SLEEVbolt®" and were developed
through many years of research and testing. (First Am. Cmplt. ¶¶ 5, 6). PB Fasteners claims that
these "specifications, dimensions, and processes are not generally known or readily ascertainable."
*Id*. ¶ 6. PB Fasteners also alleges that it has made extensive efforts to maintain the secrecy of its
SLEEVbolt® information. *Id*.

The primary consumer of the SLEEVbolt® system is The Boeing Company, which has
been a customer of PB Fasteners for more than forty years. (First Am. Cmplt. ¶ 7). Boeing and
PB Fasteners have a contract for the production of SLEEVbolts® for use in Boeing's composite
787 aircraft as well as short-term purchase orders for the production of SLEEVbolts® for Boeing's
composite 777X aircraft. *Id*. The contract for the 787 aircraft requires Boeing to purchase 90% of
the SLEEVbolt® requirements for its 787 aircraft from PB Fasteners through December 31, 2021.
*Id*. ¶¶ 7, 44. As part of their contractual and ongoing business relationship, PB Fasteners gave
Boeing access to its propriety SLEEVbolt® information, which Boeing needed to properly inspect
and approve the SLEEVbolts® and integrate them into its aircraft assembly process. *Id*. ¶ 7. PB
Fasteners alleges that it "communicated all proprietary information to Boeing with the explicit
condition that the information would remain confidential." *Id*.

The underlying case in the Central District of California arises in part from the alleged
trade secret misappropriation of PB Fasteners' SLEEVbolt® system by Briles Aerospace, Inc.,
Michael Briles, and Robert Briles (collectively the "Briles Defendants"). PB Fasteners and Briles
Aerospace are competitors in the aerospace fastener market. (First Am. Cmplt. ¶ 97). In May
2011, Michael Briles was the Director of Sales and Marketing at PB Fasteners. *Id*. ¶¶ 8, 59.
Thereafter, after leaving PB Fasteners, Michael Briles founded Briles Aerospace, Inc. in May
2012. *Id*. ¶ 8. Briles Aerospace initially provided standard products and services for the aerospace

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 85 of 131   Page ID
#:9551
Case 1:19-cv-03365-Document #:21   Filed: 06/07/19   Page 3 of 9   PageID #:130

industry. *Id.* Robert Briles is the uncle of Michael Briles. *Id.* ¶ 18. Before May 2011, Robert Briles was the President of PB Fasteners. *Id.* ¶¶ 18, 54.

PB Fasteners alleges that in 2016, Briles Aerospace "launched a campaign to misappropriate the SLEEVbolt® system and attempt to manufacture and sell it." (First Am. Cmplt. ¶ 18). As part of this alleged campaign, Briles Aerospace recruited nine current and former PB Fasteners employees with "detailed knowledge of PB Fasteners' proprietary information." *Id.* ¶¶ 9, 71. PB Fasteners also alleges that Michael Briles and Robert Briles shared PB Fasteners' confidential and proprietary information with Briles Aerospace. *Id.* ¶¶ 57, 67. In addition, PB Fasteners claims that Briles Aerospace worked with Boeing to obtain the necessary qualifications to produce the SLEEVbolt® by gaining access to PB Fasteners' proprietary information through documents, in-person meetings, and telephone calls with Boeing representatives. *Id.* ¶¶ 10, 78. PB Fasteners believes that Briles Aerospace worked with and encouraged Boeing to issue a new Request for Proposal ("RFP") in September 2018 for a SLEEVbolt® with a minor machined "notch" on the head of the tapered bolt. *Id.* ¶¶ 11, 79-80. Briles Aerospace provided a proposal in response to the RFP and began limited SLEEVbolt® deliveries to Boeing in late 2018. *Id.* ¶¶ 13, 93. PB Fasteners maintains that the "shape of the head of the protruding bolt is irrelevant to the actual functioning of the SLEEVbolt® because it plays no role in the sleeve expansion" and the "notched" SLEEVbolt® "is essentially the same as the SLEEVbolt® that does not contain the notch." *Id.* ¶¶ 81, 82.

In connection with the RFP, Boeing disclosed to PB Fasteners that it had qualified another manufacturer, Lisi Aerospace Canada, to provide tapered sleeve bolts. (First Am. Cmplt. ¶ 12). Litigation between PB Fasteners and Lisi Aerospace is currently ongoing in Montreal Superior Court. (Doc. 1, at 3 n.2). PB Fasteners claims that Boeing similarly facilitated Lisi Aerospace's

Case 2:18-cv-09536-MWF-AS  Document 196-1  Filed 06/05/19  Page 86 of 131  Page ID
#:9552
Case 1:19-cv-03365-DLC  Document #:21 Filed: 06/07/19 Page 4 of 9 PageID #:139

misappropriation of PB Fasteners' trade secrets. PB Fasteners contends that neither Briles
Aerospace or Lisi Aerospace "could have obtained the necessary qualifications without
misappropriating PB Fasteners' proprietary information." (First Am. Cmplt. ¶ 12).

On November 9, 2018, PB Fasteners filed a complaint against Briles Aerospace in the
United States District Court for the Central District of California.  PB Fasteners later filed its First
Amended Complaint adding Michael Briles and Robert Briles as defendants.  PB Fasteners' First
Amended Complaint contains ten causes of action: violation of Defend Trade Secrets Act, 18
U.S.C. §1836 *et seq.* (First Cause of Action against Briles Aerospace); violation of California
Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.* (Second Cause of Action against Briles
Aerospace); violation of Lanham Act, 15 U.S.C. § 1051 *et seq.* (Third Cause of Action against
Briles Aerospace); violation of California False Advertising Law, Cal. Civ. Code § 17500 (Fourth
Cause of Action against Briles Aerospace); violation of California Unfair Competition Law (false
advertising), Cal. Civ. Code § 17200 (Fifth Cause of Action against Briles Aerospace); intentional
interference with contractual relations (Sixth Cause of Action against Briles Aerospace); violation
of California Unfair Competition Law (interference), Cal. Civ. Code § 17200 (Seventh Cause of
Action Against Briles Aerospace); intentional interference with prospective business relations
(Eighth Cause of Action against Briles Aerospace); breach of contract (Ninth and Tenth Causes of
Action against Michael Briles and Robert Briles). (First Am. Cmplt. ¶¶ 110-189).

Boeing is not a party to the action in the Central District of California.  On March 7, 2019,
PB Fasteners served Boeing with a subpoena to produce documents in connection with the
underlying litigation.  Boeing objected to the subpoena on various grounds, including relevancy,
burdensomeness, and proportionality, on March 19, 2019. After negotiations, PB Fasteners
substantially narrowed the number of custodians and date ranges it proposed to be searched.  BP

Case 2:18-cv-09536-MWF-AS Document 196-1 Filed 03/15/19 Page 87 of 131 Page ID
#:9553
Case 1:19-cv-03365 Document #: 21 Filed: 06/04/19 Page 5 of 17 PageID #:150

Fasteners and Boeing agreed on seven Boeing custodians whose documents would be searched, six of twelve search terms, and a date range of January 1, 2016 through March 29, 2019. (Doc. 15 at 4; doc. 19 at 1). Boeing's proposal hit on approximately 20,000 documents, while PB Fasteners' proposal hit on approximately 40,000 documents. (Doc. 15 at 4). Boeing states that its proposal to review 20,000 documents will cost approximately $70,000 and PB Fasteners' additional search terms would impose nearly $70,000 in extra costs on Boeing. *Id.* at 9. Fact discovery closes on June 28, 2019 in the underlying lawsuit, and the case is set for trial on October 11, 2019. Against this factual backdrop, the Court considers PB Fasteners' motion to enforce its subpoena.

## DISCUSSION

Rule 45 of the Federal Rules of Civil Procedure governs subpoenas directed to non-parties. Rule 45(d)(2)(B)(i) provides that a party serving a subpoena may move for an order compelling production in "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(2)(B)(i). As for relevance, "[t]he scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Williams v. Blagojevich*, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008); *see also* Advisory Committee Notes regarding 1991 Amendments to Rule 45(a)(2) (stating a "non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34."). Rule 26(b)(1) allows "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The factors relevant to the proportionality inquiry are "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 88 of 131   Page ID
#:9554
Case 1:19-cv-03365 Document #: 21 Filed: 06/04/19 Page 6 of 17 PageID #:152

A party issuing a subpoena must "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Moreover, "[w]hen a third-party is ordered to produce documents pursuant to a subpoena, 'the presumption is that the responding party must bear the expense of complying with discovery requests,' including requests for electronic data." *United States v. Cardinal Growth, L.P.*, 2015 WL 850230, at *2 (N.D. Ill. Feb. 23, 2015) (citation omitted). However, an order requiring compliance "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B)(ii).

At the outset, the Court notes that PB Fasteners' motion seeks to enforce the subpoena in full, and in this respect, Boeing requests denial of the motion. Boeing's Response also clarifies, however, that it remains willing to review and produce documents based on its proposed search terms. (Doc. 15 at 2). Thus far, Boeing has not produced any documents in response to the subpoena. At oral argument, PB Fasteners essentially limited its motion to the concessions it offered during the meet and confer process by presenting and relying upon a demonstrative exhibit summarizing the agreements and disputed areas between PB Fasteners and Boeing regarding the scope of the subpoena. (Doc. 19). As a result, the Court addresses the five disputed areas listed in PB Fasteners' demonstrative exhibit in turn below.

A.      **Documents Relating to Qualification and Development of Tapered Sleeve Bolt**

The first disputed area between PB Fasteners and Boeing relates to the qualification of suppliers and the development and/or manufacture of the tapered sleeve bolt (Subpoena Requests Nos. 1-9, 11-13, and 18). With respect to this first topic, the parties agree on five search terms: BPS-F-228*, BACB31AD*, BACB31AE*, BACB31AF*, and BACB31AG*. The first term is a Boeing part standard that generally incorporates the tapered sleeve bolt. Boeing's counsel

explained at oral argument that the asterisk at the end of the first term (BPS-F-228) captures a supplemental number associated with each manufacturer, such as Briles Aerospace or Lisi Aerospace. As the Court understands it based on counsel's oral representations, the last four terms refer to Boeing part standard names that only relate to particular tapered sleeve bolts which meet PB Fasteners' dimensions, which prior to September 2018 were only provided by PB Fasteners to Boeing. The different letters at the end of the last four bolt part standards relate to the materials the bolt is made of and the type of head on the bolt. For example, BACB31AD is a term that relates only to protruding head tapered sleeve bolts. (Doc. 1-1, at 50).

Boeing argues that only information relating to Briles Aerospace is relevant to PB Fasteners' claims in the underlying case. Therefore, to limit the number of potentially irrelevant documents to be reviewed, Boeing proposes that the terms "Briles* OR @brilesaerospace.com" (the "Briles search restriction") be included with the standard part searches because it seems unlikely "that a document submitted by or sent to Briles would have no indicia that it originated or went to Briles." (Doc. 1-1, at 56). PB Fasteners contends that Boeing's proposed Briles search restriction would exclude numerous relevant documents. PB Fasteners points to several types of documents that would not be available through Boeing's proposed Briles search restriction: (1) documents relating to Briles Aerospace that do not mention the word "Briles" or were not communicated from or to a Briles Aerospace email address; (2) documents relating to Lisi Aerospace; (3) documents transmitted by Briles Aerospace via Boeing's MessageCourier information exchange system; (4) documents relating to the ability of companies other than Briles Aerospace, including Lisi Aerospace, to duplicate PB Fasteners' dimensions and processes; and (5) Boeing's internal communications relating to PB Fasteners' dimensions and processes, even if not referencing Briles Aerospace. (Doc. 1-1 at 60-61).

In the context presented here, Boeing's proposed Briles search restriction is too limited. Initially, it is important to emphasize the narrow scope of the parties' agreed part standard terms, custodians, and date range (January 1, 2016 through March 29, 2019). PB Fasteners invented the SLEEVbolt® product, which Boeing incorporated into its part standards when it developed the 787 aircraft. Until September 2018, PB Fasteners was the only qualified manufacturer of the SLEEVbolt®. The five part standard search terms are thus, highly specific to PB Fasteners' product and dimensions and unlikely to hit on irrelevant documents given the agreed targeted date range and limited custodians. Moreover, as described above, PB Fasteners has sufficiently demonstrated that relevant documents may exist that do not specifically mention the word "Briles" or the Briles Aerospace email address.

In a discovery dispute such as this, the Court has to reach a balance – a balance on limitations within the search that will yield the largest set of relevant documents along with the smallest set of irrelevant documents. Courts do this, in part, by deciding on appropriate search terms, limiting the number of custodians, and determining an appropriate date range. In most cases, this is a judgment call and one left to the sound discretion of the Court reviewing and resolving the discovery dispute. Moreover, the Court generally has to make these decisions before the search and review is done, and thus it involves a certain degree of foresight about what inputted variables will result in the best possible output. In this case, the Court finds that the date range and the number of custodians already provide sufficient limitations on the search, and when combined with the use of PB Fasteners' part standard terms, the search is sufficiently surgical and targeted. Any further limitations, in the Court's view, runs too great of a risk that relevant documents will be excluded from production.

Boeing also claims that its communications with manufactures other than Briles
Aerospace, including Lisi, Fastener Innovation Technology, and Space-Lok (Subpoena Request
Nos. 6-9) have limited relevance to the issues in the underlying litigation and should be sought
directly from those third parties.   The Court disagrees.   To succeed on its claim for
misappropriation of trade secrets under the California Uniform Trade Secret Act (CUTSA), PB
Fasteners must show:  "(1) the existence and ownership of a trade secret, and (2) misappropriation
of the trade secret." *Sun Distributing Co., LLC v. Corbett*, 2018 WL 4951966, at *3 (S.D. Cal. Oct.
12, 2018).  "A claim for misappropriation under the Defend Trade Secrets Act ("DTSA") has
substantially similar elements." *Id*.  A "trade secret" is defined as information that: (1) derives
independent economic value, actual or potential, from not being generally known to, or readily
ascertainable through proper means, by another person who can obtain economic value from its
disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy. 18 U.S.C. §
1939(3); Cal. Civ. Code § 3426.1(d).  Boeing's communications with fastener suppliers other than
Briles Aerospace during the relevant time period is the exact type of information which may show
whether PB Fasteners' dimensions and processes were known outside of PB Fasteners, the extent
to which others can re-create the SLEEVbolt® without Boeing's help, and whether PB Fasteners'
bolt dimensions could be reverse engineered.  For instance, the communications may acknowledge
that a trade secret exists as to PB Fasteners' dimensions and that its dimensions cannot be readily
ascertained.  The communications may also show Lisi Aerospace's inability to duplicate the
tapered sleeve bolt dimensions without Boeing's assistance.  Thus, evidence showing how the
parts standards information unique to PB Fasteners' product was treated by Boeing and other
tapered sleeve bolt manufactures is highly relevant to the existence of a trade secret, an essential
element of PB Fasteners' CUTSA and DTSA claims. Moreover, Boeing's communications with

Lisi Aerospace are particularly relevant to the trade secret analysis as the only two tapered bolt sleeve manufacturers that Boeing has qualified since September 2018 are Briles Aerospace and Lisi Aerospace. Further, because Boeing is the principal consumer of tapered sleeve bolts, it is the best source for this information relating to the tapered sleeve bolts at issue in this case, rather than subjecting multiple fastener suppliers to subpoenas.

Considering the proportionality factors, the part standard information sought is also proportional to the needs of the case. The Court is mindful that Boeing is a third-party in this matter and not a defendant in the underlying litigation. The Court also recognizes the burden that a Rule 45 subpoena places on a third-party, who has to expend costs and resources to produce documents for a case where it will not ultimately obtain any direct relief.

Nevertheless, the balance of factors weigh in favor of PB Fasteners' proposal. The parties' resources factor favors neither party because there is no imbalance of resources here. PB Fasteners notes that Boeing has over 155,000 employees and in 2018 had over $100 billion in revenues. (Doc. 16 at 2). On the other hand, Boeing points out that PB Fasteners' corporate parent, Precision Castparts Corp., is wholly-owned by Berkshire Hathway Inc., and is one of the world's largest manufacturers of fasteners and castings for aerospace and other industries. (Doc. 15 at 6).

All the other factors weigh in favor of PB Fasteners' proposed part standard search without the Briles search restriction. First, the importance of the issues at stake in the underlying litigation is high. PB Fasteners alleges that Briles Aerospace misappropriated PB Fasteners' trade secrets, which were the result of many years of investment, research, and development, and disrupted its contractual and business relations with Boeing. Boeing is the dominant consumer in the domestic SLEEVbolt® market, and until late 2018, PB Fasteners was the exclusive manufacturer of the SLEEVbolt® for Boeing. In addition, Boeing is allegedly negotiating a long-term contract with

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 93 of 131   Page ID
#:9559
Case 1:19-cv-09305 Document 21 Filed 06/07/19 Page 11 of 17 PageID #: 198

Briles Aerospace for tapered sleeve bolts that are subject to the contract with PB Fasteners. (First
Am. Cmplt. ¶¶ 159, 175).

Second, the amount in controversy is potentially substantial.  Although PB Fasteners has
not alleged a precise amount of damages in its First Amended Complaint, the SLEEVbolt®
"generates the vast majority of PB Fasteners' revenue." (First Am. Cmplt. ¶ 109).  PB Fasteners
claims it has "sustained and will continue to sustain significant harm and damages." *Id*. ¶¶ 116,
124, 135, 146, 152, 160, 166, 176, 183, 189.  Specifically, PB Fasteners alleges that the Briles
Defendants' conduct has caused it serious harm by, among other things, diminishing the value
associated with its exclusive manufacture of the SLEEVbolt®, reducing the value of its proprietary
information by diminishing its secrecy, misappropriating its industry reputation and goodwill, and
diverting Boeing orders for SLEEVbolts® away from PB Fasteners. *Id*. ¶ 108.

Third, Boeing has the most access to the most relevant information.  Although Boeing
argues that certain responsive communications are equally or more conveniently available from
PB Fasteners itself (Request No. 1), one of its divisions (Request No. 2), its corporate parent
(Request No. 3), and the Briles Defendants (Request Nos. 4 and 5), other evidence potentially
responsive to the part standard searches is in Boeing's exclusive possession.  For example,
Boeing's internal documents and communications relating to the specific part standards would be
in the exclusive possession of Boeing even if those documents do not specifically refer to Briles
Aerospace.  PB Fasteners' inability to obtain that information from others or through independent
means weighs in favor of eliminating the Briles search restriction from the part standard searches.

Finally, part standard term searches without the Briles search restriction do not impose an
undue or substantial burden on Boeing.  At oral argument, Boeing's counsel estimated that the
bulk of the additional $70,000 in costs would be the result of the removal of the Briles search

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 94 of 131   Page ID
Case 1:19-cv-09305 Document 21 Filed 06/07/19 Page 12 of 17 PageID #: 197
#:9560

limitation and the addition of the search for documents relating to Lisi Aerospace, which is the third disputed area below. The Court recognizes that reviewing the additional hits generated by removing the Briles search restriction will create some burden, but any such burden is not undue or significant given the limited scope of the requests to the particular dimensions of PB Fasteners' tapered sleeve bolts, the date restrictions and limitations of custodians, the potential probative value of responsive information, and the alleged central role Boeing played in the events at issue in the litigation. Moreover, Boeing has been and will continue to be directly involved in the underlying litigation. Two Boeing employees, Todd Hubbell and Joseph Hinton, provided declarations to Briles Aerospace in opposition to PB Fasteners' preliminary injunction motion and many Boeing witnesses will be deposed and testify at trial. (Doc. 16 at 2). For these reasons, the likely benefit of removing the Briles search restriction greatly outweighs the additional expense imposed on Boeing in producing responsive documents.

Under all of these circumstances, the balance of the proportionality factors weigh in favor of PB Fasteners' search proposal. Accordingly, PB Fasteners' motion to enforce is granted with regard to the first disputed area.

**B.      Dimensional Submissions by Briles Aerospace to Boeing**

As to the second disputed area, PB Fasteners seeks all submissions of tapered sleeve bolt dimensions by Briles Aerospace to Boeing (Subpoena Request Nos. 4, 5, 12). PB Fasteners proposes the five part standard terms without the Briles search restriction. Boeing has proposed no other search terms for identifying all submissions of dimensions by Briles Aerospace unless they are captured by the five part standard terms with the Briles search restriction. Again, Boeing's proposed search scope is too narrow. The tapered sleeve bolt dimensional submissions by Briles Aerospace to Boeing go to the heart of PB Fasteners' misappropriation claims. Boeing's counsel

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 95 of 131   Page ID
#:9561
Case 4:19-cv-09305 Document 21 Filed 06/07/19 Page 13 of 17 PageID #:138

acknowledged at oral argument that the dimensional submissions given by Briles Aerospace to Boeing are relevant for purposes of PB Fasteners' case against the Briles Defendants. Boeing's counsel argued, however, that Briles Aerospace should have a copy its dimensional submissions submitted to Boeing. Boeing also contends that PB Fasteners' presumption that information Boeing received from Briles Aerospace through Boeing's MessageCourier system would not contain the word "Briles" is speculation.

Contrary to Boeing's position, discovery to date in the underlying case demonstrates that Briles Aerospace submitted documents with dimensional data to Boeing which do not include the terms "Briles* or @brilesaerospace.com." At oral argument, PB Fasteners' counsel explained that dimensional submissions to Boeing are generally Excel spreadsheets with a list of dimensions which may not necessarily contain any reference to Briles Aerospace. PB Fasteners' counsel represented that a document produced in discovery shows that Briles Aerospace submitted dimensions in the form of a spreadsheet which mentions the part standard terms but does not include the terms "Briles* or @brilesaerospace.com." PB Fasteners' counsel also stated that Michael Briles testified at his deposition that he submitted several versions of Briles Aerospace's tapered sleeve bolt dimensions to Boeing through its MessageCourier system, he no longer has access to those submissions, and he did not retain a copy of those submissions. Further, as explained above, the removal of the Briles search restriction does not impose an undue burden on Boeing. As a result and in light of the evidence that Briles Aerospace does not possess all of its dimensional submissions of its proposed tapered sleeve bolt and the potential that Boeing's search protocol would not capture all of these highly relevant documents even if they do not explicitly reference Briles Aerospace, PB Fasteners' motion to enforce is granted with respect to the second disputed area.

Case 4:19-cv-09305 Document 21 Filed 06/07/19 Page 14 of 17 PageID #:139

**C.      Boeing's Documents Relating to Lisi Aerospace**

The third disputed area concerns PB Fasteners' request for documents relating to Lisi Aerospace (Subpoena Request Nos. 6, 12). PB Fasteners proposes two custodians, a date range of September 1, 2015 to the present, and the term "Lisi' with other taper sleeve bolt terms or "notch*", or "dimension*", or "diameter*". (Doc. 19 at 2). At oral argument, PB Fasteners' counsel explained that this search has a slightly different date range because Lisi Aerospace and Boeing started interacting with respect to a tapered sleeve bolt at an earlier date. Boeing repeats its argument that documents relating to Lisi Aerospace are not relevant to the claims and defenses at issue in the underlying litigation and in any event, should be sought directly from Lisi Aerospace. But, as discussed above, documents relating to the ability of other manufacturers to develop and manufacture the tapered sleeve bolt is highly relevant to whether PB Fasteners' dimensions and processes were generally known or readily ascertainable, whether its tapered sleeve bolt dimensions could have been reverse engineered, and whether its information was treated as confidential and proprietary. Thus, the Lisi Aerospace information is directly relevant to the existence of a trade secret, a key disputed issue in the underlying case. Also, as explained above, Boeing is the best source for documents relating to the development of the tapered sleeve bolt by other fastener manufacturers, including Lisi Aerospace. Regarding burden, PB Fasteners' proposal regarding information relating to Lisi Aerospace would yield between 10,300 and 14,048 additional documents. (Doc. 15-1 at 7). Considering Boeing's alleged role in the events of the case and the central importance of this information to PB Fasteners' misappropriation claims, the Court finds that the burden imposed by reviewing these additional documents related to Lisi Aerospace is not undue or significant.

Case 2:18-cv-09536-MWF-AS   Document 196-1   Filed 07/15/19   Page 97 of 131   Page ID
#:9563
Case 4:19-cv-09305 Document 21   Filed 06/07/19   Page 15 of 17   PageID #:200

#### D.    Boeing's Purchasing Information

The next disputed area involves PB Fasteners' request for Boeing's purchase information
for tapered sleeve bolts which meet PB Fasteners' dimensions (Subpoena Request Nos. 15-17).
PB Fasteners seeks production of all Boeing purchase orders or transactional data relating to any
manufacturer of tapered sleeve bolts for the period beginning January 1, 2017.  PB Fasteners also
requests documents from January 1, 2017 to the present relating to projected purchases of tapered
sleeve bolts for Boeing aircraft.  Boeing argues that its tapered sleeve bolt purchasing information
with Briles Aerospace may be obtained directly from Briles Aerospace.

Boeing's purchasing information related to tapered sleeve bolts that meet PB Fasteners'
dimensions is highly relevant to PB Fasteners' damages claims as it may indicate lost purchase
opportunities.  Boeing's total demand for tapered sleeve bolts is also relevant to its claim that
Briles Aerospace has disrupted PB Fasteners' contract with Boeing which requires Boeing to
purchase 90% of its SLEEVbolt® requirements from PB Fasteners.  Boeing is the most logical
and direct source of information relating to its purchases and the overall demand for tapered sleeve
bolts because it is the only customer of tapered sleeve bolts manufactured by Briles Aerospace,
Lisi Aerospace, and PB Fasteners.  To the extent some of the information sought could be obtained
directly from Briles Aerospace and Lisi Aerospace, it is more expedient for Boeing to produce the
information.  Boeing's suggestion at oral argument that PB Fasteners can rely in part on its own
sales forecasting and estimates of the size of the market to calculate damages is rejected as PB
Fasteners' sales forecasts and estimates are not an adequate substitute for the actual lost purchase
orders and total demand.  Boeing has provided no estimate or evidentiary support showing how
much time or expense would be involved in responding to PB Fasteners' requests for purchasing

Case 2:18-cv-09536-MWF-AS Document 196-1 Filed 07/15/19 Page 98 of 131 Page ID
#:9564
Case 1:19-cv-03305 Document 21 Filed 06/07/19 Page 16 of 17 PageID #:201

information and therefore, its burdensome objection is overruled in this regard.  PB Fasteners'

motion to enforce is granted as to the fourth disputed area.

**E.      Boeing's Communications with Briles Aerospace's Counsel**

The fifth and final area of disputed documents includes Boeing's communications with

Briles Aerospace's counsel from January 1, 2017 to the present relating to the litigation between

PB Fasteners and Briles Aerospace.  Boeing asserts that a common interest privilege with Briles

Aerospace covers the documents at issue.  The common interest doctrine is "an exception to the

rule that no privilege attaches to communications between a client and an attorney in the presence

of a third person." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).  The

doctrine applies "where the parties undertake a joint effort with respect to a common legal interest,

and the doctrine is limited strictly to those communications made to further an ongoing enterprise."

*Id*. at 816.

Boeing's blanket claim of privilege over its communications with Briles Aerospace's

counsel is insufficient to deny production. *United States v. BDO Seidman*, 337 F.3d 802, 811 (7th

Cir. 2003) ("The mere assertion of a privilege is not enough; instead, a party that seeks to invoke

the attorney-client privilege has the burden of establishing all of its essential elements.").  Rule

45(e)(2)(A) requires an entity withholding subpoenaed information under a claim of privilege or

work product to (1) "expressly make the claim" and (2) "describe the nature of the withheld

documents, communications, or tangible things in a manner that, without revealing information

itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P.

45(e)(2)(A).  Without a privilege log, neither PB Fasteners nor the Court can assess Boeing's claim

of privilege.

16

However, at this time, the Court will exercise its discretion and order that Boeing either produce or log communications with Briles Aerospace's counsel up to the date of the filing of PB Fastener's Complaint.  Ordering review and production of communications post-Complaint runs the risk of including too many irrelevant documents being swept into the review, such as communications relating to the availability of witnesses, scheduling matters, document production, and other communications between counsel in the normal course of managing litigation that have nothing to do with the underlying merits of PB Fasteners' claims.

As required by Rule 45(e)(2)(A), Boeing shall produce a privilege log for any communications that it believes are protected. *Wi-LAN v. LG Electronics, Inc.*, 2011 WL 148058, at *4 (N.D. Ill. Jan. 18, 2011) (declining "to quash the entire subpoena on such a sweeping claim of privilege . . . . the better approach is to allow CFIR/Perri to simply assert their privileges document-by-document.")  If they are not protected, Boeing shall produce responsive documents in accordance with the limitations described above.

## CONCLUSION

For these reasons, PB Fasteners' Motion to Enforce Subpoena for the Production of Documents Issued to The Boeing Company [1] is granted in part and denied in part.  Boeing shall comply with this Opinion, including production of a privilege log, by June 18, 2019.  Documents produced in response to the subpoena shall be subject to the protective order in the underlying case.  A status hearing is set for June 20, 2019 at 9:15 a.m.

**SO ORDERED.**

Dated:  June 7, 2019

_____
Sunil R. Harjani
United States Magistrate Judge

# EXHIBIT 8

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 9

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 10

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 11

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 12

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 13

## *TO BE FILED UNDER SEAL APPLICATION PENDING*

# EXHIBIT 14

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 15

## *TO BE FILED UNDER SEAL*
## *APPLICATION PENDING*

# EXHIBIT 16

## *TO BE FILED UNDER SEAL*

## *APPLICATION PENDING*

# EXHIBIT 17

*TO BE FILED UNDER SEAL*
*APPLICATION PENDING*

# EXHIBIT 18

William Molinski, SBN 145186
wmolinski@orrick.com
Alyssa Caridis, SBN 260103
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020
Facsimile:  (213) 612-2499

Attorneys for Defendant Robert Briles

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPS TECHNOLOGIES, LLC d/b/a/ PB FASTENERS,<br><br>Plaintiff,<br><br>v.<br><br>BRILES AEROSPACE, INC., MICHAEL BRILES, and ROBERT BRILES,<br><br>Defendants. | Case No. 2:18-cv-09536-MWF-AS<br><br>**DEFENDANT ROBERT BRILES' RESPONSES TO PLAINTIFF SPS TECHNOLOGIES, LLC'S FIRST SET OF INTERROGATORIES** |

PROPOUNDING PARTY:    Plaintiff SPS Technologies, LLC

RESPONDING PARTY:    Defendant Robert Briles

SET. NO.:    One (1)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P." or "Rule") and Rules 26 and 33 of the Local Rules of the United States District Court for the Central District of California, Defendant Robert Briles ("Mr. Briles") hereby responds to Plaintiff SPS Technologies, LLC's ("PB Fasteners" or "Plaintiff") First Set of Interrogatories (the "Interrogatories") as follows:

## **PRELIMINARY STATEMENT**

The following responses are based upon the facts, documents, and information presently known and available to Mr. Briles. Discovery, investigation, research, and analysis are ongoing, and may disclose the existence of additional facts or documents, add meaning to known facts or documents, or lead to additions, variations, or changes to these responses.

Without obligating himself to do so, except to the extent required under the Fed. R. Civ. P., Mr. Briles reserves the right to change or supplement these responses under Fed. R. Civ. P. 26(e) as additional facts or documents are discovered, revealed, recalled, or otherwise ascertained, and as further analysis, research, investigation, and discovery disclose additional facts, documents, interpretations, contentions, and/or legal theories which may apply. Mr. Briles specifically reserves the right to utilize any and all subsequently discovered documents, information, or evidence at any later state of these proceedings.

The objections set forth below are intended to apply to all information and documents produced or provided pursuant to these requests. All objections to definitions and instructions are applicable as if specifically set forth in each response to individual requests for production. Furthermore, these responses do not in any way waive any objections by Mr. Briles, in this or in any subsequent

1  proceedings, on any grounds, including objections as to the competency,

2  relevancy, materiality, privilege, or admissibility of the responses, or the subject

3  matter thereof.

4      Any response provided herein stating that information, documents, and

5  things will be produced is to be construed as referring only to responsive

6  information, documents, and things that are not otherwise subject to any

7  specific objection noted below. Moreover, such a statement with respect to any

8  request is not a representation that any such information, documents, or things

9  exist, but only that Mr. Briles will conduct a reasonably diligent search of the

10 materials within his possession, custody, and control, and will produce

11 responsive, non-privileged information, documents, or things if any are

12 discovered as a result of that search. For the sake of clarity, and consistent with

13 Rule 34, any response or objection to the production of material is not a

14 representation that materials are actively being withheld from production, but

15 rather a representation regarding the universe of material that will be subject to

16 a reasonable search, from which any production may be made.

17                        **OBJECTIONS TO DEFINITIONS**

18     1.    Mr. Briles objects to PB Fasteners' definition of "Briles

19 Aerospace" as rendering the requests in which they appear overly broad, unduly

20 burdensome, and calling for the production of information not within

21 Mr. Briles' possession, custody, or control because they make reference to

22 people and entities which are not currently employees of or otherwise known by

23 Mr. Briles to be under Briles Aerospace's control. Mr. Briles will interpret

24 "Briles Aerospace" to refer to the company currently known as Briles

25 Aerospace, Inc. along with its current employees and officers.

26     2.    Mr. Briles objects to PB Fasteners' definition of "PB Fasteners" as

27 rendering the requests in which they appear overly broad, unduly burdensome,

28 and calling for the production of information not within Mr. Briles' possession,

1   custody, or control because they make reference to people and entities which

2   are not currently employees of or otherwise known by Mr. Briles to be under

3   PB Fasteners' control. Mr. Briles will interpret "PB Fasteners" to refer to the

4   company currently known as SPS Technologies, LLC d/b/a PB Fasteners, along

5   with its current employees and officers.

6   **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

7   **INTERROGATORY NO. 1:**

8       Describe in detail any and all trade secret, confidential, and/or proprietary

9   information relating to tapered sleeve bolts that Paul R. Briles, Inc. sold or

10  otherwise transferred to SPS Technologies, LLC in connection with the APA.

11  **RESPONSE TO INTERROGATORY NO. 1:**

12      Mr. Briles objects to this Interrogatory to the extent it calls for a legal

13  conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory

14  to the extent it seeks information protected by the attorney-client privilege or

15  work-product doctrine or any other privilege. Mr. Briles further objects to this

16  Interrogatory as vague and ambiguous with respect to the terms "trade secret,"

17  "proprietary," "in connection with," and "transferred." Mr. Briles further

18  objects to this Interrogatory as overbroad and unduly burdensome insofar as it

19  purports to seek "any and all" information relating to tapered sleeve bolts,

20  without any attempt to tailor the Interrogatory to relevant information.

21      Subject to and without waiving the foregoing objections, despite a

22  reasonable inquiry and good faith investigation, Mr. Briles does not know of

23  trade secret, confidential, and/or proprietary information relating to tapered

24  sleeve bolts that Paul R. Briles, Inc. sold or otherwise transferred to SPS

25  Technologies, LLC in connection with the APA.

26  //

27  //

28  //

1  **INTERROGATORY NO. 2:**

2      Describe in detail any and all trade secret, confidential, and/or proprietary

3  information relating to tapered sleeve bolts that you developed, learned, or

4  otherwise acquired during your employment at Paul R. Briles, Inc.

5  **RESPONSE TO INTERROGATORY NO. 2:**

6      Mr. Briles objects to this Interrogatory to the extent it calls for a legal

7  conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory

8  as vague and ambiguous with respect to the terms "trade secret," "proprietary,"

9  "developed," "learned," and "acquired." Mr. Briles further objects to this

10 Interrogatory as overbroad with respect to the time-period. Mr. Briles further

11 objects to this Interrogatory as overbroad and unduly burdensome insofar as it

12 purports to seek "any and all" information relating to tapered sleeve bolts,

13 without any attempt to tailor the Interrogatory to relevant information.

14      Subject to and without waiving the foregoing objections, despite a

15 reasonable inquiry and good faith investigation, Mr. Briles does not know of

16 trade secret, confidential, and/or proprietary information of Paul R. Briles, Inc.

17 relating to tapered sleeve bolts that he developed, learned, or otherwise acquired

18 during his employment there. Mr. Briles was periodically provided with

19 information designated as proprietary by various customers, including Boeing

20 and Northrop Grumman Corporation, during his employment at Paul R. Briles,

21 Inc.

22 **INTERROGATORY NO. 3:**

23      For each trade secret, confidential, and/or proprietary information

24 described in response to Interrogatory No. 1 and/or Interrogatory No. 2,

25 describe in detail any and all efforts to maintain the confidentiality of such

26 information at Paul R. Briles, Inc.

27 //

28 //

1    **RESPONSE TO INTERROGATORY NO. 3:**

2         Mr. Briles objects to this Interrogatory to the extent it calls for a legal

3    conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory

4    as vague and ambiguous with respect to the terms "trade secret," "proprietary,"

5    and "efforts." Mr. Briles further objects to this Interrogatory as overbroad with

6    respect to the time-period. Mr. Briles further objects to this Interrogatory as

7    overbroad and unduly burdensome insofar as it purports to seek "any and all

8    efforts."

9         Subject to and without waiving the foregoing objections, Mr. Briles

10   recalls that at one time documents designated as confidential by customers were

11   kept and locked in a separate room at the Paul R. Briles, Inc. facility.

12   **INTERROGATORY NO. 4:**

13        Describe in detail any and all representations that you made in

14   connection with the APA relating to the trade secret, confidential, and/or

15   proprietary information of Paul R. Briles, Inc., including without limitation

16   representations made to SPS Technologies, LLC and/or the Federal Trade

17   Commission.

18   **RESPONSE TO INTERROGATORY NO. 4:**

19        Mr. Briles objects to this Interrogatory to the extent it calls for legal

20   conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory

21   to the extent it seeks information protected by the attorney-client privilege or

22   work-product doctrine or any other privilege. Mr. Briles further objects to this

23   Interrogatory as vague and ambiguous with respect to the terms "trade secret,"

24   "proprietary," "in connection with," and "representations." Mr. Briles further

25   objects to this Interrogatory as overbroad and unduly burdensome insofar as it

26   purports to seek "any and all representations," without any attempt to tailor the

27   Interrogatory to relevant information. Mr. Briles further objects to this

28   Interrogatory to the extent it seeks information not relevant to a claim or a

1  defense of a party. Therefore, Mr. Briles limits his response to any
2  representations that he made in connection with the APA relating to any trade
3  secret information of Paul R. Briles, Inc.

4      Subject to and without waiving the foregoing objections, Mr. Briles
5  responds that he does not recall any representations that he made in connection
6  with the APA relating to trade secret information or Paul R. Briles, Inc.

7  **INTERROGATORY NO. 5:**

8      Describe in detail any and all documents that you have requested and/or
9  received from counsel to Paul R. Briles, Inc. from January 1, 2015 to the
10 present that relate in any way to PB Fasteners, the APA, and/or tapered sleeve
11 bolts.

12 **RESPONSE TO INTERROGATORY NO. 5:**

13     Mr. Briles objects to this Interrogatory as vague and ambiguous with
14 respect to the term "relate." Mr. Briles objects to this Interrogatory as overbroad
15 and unduly burdensome insofar as it purports to seek "any and all documents,"
16 without any attempt to tailor the Interrogatory to relevant information.
17 Mr. Briles further objects to this Interrogatory to the extent it seeks information
18 not relevant to a claim or a defense of a party. Mr. Briles further objects to this
19 Interrogatory as overbroad and unduly burdensome insofar as it purports to seek
20 a description of "any and all documents" over the course of 5 years, beginning
21 from an irrelevant date. Mr. Briles further objects to this Interrogatory to the
22 extent it seeks information protected by the attorney-client privilege or work-
23 product doctrine or any other privilege.

24     Subject to and without waiving the foregoing obligations, Mr. Briles
25 responds that he has received several boxes of documents from counsel to
26 Paul R. Briles, Inc. that relate to the APA and/or tapered sleeve bolts. This
27 includes drafts of the APA, communications with counsel concerning the APA,
28 communications with the Federal Trade Commission, due diligence documents,

and various other agreements. Based on the foregoing objections, Mr. Briles reserves the right to not provide any privileged information contained within those boxes. Further, the Court has already found that these files include documents with limited or no relevance to this lawsuit.

**INTERROGATORY NO. 6:**

Describe in detail your involvement with Briles Aerospace, including without limitation any activity, service, and/or task that you have requested, performed, supervised, and/or observed at Briles Aerospace.

**RESPONSE TO INTERROGATORY NO. 6:**

Mr. Briles objects to this Interrogatory as vague and ambiguous with respect to the terms "involvement," "activity," "service," "task," "requested," "performed," "supervised," and "observed." Without clarification as to the term "involvement," Mr. Briles objects to this Interrogatory as argumentative insofar as it assumes Mr. Briles was involved with Briles Aerospace. Mr. Briles further objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any" involvement, without any attempt to tailor the Interrogatory to relevant information.

Subject to and without waiving the foregoing objections, Mr. Briles responds that he was neither employed by Briles Aerospace nor did he have any "involvement" with that Company, as he understands that term in the context of this Request. Mr. Briles did provide a loan to his nephew, Michael Briles, for use at Briles Aerospace. Mr. Briles also occasionally visited his nephew and friends at Briles Aerospace and while there, would have seen people working on machines or installing equipment.

**INTERROGATORY NO. 7:**

Describe in detail any and all loans and/or money transfers that you have made to Briles Aerospace, including without limitation the amount of any such loan and/or money transfer, any collateral or security related to any such loan

1  and/or money transfer, the terms and/or conditions of any such loan and/or
2  money transfer, the date on which any such loan and/or money transfer was
3  made, and the date of repayment of any such loan and/or money transfer.

4  **RESPONSE TO INTERROGATORY NO. 7:**

5      Mr. Briles objects to this Interrogatory as overbroad with respect to the
6  terms "any and all." Mr. Briles objects to this Interrogatory to the extent it seeks
7  information not relevant to a claim or a defense of a party.

8      Subject to and without waiving the foregoing objections, Mr. Briles
9  responds that pursuant to Rule 33(d), the information requested in the
10  Interrogatory may be determined by examining the loan agreement between Mr.
11  Briles and Briles Aerospace. The loan agreement has been produced in Mr.
12  Briles' supplemental document production at Begin Bates Nos. RB003201,
13  RB003204, RB0003214, and RB003219.

14  **INTERROGATORY NO. 8:**

15      Identify by Bates Number any and all documents produced by you in this
16  litigation that were created during your employment at Paul R. Briles, Inc.
17  and/or by PB Fasteners.

18  **RESPONSE TO INTERROGATORY NO. 8:**

19      Mr. Briles objects to this Interrogatory as vague and ambiguous with
20  respect to the term "created." Mr. Briles objects to this Interrogatory as
21  irrelevant, unduly burdensome, and not proportional to the needs of the case to
22  the extent that they are inconsistent with Rules 26 and 34.

23      Based on the foregoing objections, Mr. Briles reserves the right to not
24  provide such information.

25  **INTERROGATORY NO. 9:**

26      For each trade secret, confidential, and/or proprietary information
27  described in response to Interrogatory No. 1 and/or Interrogatory No. 2,
28  describe in detail any disclosure of such information by you, including without

limitation the identity of the receiving person and/or entity, the date of disclosure, the circumstances surrounding the disclosure, and any money and/or benefit provided to you in exchange for the disclosure.

**RESPONSE TO INTERROGATORY NO. 9:**

Mr. Briles objects to this Interrogatory to the extent it calls for legal conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine or any other privilege. Mr. Briles further objects to this Interrogatory as vague with respect to the time-period. Mr. Briles further objects to this Interrogatory as vague and ambiguous with respect to the terms "trade secret," "proprietary," "disclosure" and "benefit." Mr. Briles further objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any disclosure," without any attempt to tailor the Interrogatory to relevant information.

Subject to and without waiving the foregoing objections, Mr. Briles responds that this Interrogatory is not applicable based on his responses to Interrogatory No. 1 and Interrogatory No. 2.

**INTERROGATORY NO. 10:**

Describe in detail any and all communications between you, on the one hand, and Briles Aerospace and/or Michael Briles, on the other hand, relating to tapered sleeve bolts from January 1, 2015 to the present, including without limitation the development of tapered sleeve bolts, the qualification to manufacture tapered sleeve bolts for Boeing, and/or the sale of tapered sleeve bolts.

**RESPONSE TO INTERROGATORY NO. 10:**

Mr. Briles objects to this Interrogatory as vague and ambiguous with respect to the terms "communications," "development," and "qualification." Mr. Briles objects to this Interrogatory as overbroad and unduly burdensome

insofar as it purports to seek "any and all communications … relating to tapered sleeve bolts" over four years ago, beginning from an irrelevant date, without any attempt to tailor the Interrogatory to relevant information.

Subject to and without waiving the foregoing objections, Mr. Briles responds that he recalls having had conversations with his nephew, Michael Briles, from time to time between January 1, 2015 to the present concerning Briles Aerospace's efforts to qualify to manufacture tapered sleeve bolts for Boeing. Mr. Briles does not recall the details of these communications.

**INTERROGATORY NO. 11:**

Describe your involvement with, participation in, and/or knowledge of the negotiation of any contract with Boeing relating to qualification and/or tapered sleeve bolts.

**RESPONSE TO INTERROGATORY NO. 11:**

Mr. Briles objects to this Interrogatory as vague and ambiguous with respect to the terms "involvement with," "participation in," and "knowledge." Mr. Briles objects to this Interrogatory as vague with respect to the time-period. Mr. Briles further objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any contract" over an unspecified time-period, without any attempt to tailor the Interrogatory to relevant information. Mr. Briles further objects to this Interrogatory to the extent it seeks information not relevant to a claim or a defense of a party. Therefore, Mr. Briles limits his answer to those contracts with Boeing following the APA and those in which he had direct involvement.

Subject to and without waiving the foregoing objections, Mr. Briles responds that he has had no direct involvement with Boeing following the APA.

**INTERROGATORY NO. 12:**

Describe in detail any and all communications between you, on the one hand, and Boeing, on the other hand, from January 1, 2015 to the present.

**RESPONSE TO INTERROGATORY NO. 12:**

Mr. Briles objects to this Interrogatory as vague and ambiguous with respect to the terms "communications." Mr. Briles objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any and all communications," beginning from an irrelevant date, without any attempt to tailor the Interrogatory to relevant information. Mr. Briles further objects to this Interrogatory to the extent it seeks information not relevant to a claim or a defense of a party.

Subject to and without waiving the foregoing objections, Mr. Briles responds that he has had no communications with Boeing from January 1, 2015 to the present.

**INTERROGATORY NO. 13:**

Describe in detail any and all money that you received in connection with the APA, including without limitation the amount of money you received and the date on which you received the money.

**RESPONSE TO INTERROGATORY NO. 13:**

Mr. Briles objects to this Interrogatory as vague and ambiguous with respect to the terms "in connection with." Mr. Briles objects to this Interrogatory to the extent it seeks information not relevant to a claim or a defense of a party.

Subject to and without waiving the foregoing objections, Mr. Briles responds that pursuant to Rule 33(d), the information requested in this Interrogatory may be determined by examining the bank transfer documents. The bank transfer documents have been produced in Mr. Briles' document production at Begin Bates Nos. RB002425 and RB002426.

//

//

//

1  **INTERROGATORY NO. 14:**

2      Describe in detail any and all expenditures, distributions, and/or

3  investments you have made with the money described in response to

4  Interrogatory No. 13.

5  **RESPONSE TO INTERROGATORY NO. 14:**

6      Mr. Briles objects to this Interrogatory as vague and ambiguous with

7  respect to the "expenditures," distributions," and "investments." Mr. Briles

8  objects to this Interrogatory as overbroad, oppressive, and unduly burdensome

9  insofar as it purports to seek "any and all expenditures, distributions, and/or

10  investments" Mr. Briles has made with money that he received in connection

11  with the APA over the course of eight years, without any attempt to tailor the

12  Interrogatory to relevant information. Mr. Briles further objects to this

13  Interrogatory to the extent it seeks information not relevant to a claim or a

14  defense of a party.

15      Based on the foregoing objections, Mr. Briles reserves the right to not

16  provide such information.

17  **INTERROGATORY NO. 15:**

18      Describe in detail any and all financial and/or ownership interest that you

19  have in Briles Aerospace, including without limitation any shares of capital

20  stock and/or percentage of ownership interest.

21  **RESPONSE TO INTERROGATORY NO. 15:**

22      Mr. Briles objects to this Interrogatory as vague and ambiguous with

23  respect to the terms "financial … interest" and "ownership interest." Mr. Briles

24  objects to this Interrogatory to the extent it seeks information not relevant to a

25  claim or a defense of a party.

26      Subject to and without waiving the foregoing objections, Mr. Briles

27  responds that he has no financial and/or ownership interest in Briles Aerospace.

28  //

**INTERROGATORY NO. 16:**

Describe in detail any communications between you, on the one hand, and any former employee of PB Fasteners who now works at Briles Aerospace, on the other hand, relating to employment at PB Fasteners, employment at Briles Aerospace, and/or tapered sleeve bolts.

**RESPONSE TO INTERROGATORY NO. 16:**

Mr. Briles objects to this Interrogatory as vague with respect to time-period. Mr. Briles objects to this Interrogatory to the extent it seeks information not relevant to a claim or a defense of a party. Mr. Briles further objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any communication" over an unspecified time-period, without any attempt to tailor the Interrogatory to relevant information. Therefore Mr. Briles limits his answer to oral conversations between himself and any former employee of PB Fasteners who now works at Briles Aerospace relating to tapered sleeve bolts after their employment with PB Fasteners.

Subject to and without waiving the foregoing objections, Mr. Briles incorporates by reference the conversations referenced in his response to Interrogatory No. 10.   In addition, he recalls having a conversation with Michael Briles regarding a public source for Taper-Lock Gauges.  Aside from those instances, Mr. Briles responds that he has no recollection of any other conversations with any former employee of PB Fasteners who now works at Briles Aerospace relating to tapered sleeve bolts after their employment with PB Fasteners.

**INTERROGATORY NO. 17:**

Describe in detail any and all trade secrets that PB Fasteners licensed to SPS Jenkintown.

//

//

**RESPONSE TO INTERROGATORY NO. 17:**

Mr. Briles objects to this Interrogatory to the extent it calls for legal conclusion with respect to "trade secret." Mr. Briles objects to this Interrogatory as vague with respect to time-period. Mr. Briles further objects to this Interrogatory as overbroad and unduly burdensome insofar as it purports to seek "any and all trade secrets" over an unspecified time period, without any attempt to tailor the Interrogatory to relevant information.

Subject to and without waiving the foregoing objections, Mr. Briles responds that he does not know of any trade secrets that PB Fasteners licensed to SPS Jenkintown.

**INTERROGATORY NO. 18:**

For each and every Request for Admission served by PB Fasteners that you deny, describe in detail the complete factual basis for your denial.

**RESPONSE TO INTERROGATORY NO. 18:**

Mr. Briles objects to this Interrogatory as overbroad, oppressive, and unduly burdensome insofar as it purports to seek the "complete factual basis for every denial" of 475 Requests for Admission. Mr. Briles objects to this Interrogatory to the extent it seeks information not relevant to a claim or a defense of a party. Mr. Briles further objects to this Interrogatory as compound insofar as it requests information for multiple classes of goods since the Requests for Admission involve multiple topics.

This Interrogatory contains *hundreds* of discrete subparts and, therefore, exceeds the 25-limit pursuant to Rule 33(a)(1). In *Safeco of America v. Rawstron*, the court found that an interrogatory requesting disclosure of "all the information on which the denials of each request for admissions were based" counted as multiple interrogatories for purposes of the numerical limit on interrogatories because allowing such an interrogatory would essentially transform each request for admission into an interrogatory not subject to the

1    numerical limit. 181 F.R.D. 441, 442 (C.D. Cal. 1998); *see also Makeaff v.*
2    *Trump University LLC*, No. 10-CV-0940-GPC (WVG), 2014 WL 3490356, *2,
3    *7 (S.D. Cal. Jul. 11, 2014); *Hahn v. Rothman*, No. CV 09-249 ODW (FFMx),
4    2010 WL 11526734, *2 (C.D. Cal. Jun. 11, 2010). As such, there is a strong
5    presumption that each underlying request for admission constitutes a separately
6    countable subpart. *Safeco of America*, 181 F.R.D. at 445.
7           Mr. Briles anticipates denying over 100 Requests for Admissions. These
8    Requests relate to various discrete topics including, but not limited to, bolts,
9    dimensions, documents, various conversations during and after Mr. Briles'
10   employment with PB Fasteners, the APA, the loan agreement, and Paul R.
11   Briles, Inc. Each of these topics also contain discrete subparts. Thus, Mr. Briles
12   objects to this Interrogatory as it exceeds the numerical limit of 25 in Rule
13   33(a)(1).
14          Based on the foregoing objections, Mr. Briles reserves the right to not
15   provide such information.
16
17   DATED:  June 28, 2019              ORRICK, HERRINGTON & SUTCLIFFE LLP
18                                      By  */s/ Alyssa Caridis*
19                                          William Molinski
                                            Alyssa Caridis
20
21                                          Attorneys for Defendant Robert Briles
22
23
24
25
26
27
28

1          **<u>PROOF OF SERVICE</u>**

2          I, Amy Maruska, am over the age of eighteen years and not a party to the

3   within-entitled action. My business address is Orrick, Herrington & Sutcliffe

4   LLP, 777 S. Figueroa Street, Suite 3200, Los Angeles, California 90017.

5          On June 28, 2019, I served the following document(s):

6
7   **DEFENDANT ROBERT BRILES' RESPONSES TO PLAINTIFF SPS
TECHNOLOGIES, LLC'S FIRST SET OF INTERROGATORIES**

8         **By Electronic Mail:** By transmitting said document(s) to the email

9   addresses listed below. The transmission was reported as complete and without

10  error:

11            **SERVICE LIST**

12
13
14
15
16

Matthew Donald Umhofer, Esq.       Attorneys for
Elizabeth Anne Mitchell, Esq.        SPS Technologies, LLC
**SPERTUS LANDES AND UMHOFER LLP**
1990 South Bundy Drive, Suite 705
Los Angeles, CA 90025
matthew@spertuslaw.com
emitchell@spertuslaw.com

17
18
19
20
21
22
23
24
25
26
27

Bruce R. Genderson, Esq.         Attorneys for
Thomas H. L. Selby, Esq.         SPS Technologies, LLC
Daniel P. Shanahan, Esq.
Joseph Q. Wood, Esq.
William B. Snyderwine, Esq.
Michelle L. Hood, Esq.
**WILLIAMS AND CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
bgenderson@wc.com
tselby@wc.com
dshanahan@wc.com
jwood@wc.com
wsnyderwine@wc.com
mhood@wc.com

28

1
2
3
4
5
6
7
8
9
10
11
12
13

Christopher Mathews, Esq.
Duane Lyons, Esq.
Tigran Guledjian, Esq.
Jason Frank Lake, Esq.
Nima Hefazi, Esq.
Patrick Schmidt, Esq.
Richard H. Doss, Esq.
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
chrismathews@quinnemanuel.com
duanelyons@quinnemanuel.com
tigranguledjian@quinnemanuel.com
jasonlake@quinnemanuel.com
nimahefazi@quinnemanuel.com
patrickschmidt@quinnemanuel.com
richarddoss@quinnemanuel.com

Attorneys for
Briles Aerospace, Inc. and
Michael Briles

14
15
16
17

Lance S. Strumpf, Esq.
Law Offices of Lance S Strumpf
5136 Woodley Avenue
Encino, CA 91436
lance206@mac.com

Attorneys for
Briles Aerospace, Inc. and
Michael Briles

18
19
20
21
22

I declare under penalty of perjury under the laws of the United States of America that I am employed in the office of a member of the bar of this Court, at whose direction the service was made, and that the foregoing is true and correct.

Executed on June 28, 2019, at Los Angeles, California.

23
24
25
26
27
28

_____
Amy Maruska

# EXHIBIT 19

## EMPLOYEE PATENT & CONFIDENTIALITY AGREEMENT

TO:      SPS TECHNOLOGIES, LLC:

I, _____, in consideration of my employment or continued employment by SPS Technologies, LLC, or one of its subsidiaries or affiliates (hereinafter collectively called the "Company"), and of the salary or wages to be paid to me during the continuance of such employment, agree as follows:

1.      To disclose promptly to the Company all inventions, discoveries, improvements, developments, designs, methods, systems, computer programs, trade secrets or any other intellectual property (hereinafter collectively called "Inventions") made, conceived or first reduced to practice by me solely or jointly with others during the period of my employment with the Company, relating to the business activities of the Company or resulting from or suggested by any of the work I have performed or may perform for the Company, whether or not such Inventions are patentable.

2.      The Company shall be free to adopt any such Invention, if it so desires, and any property rights therein including rights arising from the obtaining of letters patent or copyright in respect thereof shall be vested in the Company, and I will at the Company's request and cost execute any necessary assignment, patent or copyright forms and the like, and will assist in the drafting of any description or specification of the Invention as may be required and in connection with any application for letters patent.

3.      The Company's rights hereunder shall not be limited to this country but shall extend to any country in the world and shall attach to any such Invention notwithstanding that it is perfected or reduced to specific form after I have left the Company's employment, provided that its conception arose during the course of my employment.

4.      To lend such assistance as I may be able at the Company's request and expense in connection with any proceedings relating to such letters patent, copyright or application therefor; in such case the Company will pay me in respect of my expenses which I may incur in assisting the Company to obtain letters patent, copyright or other protection.

5.      Not to disclose directly or indirectly, publish or in any other way reveal to any unauthorized person at any time during or subsequent to my employment, or to utilize subsequent to my employment by the Company any knowledge not already available to the public respecting the Company's Inventions or other private or confidential matters of the Company and its business acquired or developed by me during the course of my employment, without first obtaining the Company's permission in a writing signed on behalf of the Company by its President.

6.      On leaving the Company's employ, I will promptly hand over all drawings and copies thereof, tables, notes, notebooks, correspondence and other written, printed or photographed material in my possession or control relating to such Inventions or other private or confidential matters of the Company and its business, and not retain any such document or writing.

7.      I have set out below a complete list of all Inventions, if any, patented or unpatented, including the numbers of all patents and patent applications filed thereon, and a brief description of all unpatented Inventions, which I made prior to my employment by the Company, and which are to be excluded from the scope of this Agreement.  I agree that any patentable improvements made upon the listed Inventions subsequent to my employment by the Company are to be the property of the Company if within the scope of Paragraph 1 hereof.

8.      In the course of performing services hereunder, on behalf of the Company and its affiliates, I understand and acknowledge that from time to time I will have access to Confidential Information (including, without limitation, all tangible and intangible data and electronic media, memoranda, detailed vendor information, procurement strategies, detailed customer lists and contact information, sales strategies, customer programs, manufacturing methods and methodologies, notes, programs and other papers and items, and reproductions thereof relating to the foregoing matters). I agrees to hold the Confidential Information in strict confidence, (b) not to disclose the Confidential Information to any person (other than in the regular business of the Company), and (c) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of the Company.  All documents, records, data, apparatus, equipment and other physical property, whether or not pertaining to Confidential Information, that are furnished to me by the Company or are produced by me in connection with my employment will be and remain the sole property of the Company.  Upon the termination of my employment with the Company for any reason and as and when otherwise requested by the Company, all Confidential Information (including, without limitation, all data, memoranda, customer lists, notes, programs and other papers and items, and reproductions thereof relating to the foregoing matters) in Executive's possession or control, shall be immediately returned to the Company.

9.      I hereby confirm that I am not bound by the terms of any agreement with any previous employer or other party that restricts in any way my use or disclosure of information or my engagement in any business.  I represent to the Company that my execution of this Agreement, my employment with the Company and the performance of my proposed duties for the Company will not violate any obligations I may have to any such previous employer or other party.  In my

RB002079

work for the Company, I will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and I will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

10.     During and after my employment, I shall cooperate fully with the Company in the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company that relate to events or occurrences that transpired while I was employed by the Company. I understand and acknowledge that my full cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company at mutually convenient times. During and after my employment, I also shall cooperate fully with the Company in connection with any investigation or review of any federal, state or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while I was employed by the Company. The Company shall reimburse me for any reasonable out-of-pocket expenses incurred in connection with my performance of obligations pursuant to this section.

11.     I recognize that the Company possesses a proprietary interest in all of the information described in herein and the Company has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of me, except as otherwise agreed between the Company and me in writing. I expressly agrees that any products, inventions, discoveries or improvements made by me or my agents or affiliates in the course of my employment, including any of the foregoing which is based on or arises out of the information described herein, shall be the property of and inure to the exclusive benefit of the Company.

12.     Each section of this Agreement constitutes a separate and distinct provision hereof.  In the event that any provision of this Agreement shall finally be judicially determined to be invalid, ineffective, or unenforceable, such determination will apply only in the jurisdiction in which such adjudication is made and every other provision of this Agreement will remain in full force and effect.  The invalid ineffective or unenforceable provision will without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective, or unenforceable provision; provided however, that such amendment will apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

13.     In the event that any provision contained herein is in violation of any law of the country in which this Agreement is signed or of any country to which I am subsequently transferred, then in that event such provision shall be considered null, void and of no effect, but the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon me.

14.     The provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of the parties.

15.     Nothing in this Agreement shall be deemed to bind the Company to employ me for any particular period of time, and I understand that my employment is terminable at the will of the Company.

16.     This Agreement supersedes all earlier agreements between the Company and me which deal with the subject matter of this Agreement, if any, and may not be modified in whole or in part except by a statement in writing signed by an officer of the Company.


I intend to be legally bound hereby this_____ day of _____, 2011.



Signed_____
          (Employee)


(l)Executed copy HR Dept.
(l)Executed copy Employee

CONFIDENTIAL
RB002080