SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
1990 S. Bundy Drive, Suite 705
Los Angeles, CA 90025
Telephone:  (310) 826-4700
Facsimile:  (310) 826-4711
matthew@spertuslaw.com
emitchell@spertuslaw.com

WILLIAMS & CONNOLLY LLP
Bruce R. Genderson (*pro hac vice*)
Thomas H.L. Selby (*pro hac vice*)
Daniel P. Shanahan (*pro hac vice*)
Edward C. Reddington (*pro hac vice*)
Joseph Q. Wood (*pro hac vice*)
Michelle L. Hood (*pro hac vice*)
William B. Snyderwine (*pro hac vice*)
Miranda R. Petersen (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
bgenderson@wc.com
tselby@wc.com
dshanahan@wc.com
ereddington@wc.com
jwood@wc.com
mhood@wc.com
wsnyderwine@wc.com
mpetersen@wc.com

*Attorneys for SPS Technologies, LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| SPS TECHNOLOGIES, LLC d/b/a/ PB FASTENERS,<br><br>Plaintiff,<br><br>v.<br><br>BRILES AEROSPACE, INC., MICHAEL BRILES, ROBERT BRILES as an individual and as Trustee of the ROB BRILES REVOCABLE FAMILY TRUST DATED MARCH 28, 1991, RICHARD BRILES as an | Case No. 2:18-cv-09536-MWF-AS<br><br>**SECOND AMENDED COMPLAINT**<br><br>**1. VIOLATION OF DEFEND TRADE SECRETS ACT**<br>**2. VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT**<br>**3. VIOLATION OF LANHAM ACT**<br>**4. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**<br>**5. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW** |

1  individual and as Trustee of the
   RICK AND KEANNA A. BRILES
2  FAMILY REVOCABLE TRUST
   DATED DECEMBER 12, 1990,
3  HI-SHEAR CORP., LISI
   AEROSPACE NORTH
4  AMERICA, INC., LISI
   AEROSPACE CANADA CORP.,
5  BLANC AERO INDUSTRIES
   SAS, SPACE-LOK, INC., and
6  MONTGOMERY
   MERCHANDIZING, LLC d/b/a
7  MONTGOMERY MACHINE

8            Defendants.

**6. INTENTIONAL INTERFERENCE
WITH CONTRACTUAL RELATIONS
7. INTENTIONAL INTERFERENCE
WITH PROSPECTIVE BUSINESS
RELATIONS
8. BREACH OF CONTRACT
9. INTENTIONAL
MISREPRESENTATION
10. CONCEALMENT**

**DEMAND FOR JURY TRIAL**

**REDACTED VERSION OF DOCUMENT
TO BE FILED UNDER SEAL
PURSUANT TO ORDER OF COURT
DATED JULY 16, 2019**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff SPS Technologies, LLC d/b/a PB Fasteners ("PB Fasteners" or "Plaintiff"), by and through its attorneys, and for its Second Amended Complaint against Briles Aerospace, Inc. ("Briles Aerospace"), Michael Briles, Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991), Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), HI-SHEAR Corp., Lisi Aerospace North America, Inc. (together with HI-SHEAR Corp., "Lisi USA"), Lisi Aerospace Canada Corp. ("Lisi Canada"), Blanc Aero Industries SAS ("Lisi France"), Space-Lok, Inc. ("Space-Lok"), and Montgomery Merchandizing, LLC d/b/a Montgomery Machine ("Montgomery Machine") (collectively, "Defendants"), hereby alleges as follows:

## I.   INTRODUCTION

1.     PB Fasteners is a leader in the design and manufacture of high-strength aerospace fasteners, with more than fifty years of experience in the industry.  PB Fasteners' marquee product is the SLEEVbolt®, which is an advanced-concept fastening system with critical applications in commercial and military aircraft.  This case arises from the wrongful acts of the Defendants pertaining to that SLEEVbolt® system, which have resulted in trade secret misappropriation, false advertisement, unfair competition, intentional interference with contractual and prospective business relations, breach of contract, intentional misrepresentation, and concealment.

2.     The SLEEVbolt® system consists of a tapered bolt made of titanium or nickel superalloy combined with a tapered stainless steel sleeve that the bolt slides into.  During the manufacturing process, the bolt is pushed partially into the sleeve and the assembly is delivered to the customer in that state.  This is referred to as the semi-expanded state of the SLEEVbolt®.

3.     During installation, the SLEEVbolt® is placed into a hole drilled through the aircraft components that need to be joined together.  The hole is drilled to precisely match the outer diameter of the SLEEVbolt® in the semi-expanded state.  The tapered

bolt is then driven fully through the sleeve, causing a precise amount of uniform expansion throughout the sleeve.  The expansion of the sleeve creates a uniform force, referred to as interference, between the hole and the SLEEVbolt®.

4.     The SLEEVbolt® system offers significant benefits over competing aerospace fasteners.  As one example, the SLEEVbolt® provides a uniform interference fit with constant radial compression between the fastener and secured aircraft components, which reduces structural fatigue.  As another example, the uniform expansion of the SLEEVbolt® provides critical lightning strike protection in composite structures.

5.     The tapered bolt and sleeve are made and assembled with confidential and proprietary dimensions, formulae, and processes, which are essential to the proper manufacture and functioning of the SLEEVbolt®.  These dimensions, formulae, and processes are not generally known or readily ascertainable.

6.     PB Fasteners developed its confidential and proprietary dimensions, formulae, and processes through many years of research and testing.  This development required significant engineering expertise, industry experience and know-how, and investment of resources.  PB Fasteners also was required to refine its dimensions, formulae, and processes over time as it developed new models of the SLEEVbolt®, including large-diameter SLEEVbolts® starting in 2013.  Given the value of this information, PB Fasteners has made extensive efforts to maintain its secrecy.

7.     The primary consumer of the SLEEVbolt® system is The Boeing Company ("Boeing"), which has been a customer of PB Fasteners for more than forty years.  Boeing has contracted with PB Fasteners for the production of SLEEVbolts® for Boeing's composite 787 aircraft and has placed short-term purchase orders for the production of SLEEVbolts® for Boeing's composite 777X aircraft.  The contract for the 787 aircraft runs through December 31, 2021.  As part of their contractual and ongoing business relationship, PB Fasteners gave Boeing access to its proprietary

SLEEVbolt® information.  Boeing required this information to be able to properly inspect and approve the SLEEVbolts® and to integrate them into the aircraft assembly process.  PB Fasteners provided proprietary information to Boeing in documents describing specific dimensions and processes; during in-person meetings and telephone calls with Boeing engineers; and in conjunction with inspections conducted by Boeing at PB Fasteners' factory.  PB Fasteners communicated all proprietary information to Boeing on the condition that the information would remain confidential.  Boeing understood that it had an obligation to maintain the confidentiality of PB Fasteners' proprietary information.

8.      In 2011, Plaintiff SPS Technologies, LLC purchased the assets of Paul R. Briles d/b/a PB Fasteners, which included the proprietary information and trade secrets necessary to make the SLEEVbolt®.  For several years after the acquisition, Plaintiff was the exclusive manufacturer of SLEEVbolts® for Boeing.

9.      Before Plaintiff's acquisition of the assets of PB Fasteners, Robert Briles was the President of PB Fasteners, and Michael Briles worked as its Director of Sales and Marketing.  In conjunction with their employment at PB Fasteners after the asset acquisition, Robert and Michael Briles each entered into confidentiality agreements with Plaintiff.  Shortly after the asset acquisition, Michael Briles left PB Fasteners and founded Briles Aerospace.  Initially, Briles Aerospace manufactured and provided only standard products and services for the aerospace industry.  When standard products and services failed to yield sufficient profits, however, Briles Aerospace began working to misappropriate the SLEEVbolt®.  Robert Briles was a principal facilitator and financier of these efforts.

10.     To develop a copy of the SLEEVbolt®, Briles Aerospace relied on PB Fasteners' confidential, proprietary, and trade secret information, which Briles Aerospace acquired and used through improper means.  As one example, Briles Aerospace obtained PB Fasteners' confidential, proprietary, and trade secret information from former PB Fasteners employees with detailed knowledge of that

information, including Michael Briles, Robert Briles, and others.  These employees were subject to confidentiality agreements that prohibited the disclosure or use of PB Fasteners' confidential, proprietary, and trade secret information.  As another example, Briles Aerospace began to work with Boeing to obtain qualifications to produce the SLEEVbolt®.  In doing so, Briles Aerospace gained access to PB Fasteners' trade secret and proprietary information through documents exchanged with Boeing, as well as through in-person meetings and telephone calls with representatives from Boeing.  As a result of this improper conduct, Briles Aerospace was able to qualify to produce the SLEEVbolt® in far less time than would have been possible without PB Fasteners' confidential, proprietary, and trade secret information. Indeed, Briles Aerospace lacked the capital and independent manufacturing expertise to re-create the SLEEVbolt® when it began its efforts to qualify with Boeing.

11.    Lisi USA, Lisi Canada, and Lisi France (collectively, "Lisi Aerospace") also misappropriated PB Fasteners' trade secret information related to the SLEEVbolt®.  Like Briles Aerospace, Lisi Aerospace acquired PB Fasteners' trade secrets through improper means to develop its copy of the SLEEVbolt®.  As one example, Lisi Aerospace gained access to these trade secrets through a former employee of Plaintiff, Larry Kline, who had detailed knowledge of that information. Mr. Kline was subject to a confidentiality agreement that prohibited the disclosure or use of Plaintiff's confidential, proprietary, and trade secret information.  As another example, Lisi Aerospace began to work with Boeing to obtain qualifications to produce the SLEEVbolt® through a process similar to the process that Briles Aerospace had pursued with Boeing to develop its copy of the SLEEVbolt®.  During this qualification process, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ██████████████████████████████████████████

6       12.    Space-Lok and Montgomery Machine also misappropriated PB

7 Fasteners' trade secrets to develop a copy of the SLEEVbolt®. Like Briles Aerospace

8 and Lisi Aerospace, Space-Lok and Montgomery Machine obtained these trade

9 secrets through the qualification process with Boeing. ██████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████ █████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████

27       13.    Briles Aerospace and Lisi Aerospace were able to qualify to produce the

28 SLEEVbolt® for Boeing only because they acquired PB Fasteners' trade secret

1    information through improper means and/or improperly used that information.

2    ██████████████████████████████████████████████████

3    ████████████████ only because they acquired PB Fasteners' trade secret

4    information through improper means and/or improperly used that information.

5        14.    In September 2018, Boeing issued a new Request for Proposal ("RFP")

6    for a SLEEVbolt® with a minor machined "notch" on the head of the tapered bolt.

7    Before issuing this new RFP, Briles Aerospace and Lisi Aerospace had worked with

8    Boeing to develop the "notched" design revision, thereby encouraging Boeing to

9    breach its contractual obligations to PB Fasteners and interfering with Boeing and PB

10   Fasteners' ongoing and prospective contractual and business relations.

11       15.    In connection with that RFP, Boeing disclosed to PB Fasteners for the

12   first time that it had qualified Briles Aerospace and Lisi Aerospace as additional

13   manufacturers of the SLEEVbolt®.  Neither of these manufacturers could have

14   obtained the necessary qualifications without misappropriating PB Fasteners'

15   proprietary information. ██████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████

18       16.    Instead of promoting legitimate competition in the market for aerospace

19   fasteners, Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine

20   stole PB Fasteners' trade secrets.  The trade secret and proprietary information stolen,

21   misused, and misappropriated by Defendants was the result of many years of

22   investment, research, and development.  In response to Defendants' misconduct, PB

23   Fasteners brings this Complaint to prevent any further misuse of its proprietary

24   information, to prevent Defendants from undermining its business and reputation, and

25   to obtain compensation for its damages and for Defendants' unjust enrichment

26   resulting from their unlawful conduct.

27

28

## II.    PARTIES

17.    SPS Technologies, LLC is a limited liability company organized and existing under the laws of Pennsylvania.  Its principal place of business is at 4650 SW Macadam Ave., Portland, Oregon 97239.  As set forth below, SPS Technologies, LLC owns all of the proprietary, confidential, and trade secret information that Defendants misappropriated.  SPS Technologies, LLC owns and operates a manufacturing facility at 1700 W. 132nd St., Gardena, California 90249, under the name PB Fasteners.

18.    Briles Aerospace, Inc. is a California corporation with its principal place of business at 1559 West 135th St., Gardena, California 90249.

19.    Michael Briles is a resident, domiciliary, and citizen of California. Michael Briles is the founder and President of Briles Aerospace, Inc., the nephew of Robert Briles, and the son of Richard Briles.  Before founding Briles Aerospace, Inc., Michael Briles was an employee of PB Fasteners.

20.    Robert Briles is a resident, domiciliary, and citizen of California.  He is the former President of PB Fasteners, the uncle of Michael Briles, and the brother of Richard Briles.  Robert Briles is the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991.

21.    Richard Briles is a resident, domiciliary, and citizen of California.  He is a former Director of PB Fasteners, the father of Michael Briles, and the brother of Robert Briles.  He is the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990.

22.    HI-SHEAR Corp. is a Delaware corporation with its principal place of business at 2600 Skypark Drive, Torrance CA 90509.

23.    Lisi Aerospace North America, Inc. is a Delaware corporation with its principal place of business at 2600 Skypark Drive, Torrance CA 90509.

24.    Lisi Aerospace Canada Corp. is a Canadian company with its principal place of business at 2000 Place Transcanadienne, Dorval, Quebec, H9P 2X5, Canada.

25.     Blanc Aero Industries SAS is a French company with its principal place of business at 45/52 Quai de la Râpée, 75012 Paris 12, France.

26.     Space-Lok, Inc. is a California corporation with its principal place of business at 6300 Ridglea Place Suite 914, Fort Worth TX 76116.  Space-Lok, Inc. owns and operates a manufacturing facility at 13306 Halldale Ave., Gardena CA 90249.

27.     Montgomery Merchandizing, LLC is a Connecticut limited liability company with its principal place of business at 52 Indian Road, Guilford CT 06437. Montgomery Merchandizing, LLC operates a manufacturing facility under the name Montgomery Machine at 1 Orchard Park Road, Suite 2, Madison CT 06443.

## III.   JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over PB Fasteners' federal trade secret claims pursuant to 18 U.S.C. §§ 1836 *et seq.* and 28 U.S.C. § 1331.  The Court has subject matter jurisdiction over PB Fasteners' federal Lanham Act claim pursuant to 15 U.S.C. §§ 1051 *et seq.* and 28 U.S.C. § 1331.   The Court has supplemental jurisdiction over the state law claims alleged in this Second Amended Complaint pursuant to 28 U.S.C. § 1367.

29.     The Court has personal jurisdiction over Briles Aerospace because Briles Aerospace resides in California and/or does business in California.

30.     The Court has personal jurisdiction over Michael Briles because he is a resident, domiciliary, and citizen of California, and/or because he does business in California.

31.     The Court has personal jurisdiction over Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) because he is a resident, domiciliary, and citizen of California, and/or because he has done business in California.

32.     The Court has personal jurisdiction over Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated

December 12, 1990) because he is a resident, domiciliary, and citizen of California, and/or because he has done business in California.

33.     The Court has personal jurisdiction over HI-SHEAR Corp. because HI-SHEAR Corp. resides in California and/or does business in California.

34.     The Court has personal jurisdiction over Lisi Aerospace North America, Inc. because Lisi Aerospace North America, Inc. resides in California and/or does business in California.

35.     The Court has personal jurisdiction over Lisi Aerospace Canada Corp. because Lisi Aerospace Canada Corp. has committed and continues to commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and, upon information and belief, ships infringing products into the State of California, including this District. The acts of Lisi Aerospace Canada Corp. cause deliberate injury to PB Fasteners within this District.  Upon information and belief, Lisi Aerospace Canada Corp. derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

36.     The Court has personal jurisdiction over Blanc Aero Industries SAS because Blanc Aero Industries SAS has committed and continues to commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and, upon information and belief, ships infringing products into the State of California, including this District. The acts of Blanc Aero Industries SAS cause deliberate injury to PB Fasteners within this District.  Upon information and belief, Blanc Aero Industries SAS derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

37.     The Court has personal jurisdiction over Space-Lok, Inc. because Space-Lok, Inc. resides in California and/or does business in California.

38.     The Court has personal jurisdiction over Montgomery Merchandizing, LLC d/b/a Montgomery Machine because, upon information and belief, Montgomery Merchandizing, LLC d/b/a Montgomery Machine has committed and continues to

commit acts of misappropriation in violation of 18 U.S.C. §§ 1836 *et seq.* and ships infringing products into the State of California, including this District.  The acts of Montgomery Merchandizing, LLC d/b/a Montgomery Machine cause deliberate injury to PB Fasteners within this District.  Upon information and belief, Montgomery Merchandizing, LLC d/b/a Montgomery Machine derives substantial financial benefit from the shipment of infringing products within this District and expects its actions to have consequences within this District.

39.     Venue is proper within this District under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims alleged in this Second Amended Complaint occurred in this judicial district and because Lisi Aerospace Canada Corp. and Blanc Aero Industries SAS are not resident in the United States.

## IV.     FACTUAL ALLEGATIONS

### A.     PB Fasteners Develops the SLEEVbolt® System.

40.     PB Fasteners specializes in the manufacture of high-strength aerospace fasteners.  The company was founded in 1967, and now maintains a 100,000 square foot manufacturing facility in Gardena, California, where it has about 250 employees.

41.     Aerospace fasteners are subject to demanding specifications relating to temperature, corrosion, weight, geometry, fatigue, and conductivity.  As a result, the aerospace fastener industry requires significant engineering expertise.

42.     PB Fasteners is a leader in the design and manufacture of high-strength aerospace fasteners.

43.     One of the earliest inventions covered by a PB Fasteners trademark was the Taper-Lok®, which is an integrated fastening system used specifically for applications requiring precise levels of interference fit between the bolt and the materials being joined.

44.     The Taper-Lok® system is comprised of a tapered, conical-shank fastener, which is installed into a precision tapered hole.  The interference fit between the Taper-Lok® and the tapered hole induces static radial compression.

45.     The benefit of the Taper-Lok® system is that it effectively reduces fatigue and enhances the life of the joint.  The requirement of drilling a precisely tapered hole to exact dimensions requires additional expertise and cost during aircraft assembly.

46.     PB Fasteners developed the SLEEVbolt® system to capture the benefits of the Taper-Lok® system without incurring the additional cost at installation.

47.     The SLEEVbolt® system is an advanced-concept fastening system with critical applications in commercial and military aircraft.  The SLEEVbolt® system combines a tapered bolt made of titanium or nickel superalloy with a stainless steel sleeve.

48.     Because the SLEEVbolt® is delivered in a semi-expanded state and the outside diameter of the sleeve is straight, not tapered, the assembly process is easier and less expensive than the Taper-Lok® system.  With the SLEEVbolt® system the assembler can drill a straight hole instead of a tapered hole.  Because the diameter of that straight hole is very close to the outer diameter of the sleeve in its semi-expanded state, the assembler simply drops the SLEEVbolt® into the hole and drives the bolt the rest of the way into the sleeve, which expands the outer diameter of the sleeve to create the exact amount of necessary radial compression and interference between the SLEEVbolt® and the components that it joins.

49.     For the SLEEVbolt® system to function properly, the outer diameter of the sleeve must expand in a precise, uniform, and consistent way as the bolt is fully driven into the sleeve.  The dimensions, formulae, and processes for manufacturing and assembling the bolt and sleeve that were developed by PB Fasteners are necessary to make that expansion happen correctly in the SLEEVbolt® system.

50.     The SLEEVbolt® comes in two forms: a protruding head version, used to fasten structural components such as the wing box of the aircraft, and a flush head version, used to fasten surface components such as the skins to the wings of the aircraft.

51.     The SLEEVbolt® system offers significant benefits over competing aerospace fasteners:

      a.     It provides a uniform interference fit with radial compression between the fastener and secured aircraft components, which reduces structural fatigue at the joint;

      b.     It provides critical lightning strike protection in composite structures by ensuring that there are no gaps in the conductive electrical circuits of the aircraft;

      c.     It provides superior joint strength through more even load distribution, thus requiring fewer fasteners than conventional methods; and

      d.     It does not delaminate composite structures.

52.     The tapered bolt and sleeve are made and assembled with confidential and proprietary dimensions, formulae, and processes, which are essential to the proper manufacture and functioning of the SLEEVbolt® system.

53.     These confidential and proprietary dimensions, formulae, and processes are not generally known or readily ascertainable.

54.     PB Fasteners developed its dimensions, formulae, and processes through many years of research and testing, which required significant engineering expertise, the invention of manufacturing tools and machinery, recruitment and training of specialized employees, investment in certifications, and industry experience and know-how.

55.     PB Fasteners has made extensive efforts to maintain the secrecy of its proprietary information.  These efforts include training employees in the protection

of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary dimensions, formulae, and processes, and performing exit interviews with departing employees.

56.     Although PB Fasteners has disclosed some of its proprietary dimensions, formulae, and processes to authorized business customers, vendors, or licensees, it has informed recipients of such information that the information is proprietary, has required recipients of such information to maintain its confidentiality, and the recipients of such information have understood that they must maintain the confidentiality of this information.

**B.     Boeing Depends on the SLEEVbolt® System.**

57.     PB Fasteners has been a major supplier of aerospace fasteners to Boeing for more than forty years.

58.     The relationship between PB Fasteners and Boeing assumed greater significance with the development of composite aircraft in the late 2000s.  Unlike conventional metal airframes that readily conduct electricity, composite aircraft require the manufacturer to engineer conductive electrical circuits to withstand lightning strikes.  The SLEEVbolt® system plays an important role in ensuring lightning strike protection for Boeing's composite 787 and 777X aircraft.

59.     Boeing and PB Fasteners operate under a contract that requires Boeing to purchase 90% of the SLEEVbolt® requirements for its 787 aircraft from PB Fasteners through December 31, 2021.

60.     Before September 2018, no other manufacturer of aerospace fasteners had ever supplied SLEEVbolts® to Boeing without first obtaining a license to use PB Fasteners' proprietary information.

61.     As part of its relationship with PB Fasteners, Boeing has required that it be allowed to "qualify" PB Fasteners by visiting its facilities to verify that the facilities and its processes are adequate.  Boeing representatives performed in-person

inspections at PB Fasteners, where they had access to PB Fasteners' confidential and proprietary dimensions and processes.

62.   In addition, in connection with qualifications of specific fasteners, including SLEEVbolts®, Boeing has required the exchange of part specification documents with PB Fasteners.  Such documents include PB Fasteners' confidential and proprietary dimensions and processes.

63.   Although PB Fasteners has provided Boeing access to its dimensions and processes, PB Fasteners has insisted that such information is proprietary and must remain confidential, PB Fasteners and Boeing have contractually agreed to maintain the confidentiality of such information, and Boeing has understood that it must maintain the confidentiality of such information.

## C.   SPS Jenkintown Is Unable to Re-create the SLEEVbolt® System.

64.   In the 2000s, Boeing recognized that the SLEEVbolt® system was critical to its manufacture of composite aircraft.  As a result, Boeing identified SPS Jenkintown as a potential SLEEVbolt® manufacturer to diversify its supply chain.

65.   SPS Jenkintown is a premier manufacturer of high-strength aerospace fasteners with nearly a century of engineering experience and industry know-how.

66.   PB Fasteners granted SPS Jenkintown a license to use its proprietary information, including specifically its trade secrets.  PB Fasteners also provided SPS Jenkintown with in-person training and support as it attempted to manufacture the SLEEVbolt® system.  Those efforts lasted for more than eighteen months.

67.   Despite SPS Jenkintown's extensive engineering expertise, industry know-how, and access to PB Fasteners' proprietary information, it was unable to consistently manufacture the SLEEVbolt® system for Boeing using its own parts. Instead, Jenkintown could consistently manufacture the SLEEVbolt® system for Boeing only by purchasing the sleeves from PB Fasteners, which SPS Jenkintown continued to do for the duration of its license.

**D.** **Plaintiff Purchases the SLEEVbolt® System, and Briles Aerospace Steals It Back.**

68.     SPS Technologies, LLC purchased the assets of Paul R. Briles, Inc. d/b/a PB Fasteners in October 2011.

69.     Before the acquisition, Robert Briles was the President of, and a shareholder in, PB Fasteners for many years.  As a result, Robert Briles had access to, and detailed knowledge of, all of PB Fasteners' confidential and proprietary information, including without limitation the trade secret dimensions, formulae, and processes that are essential to the manufacture of the SLEEVbolt®.

70.     During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets, including specifically the processes used in the manufacture of the SLEEVbolt® system.  Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles made this representation to Plaintiff, among other occasions, on June 7, 2011 during a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and representatives of the Federal Trade Commission.

71.     In the Asset Purchase Agreement ("APA") with SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. further represented (i) that Paul R. Briles, Inc.'s intellectual property rights included trade secrets, *see, e.g.*, APA definition of Intellectual Property Rights, (ii) that Paul R. Briles, Inc. owned such trade secrets free and clear, *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc. was aware of no improper use of such trade secrets by others, *see, e.g.*, APA Section 4.8.3, and (iv) that the assets acquired by SPS Technologies, LLC included all such

trade secrets, *see, e.g.*, APA Section 2.1.5.  Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles made this representation to Plaintiff, among other occasions, on May 4, 2011 (the date of the APA), September 27, 2011 (the date of Amendment No. 1 to the APA), and October 4, 2011 (the APA closing date).

72.     During this litigation, in Robert Briles's Responses (served June 28, 2019) to Plaintiff's First Set of Interrogatories, Robert Briles asserted that he has no knowledge of confidential, proprietary, and/or trade secret information relating to the SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies, LLC in connection with the APA.  Thus, in effect, Robert Briles now asserts that, before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions, formulae, and processes that Plaintiff has identified in this lawsuit and/or that such dimensions, formulae, and processes are not trade secret or proprietary information.  This assertion is false.

73.     If Robert Briles's assertion is correct—and Plaintiff maintains that it is clearly false—then, in the alternative, (i) the representation of the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), that Paul R. Briles, Inc. owned trade secrets was false; (ii) the Directors and shareholders of Paul R. Briles, Inc. knew that the representation that Paul R. Briles, Inc. owned trade secrets was false when they made it, or they made such representation recklessly and without regard for its truth; (iii) the Directors and shareholders of Paul R. Briles, Inc. intended that Plaintiff rely on the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff

entered into, amended, and closed on the APA; and (iv) Plaintiff reasonably relied on the representation that Paul R. Briles, Inc. owned trade secrets when Plaintiff entered into, amended, and closed on the APA.

74.    In addition, if Robert Briles's assertion is correct—and again Plaintiff maintains that it is clearly false—then in the alternative, (i) the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), intentionally failed to disclose to Plaintiff that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or did not take reasonable measures to protect the secrecy of its trade secrets, such that the representation about Paul R. Briles, Inc.'s ownership of trade secrets was deceptive; (ii) Plaintiff could not have discovered this material information, which was in the exclusive control of Paul R. Briles, Inc., Robert Briles, and Richard Briles; (iii) Plaintiff did not know that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, or closed on the APA; (iv) the Directors and shareholders of Paul R. Briles, Inc. intended to deceive Plaintiff by concealing that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA; and (v) had Plaintiff known that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets, Plaintiff reasonably would not have entered into, amended, or closed on the APA.

75.    Plaintiff paid Paul R. Briles, Inc. ███████ for its assets pursuant to the APA (benefitting the former Directors and shareholders of Paul R. Briles, Inc., including Robert Briles and Richard Briles).  This purchase price could not be

justified by the value of Paul R. Briles, Inc.'s non-trade secret assets or its non-SLEEVbolt® sales at the time of the APA.  To the contrary, at that purchase price, Plaintiff understood, and was led to believe by the Directors and shareholders of Paul R. Briles, Inc., that Paul R. Briles, Inc. possessed, had maintained, and was transferring valuable trade secrets relating to the SLEEVbolt®.

76.    In consideration for the purchase of the assets of Paul R. Briles, Inc., Robert Briles was party to the APA, which is valid and enforceable.

77.    In Paragraph 6.6.5 of the APA, Robert Briles agreed to "keep confidential . . . all non-public information relating to the Acquired Business, the Acquired Assets [including all trade secrets and other proprietary rights] and Assumed Liabilities, unless and to the extent that (i) the aforementioned information becomes known or available for use by the public other than as a result of disclosure by . . . [Robert Briles], (ii) any disclosure is . . . required by Law . . . or (iii) any disclosure is requested or otherwise made in connection with Tax Returns, or pursuing and defending claims . . . ."

78.    SPS Technologies, LLC performed all material terms required under the APA.

79.    On information and belief, Robert Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace in violation of the APA.

80.    In consideration for his employment by PB Fasteners after the assets were acquired by SPS Technologies, LLC, Robert Briles entered into a valid and enforceable Employee Patent & Confidentiality Agreement ("Employee Agreement") with PB Fasteners in September 2011.

81.    In Paragraph 5 of the Employee Agreement, Robert Briles agreed "[n]ot to disclose directly or indirectly, publish or in any other way reveal to any unauthorized person at any time during or subsequent to [his] employment, or to utilize subsequent to [his] employment by the Company any knowledge not already

available to the public respecting the Company's Inventions or other private or confidential matters of the Company and its business acquired or developed by [him] during the course of [his] employment, without first obtaining the Company's permission in a writing signed on behalf of the Company by its President."

82.     In Paragraph 6 of the Employee Agreement, Robert Briles also agreed that on leaving PB Fasteners, he would "promptly hand over all drawings and copies thereof, tables, notes, notebooks, correspondence and other written, printed or photographed material in [his] possession or control relating to . . . private or confidential matters of the Company and its business, and not retain any such document or writing."

83.     In Paragraph 8 of the Employee Agreement, Robert Briles also agreed (a) "to hold [PB Fasteners'] Confidential Information in strict confidence, (b) not to disclose the Confidential Information to any person (other than in the regular business of the Company), and (c) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of the Company."

84.     In Paragraph 11 of the Employee Agreement, Robert Briles also agreed "that the Company possesses a proprietary interest in all of the information described [] herein and the Company has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of [him] . . . ."

85.     PB Fasteners performed all material terms required under the Employee Agreement.

86.     Robert Briles retained PB Fasteners' confidential and proprietary information in violation of the Employee Agreement.

87.     On information and belief, Robert Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace in violation of the Employee Agreement.

88.    On information and belief, Briles Aerospace is using PB Fasteners' confidential and proprietary information that it obtained from Robert Briles to manufacture  SLEEVbolts®.

89.    In May 2011, Michael Briles was PB Fasteners' Director of Sales and Marketing.  In consideration for his employment by PB Fasteners, Michael Briles entered into a valid and enforceable Employee Patent & Confidentiality Agreement ("Employee Agreement") with PB Fasteners in September 2011.

90.    In Paragraph 5 of the Employee Agreement, Michael Briles agreed "[n]ot to disclose directly or indirectly, publish or in any other way reveal to any unauthorized person at any time during or subsequent to [his] employment, or to utilize subsequent to [his] employment by the Company any knowledge not already available to the public respecting the Company's Inventions or other private or confidential matters of the Company and its business acquired or developed by [him] during the course of [his] employment, without first obtaining the Company's permission in a writing signed on behalf of the Company by its President."

91.    In Paragraph 6 of the Employee Agreement, Michael Briles also agreed that on leaving PB Fasteners, he would "promptly hand over all drawings and copies thereof, tables, notes, notebooks, correspondence and other written, printed or photographed material in [his] possession or control relating to . . . private or confidential matters of the Company and its business, and not retain any such document or writing."

92.    In Paragraph 8 of the Employee Agreement, Michael Briles also agreed (a) "to hold [PB Fasteners'] Confidential Information in strict confidence, (b) not to disclose the Confidential Information to any person (other than in the regular business of the Company), and (c) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of the Company."

93.    In Paragraph 11 of the Employee Agreement, Michael Briles also agreed "that the Company possesses a proprietary interest in all of the information described

[] herein and the Company has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of [him] . . . ."

94.   PB Fasteners performed all material terms required under the Employee Agreement.

95.   Shortly after the acquisition of the assets of PB Fasteners, Michael Briles left the company and later founded Briles Aerospace.

96.   In violation of the Employee Agreement, Michael Briles retained PB Fasteners' confidential and proprietary information, ███ ███
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████

97.   Michael Briles shared, disclosed, revealed, used, and/or utilized PB Fasteners' confidential and proprietary information with Briles Aerospace, Robert Briles, and others in violation of the Employee Agreement.

98.   Briles Aerospace is using PB Fasteners' confidential and proprietary information that it obtained from Michael Briles to manufacture SLEEVbolts®.

99.   Briles Aerospace initially manufactured and provided only standard products and services for the aerospace industry.  At this time, Briles Aerospace lacked the capital, manpower, and manufacturing expertise to develop a copy of the SLEEVbolt®.

100.  When standard products and services failed to yield sufficient profits, however, Briles Aerospace began working to misappropriate the SLEEVbolt®.

101.  To develop a copy of the SLEEVbolt®, Briles Aerospace relied on former PB Fasteners employees, including Michael Briles, Robert Briles, and multiple others.

102.  Each of these former employees had detailed knowledge of PB Fasteners' proprietary information, as well as PB Fasteners' contractual and ongoing

21

business relationship with Boeing.  These former employees are using PB Fasteners' confidential and proprietary information to manufacture SLEEVbolts® for Briles Aerospace.

103.   Consistent with PB Fasteners' standard practice, each of the former employees signed a confidentiality agreement in which they agreed they would not disclose any proprietary information outside PB Fasteners and that they would not use any proprietary information except as necessary in connection with their work for PB Fasteners.

104.   Briles Aerospace also acquired PB Fasteners' trade secret information through improper means during the qualification process with Boeing.

105.   The qualification process required Briles Aerospace to complete two steps. First, it had to qualify its facilities.  On information and belief, Briles Aerospace received PB Fasteners' proprietary information during this qualification process through documents exchanged with Boeing, as well as through in-person visits and inspections and telephone calls with the same Boeing representatives who previously had gained access to the confidential, proprietary, and trade secret information of PB Fasteners (including Joseph Hinton and Todd Hubbell).

106.   Second, Briles Aerospace had to qualify its manufacture of the SLEEVbolt®.   On information and belief, Briles Aerospace also received PB Fasteners proprietary information during this qualification.

107.   Briles Aerospace was able to obtain these qualifications from Boeing only by acquiring and/or using PB Fasteners' proprietary information through improper means.  Briles Aerospace does not have a license from PB Fasteners to use its proprietary information.

108.   Briles Aerospace has attempted, and continues to attempt, to conceal its misappropriation.  As one example, Michael Briles has claimed that ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1  █████████████████████████████████████████████

2  █████████████████████████████████████████████

3  █████████████████████████████████████████████

4  █████████████████████████████████████████████

5  █████████████████████████████████████████████

6  ████████      ███████████████████████████████

7  █████████████████████████████████████████████

8  ███████████████████████████████

9      109.   As another example, ████████████████████

10 █████████████████████████████████████████████

11 █████████████████████████████████████████████

12 █████████████████████████████████████████████

13 █████████████████████████████████████████████

14 ██████████████████████████████████████

15     110.   For several years after Briles Aerospace was founded, it provided only

16 standard products and services for the aerospace industry.  During the qualification

17 process, however, Briles Aerospace claims that it reorganized its business to sell

18 SLEEVbolts® to Boeing and that such sales are now Briles Aerospace's only source

19 of revenue.   On information and belief, Briles Aerospace made such significant

20 changes only because it had taken deliberate steps to cause a disruption in the

21 contractual and ongoing business relationship between Boeing and PB Fasteners,

22 including by agreeing to sell SLEEVbolts® to Boeing in violation of Boeing's

23 contract with PB Fasteners and by working with and encouraging Boeing to breach

24 its contractual obligations to PB Fasteners.

25     **E.     Lisi Aerospace Steals the SLEEVbolt®.**

26     111.   To develop a copy of the SLEEVbolt®, Lisi Aerospace gained improper

27 access to Plaintiff's trade secret information from Larry Kline, who had worked

28 previously at SPS Jenkintown.  Mr. Kline was SPS Jenkintown's Director of Quality

before taking a position with Lisi USA in 2016.  During his employment at SPS Jenkintown, Mr. Kline worked extensively on SPS Jenkintown's qualification to manufacture SLEEVbolts® for Boeing, and thus had detailed knowledge of PB Fasteners' trade secrets. ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████        Mr. Kline was subject to a confidentiality agreement that prohibited the disclosure or use of Plaintiff's confidential, proprietary, and trade secret information.  Lisi Aerospace also acquired PB Fasteners' trade secret information through improper means during the qualification process with Boeing.  On information and belief, Lisi Aerospace received PB Fasteners' proprietary information during this qualification process through documents exchanged with Boeing, as well as through in-person visits and inspections and telephone calls with the same Boeing representatives who had gained access to the confidential, proprietary, and trade secret information of PB Fasteners and who also had worked to qualify Briles Aerospace (including Joseph Hinton and Todd Hubbell).

112.  ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████

2  ██████████

3       113.   Lisi Aerospace was able to qualify to produce SLEEVbolts® for Boeing

4  only by acquiring and/or using PB Fasteners' proprietary information through

5  improper means.  Lisi Aerospace does not have a license from PB Fasteners to use its

6  proprietary information.

7       **F.     Space-Lok and Montgomery Machine Steal the SLEEVbolt®.**

8       114.   Like Briles Aerospace and Lisi Aerospace, Space-Lok and Montgomery

9  Machine acquired PB Fasteners' trade secret information through improper means

10  during the qualification process with Boeing.  On information and belief, Space-Lok

11  and Montgomery Machine received PB Fasteners' proprietary information during this

12  qualification process through documents exchanged with Boeing, as well as through

13  in-person visits and inspections and telephone calls with the same Boeing

14  representatives who previously had gained access to the confidential, proprietary, and

15  trade secret information of PB Fasteners and who also had worked to qualify Briles

16  Aerospace and Lisi Aerospace (including Joseph Hinton and Todd Hubbell).

17       115.   ████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28



only because they acquired PB Fasteners' trade secret information through improper means and/or improperly used that information. Neither Space-Lok nor Montgomery Machine has a license from PB Fasteners to use its proprietary information.

### G.    Boeing Issues a New RFP for SLEEVbolts®.

118.   Boeing issued a new RFP for SLEEVbolts® on September 21, 2018. The new RFP called for a minor revision to the protruding head SLEEVbolt® by including a small machined "notch" in the head of the tapered bolt. The shape of the head of the protruding bolt is irrelevant to the actual functioning of the SLEEVbolt® because it plays no role in the sleeve expansion. The "notched" product is exactly the same as the SLEEVbolt® produced for Boeing by PB Fasteners that does not contain the notch, with the exception of one additional cut in the side of the bolt head. That cut requires mere seconds of additional run time during the machining process.

119.   PB Fasteners had no advance notice of the "notched" design revision, despite the fact that PB Fasteners was the creator of the SLEEVbolt® and Boeing's sole supplier at the time. Instead, Briles Aerospace and Lisi Aerospace worked with Boeing to develop the "notched" design revision to encourage Boeing to breach its

contractual obligations to PB Fasteners and in interference with Boeing and PB Fasteners' ongoing and prospective contractual and business relations.

120.   Because the "notched" SLEEVbolt® is essentially the same as the SLEEVbolt® that does not contain the notch, the work contemplated by the RFP remains subject to Boeing's contract with PB Fasteners.  As a result, Boeing is still required to purchase 90% of its SLEEVbolt® requirements, including any "notched" SLEEVbolt® requirements, for its 787 aircraft from PB Fasteners through December 31, 2021.  Nevertheless, upon information and belief, Briles Aerospace has agreed to sell more than 10% of Boeing's SLEEVbolt® requirements for Boeing's 787 aircraft, using the "notched" design as a pretext for avoiding Boeing's contractual obligations to PB Fasteners.

121.   Briles Aerospace knew of the contractual and ongoing business relationship between Boeing and PB Fasteners.

122.   Briles Aerospace worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than under Boeing's existing contract with PB Fasteners.

123.   On information and belief, Briles Aerospace intended its efforts with Boeing to result in a disruption of the contractual and ongoing business relationship between Boeing and PB Fasteners, and these efforts have caused an actual disruption of that relationship.

124.   In addition, PB Fasteners learned, for the first time, in connection with the new RFP that it had qualified Briles Aerospace and Lisi Aerospace as two new manufacturers of the SLEEVbolt®.  Neither of these manufacturers could have obtained the necessary qualifications without misappropriating PB Fasteners' proprietary information.

125.   ████████████████████████████████████
████████████████████████████████████████████

1  ████████.  Before September 2018, neither Briles Aerospace nor Lisi Aerospace had

2  sold SLEEVbolts®.

3      126.  Briles Aerospace and Lisi Aerospace were able to ████████████

4  ████████████████ only by acquiring and using PB Fasteners' proprietary

5  information through improper means.

6      127.  Without improper acquisition and use of PB Fasteners' trade secret and

7  proprietary information, Briles Aerospace, Lisi Aerospace, Space-Lok, and

8  Montgomery Machine would not have been able to independently develop the

9  essential dimensions and processes given their respective level of expertise and

10  timeline for qualification.  As noted above, SPS Jenkintown was unable to re-create

11  the SLEEVbolt® system for over eighteen months even though it had extensive

12  engineering expertise and industry know-how, in addition to a license for PB

13  Fasteners' proprietary information.

14  **H.  Briles Aerospace Uses Misleading Advertising to Take Business from PB Fasteners.**

15

16      128.  PB Fasteners and Briles Aerospace are competitors in the aerospace

17  fastener market.

18      129.  Briles Aerospace has maintained a website on which it has advertised its

19  products to consumers in the aerospace fasteners industry.

20      130.  On this website, Briles Aerospace has made the following statement in

21  connection with the sale of its fasteners:  "Briles companies have been valued

22  Manufacturers of High Strength Aerospace Fasteners for over half a century."

23      131.  This statement is misleading and has the tendency to deceive a

24  substantial segment of its audience because it implies that Briles Aerospace has

25  existed in some form for over fifty years.

26      132.  In reality, Briles Aerospace was founded in May 2012.

27      133.  By implying that Briles Aerospace has existed in some form for over

28  fifty years, this statement misappropriates the industry reputation and goodwill of PB

Fasteners, which was owned by relatives of Michael Briles before its assets were acquired by SPS Technologies, LLC.

134.   PB Fasteners has no relation to Briles Aerospace or Michael Briles.

135.   On information and belief, Briles Aerospace has made additional advertisements that similarly imply that Briles Aerospace has existed in some form for over fifty years.

136.   Such advertisements are likely to influence the purchasing decision of customers in the aerospace fastener market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

137.   On information and belief, Briles Aerospace made such statements for the purpose of causing a disruption in the contractual and ongoing business relationship between Boeing and PB Fasteners.

138.   On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace rather than PB Fasteners, which has resulted in a disruption in the contractual and ongoing business relationship between Boeing and PB Fasteners.

**I.     PB Fasteners Has Been, and Will Be, Severely Harmed by Defendants' Wrongful Conduct.**

139.   Defendants' wrongful conduct has caused PB Fasteners serious harm:

a.     It has caused competitive injury to PB Fasteners by giving Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine an unfair head start in manufacturing the SLEEVbolt® system;

b.     It has caused competitive injury to PB Fasteners by diminishing the value associated with exclusive manufacture of the SLEEVbolt®;

c.     It has reduced the value of the proprietary information by diminishing its secrecy;

SECOND AMENDED COMPLAINT

d.    It has misappropriated the industry reputation and goodwill of PB Fasteners;

e.    It has resulted in Boeing diverting orders for SLEEVbolts® away from PB Fasteners, which constitutes a disruption of the contractual and ongoing business relationship between PB Fasteners and Boeing;

f.    It has resulted in breach of the contractual relationship between Plaintiff, on the one hand, and Robert and Michael Briles, on the other hand.

140.    The misappropriation of PB Fasteners' trade secrets by Briles Aerospace, Lisi Aerospace, Space-Lok, and Montgomery Machine will cause severe and irreparable harm to PB Fasteners if these Defendants are not enjoined.  As one example, the SLEEVbolt® generates the vast majority of PB Fasteners' revenue.  If these Defendants are permitted to misappropriate PB Fasteners' trade secrets, it will compel irreversible and highly detrimental changes to PB Fasteners' business.  As another example, PB Fasteners has preserved the secrecy of its proprietary information for many years.  If these Defendants are allowed to utilize this improperly obtained proprietary information, there is a significant threat that the value of the trade secrets would be destroyed altogether.

## **FIRST CAUSE OF ACTION**

### **Violation of Defend Trade Secrets Act,**

### **18 U.S.C. §§ 1836 *et seq.***

### **(Alleged against Briles Aerospace only)**

141.    PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

142.    PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions,

formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

143.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

144.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

145.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

146.   In violation of PB Fasteners' rights, Briles Aerospace misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment and use of current and former PB Fasteners employees with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Briles Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Briles Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

147.   As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

148.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

149.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

**SECOND CAUSE OF ACTION**

**Violation of California Uniform Trade Secrets Act,**

**Cal. Civ. Code §§ 3426 *et seq.***

**(Alleged against Briles Aerospace only)**

150.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

151.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

152.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

153.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

154.   In violation of PB Fasteners' rights, Briles Aerospace misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment and use of current and former PB Fasteners employees with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Briles Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Briles Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

155.   As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

156.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

157.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## **THIRD CAUSE OF ACTION**

### **Violation of Lanham Act,**

### **15 U.S.C. §§ 1051 *et seq.***

### **(Alleged against Briles Aerospace only)**

158.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

159.   Briles Aerospace has made the following statement of fact on its website in connection with the sale of its aerospace fasteners: "Briles companies have been valued Manufacturers of High Strength Aerospace Fasteners for over half a century."

160.   This statement is misleading and has the tendency to deceive a substantial segment of its audience because it implies that Briles Aerospace has existed in some form for over fifty years when in fact Briles Aerospace was founded in May 2012.  Although PB Fasteners was founded by relatives of Michael Briles, PB Fasteners has no relationship with Briles Aerospace or Michael Briles.

161.   The statement is material, as it is likely to influence the purchasing decision of customers in the aerospace fasteners market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

162.   Briles Aerospace placed this statement in interstate commerce by posting it on its website.

163.   PB Fasteners has been injured, and is likely to be injured in the future, as a result of this statement because PB Fasteners and Briles Aerospace are direct competitors in the aerospace fastener industry and Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

164.   On information and belief, Briles Aerospace has made other statements in connection with the sale of aerospace fasteners that similarly imply that Briles Aerospace has existed in some form for over fifty years.

165.   Briles Aerospace's statement was knowingly and intentionally misleading.

166.   As a direct and proximate result of Briles Aerospace's statement, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

167.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks injunctive relief to protect its legitimate business interests.

168.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of treble damages and attorneys' fees.

## **FOURTH CAUSE OF ACTION**

### **Violation of California False Advertising Law,**

### **Cal. Civ. Code § 17500**

### **(Alleged against Briles Aerospace only)**

169.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

170.   Briles Aerospace has made the following statement of fact on its website in connection with the sale of its aerospace fasteners: "Briles companies have been valued Manufacturers of High Strength Aerospace Fasteners for over half a century."

171.   This statement is misleading because it implies that Briles Aerospace has existed in some form for over fifty years when in fact Briles Aerospace was founded in May 2012.  Although PB Fasteners was founded by relatives of Michael Briles, PB Fasteners has no relationship with Briles Aerospace or Michael Briles.

172.   Briles Aerospace knew or should have known that this statement was misleading because it was founded in May 2012.

173.   The statement is material, as it is likely to influence the purchasing decision of customers in the aerospace fasteners market because they will believe that Briles Aerospace has extensive engineering expertise and industry know-how.

174.   PB Fasteners has been injured and has lost money or property as a result of this statement because Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

175.   On information and belief, Briles Aerospace has made other statements in connection with the sale of aerospace fasteners that similarly imply that Briles Aerospace has existed in some form for over fifty years.

176.   On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace.

177.   As a direct and proximate result of Briles Aerospace's false advertising, PB Fasteners has sustained and will continue to sustain significant harm.   PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its false advertising, and (2) an injunction restraining Briles Aerospace from engaging in additional false advertising.

## FIFTH CAUSE OF ACTION

**Violation of California Unfair Competition Law (False Advertising),**

**Cal. Civ. Code § 17200**

**(Alleged against Briles Aerospace only)**

178.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

179.   Briles Aerospace engaged in unlawful business acts and practices, as well as unfair, deceptive, untrue, or misleading advertising.  Such wrongful conduct includes without limitation the use of false and misleading advertising in violation of the Lanham Act and the California False Advertising Law, as set forth above.

180.   This wrongful conduct constitutes Briles Aerospace's business practice, as the false and misleading statement on Briles Aerospace's website has been made in connection with the sale of aerospace fasteners.

181.   PB Fasteners has been injured and has lost money and property as a result of this statement because Briles Aerospace has misappropriated PB Fasteners' industry reputation and goodwill.

182.   On information and belief, Boeing and other customers relied on such statements in choosing to do business with Briles Aerospace.

183.   As a direct and proximate result of Briles Aerospace's false advertising, PB Fasteners has sustained and will continue to sustain significant harm.   PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its false advertising, and (2)

an injunction restraining Briles Aerospace from engaging in additional false advertising.

## SIXTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (Alleged against Briles Aerospace only)

184.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

185.   Boeing and PB Fasteners operate under a valid and enforceable contract that requires Boeing to purchase 90% of the SLEEVbolt® requirements for its 787 aircraft from PB Fasteners through December 31, 2021.

186.   Briles Aerospace was aware of this contract between Boeing and PB Fasteners because it hired multiple former PB Fasteners employees with detailed knowledge of the contract and because it is well known in the industry that PB Fasteners is a major contractual supplier of aerospace fasteners, including the SLEEVbolt®, to Boeing.

187.   Although Briles Aerospace was aware of the contract between Boeing and PB Fasteners, on information and belief, Briles Aerospace agreed to sell SLEEVbolts® to Boeing in violation of Boeing's contract with PB Fasteners and worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than under Boeing's contract with PB Fasteners, all with the intent to disrupt the contractual relationship between Boeing and PB Fasteners.  On information and belief, Briles Aerospace made significant changes to its business only because it had taken such steps with the intent to cause a disruption in the contractual relationship between Boeing and PB Fasteners.

188.   Although Briles Aerospace was aware of the contract between Boeing and PB Fasteners, on information and belief, Briles Aerospace made false

advertisements, as described above, with the intent to disrupt the contractual relationship between Boeing and PB Fasteners.

189.   Briles Aerospace knew that these intentional acts would result in a disruption in the contractual relationship between Boeing and PB Fasteners.

190.   These intentional acts by Briles Aerospace have disrupted the contractual relationship between Boeing and PB Fasteners.  ████████████████████ ████████████████████████████████████████████████ Because the "notched" SLEEVbolt® at issue in the RFP is essentially the same as the SLEEVbolt® that does not contain the notch, the work contemplated by the RFP remains subject to Boeing's contract with PB Fasteners.  As a result, Boeing is required to purchase a certain percentage of its "notched" SLEEVbolt® requirements from PB Fasteners through December 31, 2021.  Rather than upholding that contractual term, however, on information and belief, Briles Aerospace has negotiated a long-term contract with Boeing for SLEEVbolts® that are subject to the contract with PB Fasteners.

191.   As a direct and proximate result of Briles Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

192.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks preliminary and permanent injunctive relief to restrain Briles Aerospace from engaging in additional intentional interference.  Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

**SEVENTH CAUSE OF ACTION**

**Violation of California Unfair Competition Law (Interference),**

**Cal. Civ. Code § 17200**

**(Alleged against Briles Aerospace only)**

193.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

194.   Briles Aerospace engaged in unlawful business acts and practices.  Such conduct includes without limitation the intentional interference with the contractual relationship between Boeing and PB Fasteners, as set forth above.

195.   This unlawful conduct constitutes Briles Aerospace's business practice, as the intentional interference has been inflicted by Briles Aerospace as a business strategy to disrupt the contractual relationship between Boeing and PB Fasteners, which is Briles Aerospace's direct competitor in the aerospace fasteners industry.

196.   PB Fasteners has been injured and has lost money and property as a result of this interference because Briles Aerospace has caused Boeing to divert sales from PB Fasteners.

197.   As a direct and proximate result of Briles Aerospace's intentional interference, PB Fasteners has sustained and will continue to sustain significant harm. PB Fasteners is therefore entitled to (1) recover restitution, including without limitation all benefits that Briles Aerospace received as a result of its intentional interference, and (2) an injunction restraining Briles Aerospace from engaging in additional intentional interference.

**EIGHTH CAUSE OF ACTION**

**Intentional Interference with Prospective Business Relations**

**(Alleged against Briles Aerospace only)**

198.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

SECOND AMENDED COMPLAINT

199.   PB Fasteners has been a major supplier of aerospace fasteners to Boeing for more than forty years.  In fact, before September 2018, the only qualified suppliers of SLEEVbolts® to Boeing were PB Fasteners and its licensee, SPS Jenkintown.  SPS Jenkintown was unable to consistently manufacture the sleeve portion of the assembly and instead used sleeves manufactured by PB Fasteners.

200.   Based on this ongoing business relationship, there was a high probability of future economic benefit to PB Fasteners from the manufacture of SLEEVbolts® for Boeing's composite aircraft, including in connection with the RFP issued by Boeing in September 2018.

201.   Briles Aerospace was aware of this ongoing business relationship between Boeing and PB Fasteners because it hired multiple former PB Fasteners employees with detailed knowledge of the ongoing relationship and because it is well known in the industry that PB Fasteners is a major supplier of aerospace fasteners, including the SLEEVbolt®, to Boeing.

202.   Although Briles Aerospace was aware of the ongoing business relationship between Boeing and PB Fasteners, on information and belief, Briles Aerospace agreed to sell SLEEVbolts® to Boeing and worked with and encouraged Boeing to issue the "notched" SLEEVbolt® design as a pretext for placing orders for SLEEVbolts® with alternate suppliers rather than with PB Fasteners, all with the intent to disrupt the ongoing business relationship between Boeing and PB Fasteners. On information and belief, Briles Aerospace made significant changes to its business only because it had taken such steps with the intent to cause a disruption in the ongoing business relationship between Boeing and PB Fasteners.

203.   Although Briles Aerospace was aware of the ongoing business between Boeing and PB Fasteners, on information and belief, Briles Aerospace made false advertisements, as described above, with the intent to disrupt the ongoing business relationship between Boeing and PB Fasteners.

1  204.  This misconduct was independently wrongful, as it violated the Lanham
2  Act, the California Unfair Competition Law, and California common law.

3  205.  Briles Aerospace knew that this misconduct would result in a disruption
4  in the ongoing business relationship between Boeing and PB Fasteners.

5  206.  This intentional misconduct by Briles Aerospace has disrupted the
6  ongoing business relationship between Boeing and PB Fasteners.  ███████
7  █████████████████████████████████████████████████████████████████████
8  Boeing began limited SLEEVbolt® orders to Briles Aerospace in late 2018, and, on
9  information and belief, Briles Aerospace has negotiated a long-term contract with
10 Boeing based on its RFP response.  But for Briles Aerospace's intentional
11 misconduct, PB Fasteners would have filled such orders for Boeing.

12 207.  As a direct and proximate result of Briles Aerospace's conduct, PB
13 Fasteners has sustained and will continue to sustain significant harm and damages in
14 an amount to be proven at trial.

15 208.  In addition, because PB Fasteners has sustained and will continue to
16 sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners
17 seeks preliminary and permanent injunctive relief to restrain Briles Aerospace from
18 engaging in additional intentional interference.  Absent such relief, PB Fasteners will
19 continue to suffer irreparable injury, including in connection with the RFP issued by
20 Boeing in September 2018.

21 **NINTH CAUSE OF ACTION**

22 **Breach of Contract (Employee Agreement)**

23 **(Alleged against Michael Briles only)**

24 209.  PB Fasteners incorporates all of the above paragraphs as though fully set
25 forth herein.

26 210.  In September 2011, Michael Briles entered into the Employee
27 Agreement with PB Fasteners in consideration for his employment.

28 211.  The Employee Agreement is valid and enforceable.

212.   PB Fasteners performed all material terms required under the Employee Agreement, including by continuing to employ Michael Briles until he voluntarily left the company.

213.   Michael Briles breached the Employee Agreement by, among other things, (1) retaining PB Fasteners' confidential and proprietary information, (2) sharing PB Fasteners' confidential and proprietary information with Briles Aerospace and others, and (3) using PB Fasteners' confidential and proprietary information at Briles Aerospace to manufacture SLEEVbolts®.

214.   As a direct and proximate result of Michael Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### Breach of Contract (APA)

### (Alleged against Robert Briles only)

215.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

216.   In May 2011, Robert Briles was party to the APA with SPS Technologies, LLC in consideration for the purchase of the assets of PB Fasteners.

217.   The APA is valid and enforceable.

218.   SPS Technologies, LLC performed all material terms required under the APA, including by purchasing the assets of PB Fasteners.

219.   On information and belief, Robert Briles breached the APA by, among other things, sharing PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace.

220.   As a direct and proximate result of Robert Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of Contract (Employee Agreement)

### (Alleged against Robert Briles only)

221.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

222.   In September 2011, Robert Briles entered into the Employee Agreement with PB Fasteners in consideration for his employment.

223.   The Employee Agreement is valid and enforceable.

224.   PB Fasteners performed all material terms required under the Employee Agreement, including by continuing to employ Robert Briles until he voluntarily left the company.

225.   On information and belief, Robert Briles breached the Employee Agreement by, among other things, (1) retaining PB Fasteners' confidential and proprietary information, (2) sharing PB Fasteners' confidential and proprietary information with Michael Briles and Briles Aerospace, and (3) using PB Fasteners' confidential and proprietary information at Briles Aerospace to manufacture SLEEVbolts®.

226.   As a direct and proximate result of Robert Briles's breach, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Intentional Misrepresentation

### (Alleged against Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990) only)

227.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

43

228.   SPS Technologies, LLC purchased the assets of Paul R. Briles, Inc. d/b/a PB Fasteners in October 2011.

229.   During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets, including specifically the processes used in the manufacture of SLEEVbolt®.  Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).   Robert Briles made this representation to Plaintiff, among other occasions, on June 7, 2011 during a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and representatives of the Federal Trade Commission.

230.   In the APA with SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. further represented (i) that Paul R. Briles, Inc.'s intellectual property rights included trade secrets, *see, e.g.*, APA definition of Intellectual Property Rights, (ii) that Paul R. Briles, Inc. owned such trade secrets free and clear, *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc. was aware of no improper use of such trade secrets by others, *see, e.g.*, APA Section 4.8.3, and (iv) that the assets acquired by SPS Technologies, LLC included all such trade secrets, *see, e.g.*, APA Section 2.1.5.  Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles made this representation to Plaintiff, among other occasions, on May 4, 2011

1  (the date of the APA), September 27, 2011 (the date of Amendment No. 1 to the

2  APA), and October 4, 2011 (the APA closing date).

3      231.  During this litigation, in Robert Briles's Responses to Plaintiff's First

4  Set of Interrogatories (served June 28, 2019), Robert Briles asserted that he has no

5  knowledge of confidential, proprietary, and/or trade secret information relating to the

6  SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies,

7  LLC in connection with the APA.  Thus, in effect, Robert Briles now asserts that,

8  before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions,

9  formulae, and processes that Plaintiff has identified in this lawsuit and/or that such

10  dimensions, formulae, and processes are not trade secret or proprietary information.

11      232.  If Robert Briles's assertion is correct then:

12        a.  The representation of the Directors and shareholders of Paul R. Briles,

13          Inc., including Robert Briles (as an individual and as the Trustee of the

14          Rob Briles Revocable Family Trust dated March 28, 1991) and Richard

15          Briles (as an individual and as the Trustee of the Rick and Keanna A.

16          Briles Family Revocable Trust dated December 12, 1990), that Paul R.

17          Briles, Inc. owned trade secrets was false;

18        b.  The Directors and shareholders of Paul R. Briles, Inc. knew that the

19          representation that Paul R. Briles, Inc. owned trade secrets was false

20          when they made it, or they made such representation recklessly and

21          without regard for its truth;

22        c.  The Directors and shareholders of Paul R. Briles, Inc. intended that

23          Plaintiff rely on the representation that Paul R. Briles, Inc. owned trade

24          secrets when Plaintiff entered into, amended, and closed on the APA;

25          and

26        d.  Plaintiff reasonably relied on the representation that Paul R. Briles, Inc.

27          owned trade secrets when Plaintiff entered into, amended, and closed on

28          the APA.

233.   As a direct and proximate result of this intentional misrepresentation and Plaintiff's reasonable reliance thereon, Plaintiff has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION

### Concealment

**(Alleged against Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990) only)**

234.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

235.   SPS Technologies, LLC purchased the assets of PB Fasteners Paul R. Briles, Inc. d/b/a in October 2011.

236.   During the negotiations for the acquisition of Paul R. Briles, Inc.'s assets by SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. represented to SPS Technologies, LLC that Paul R. Briles, Inc. owned trade secrets, including specifically the processes used in the manufacture of the SLEEVbolt®. Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990).  Robert Briles made this representation to Plaintiff, among other occasions, on June 7, 2011 during a teleconference with counsel for Plaintiff, counsel for Paul R. Briles, Inc., and representatives of the Federal Trade Commission.

237.   In the APA with SPS Technologies, LLC, the Directors and shareholders of Paul R. Briles, Inc. further represented (i) that Paul R. Briles, Inc.'s intellectual property rights included trade secrets, *see, e.g.*, APA definition of Intellectual

Property Rights, (ii) that Paul R. Briles, Inc. owned such trade secrets free and clear, *see, e.g.*, APA Section 4.8.1, (iii) that Paul R. Briles, Inc. was aware of no improper use of such trade secrets by others, *see, e.g.*, APA Section 4.8.3, and (iv) that the assets acquired by SPS Technologies, LLC included all such trade secrets, *see, e.g.*, APA Section 2.1.5. Robert Briles made this representation on behalf of, and as authorized by, the Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990). Robert Briles made this representation to Plaintiff on May 4, 2011 (the date of the APA), September 27, 2011 (the date of Amendment No. 1 to the APA), and October 4, 2011 (the APA closing date).

238. During this litigation, in Robert Briles's Responses to Plaintiff's First Set of Interrogatories (served June 28, 2019), Robert Briles asserted that he has no knowledge of confidential, proprietary, and/or trade secret information relating to the SLEEVbolt® that was sold or transferred by Paul R. Briles, Inc. to SPS Technologies, LLC in connection with the APA. Thus, in effect, Robert Briles now asserts that, before the APA, Paul R. Briles, Inc. did not own the trade secret dimensions, formulae, and processes that Plaintiff has identified in this lawsuit and/or that such dimensions, formulae, and processes are not trade secret or proprietary information.

239. If Robert Briles's allegation is correct then:

a. The Directors and shareholders of Paul R. Briles, Inc., including Robert Briles (as an individual and as the Trustee of the Rob Briles Revocable Family Trust dated March 28, 1991) and Richard Briles (as an individual and as the Trustee of the Rick and Keanna A. Briles Family Revocable Trust dated December 12, 1990), intentionally failed to disclose that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or did not take reasonable measures to protect the secrecy of its trade

SECOND AMENDED COMPLAINT

secrets, such that the representation about Paul R. Briles, Inc.'s ownership of trade secrets was deceptive;

    b.  Plaintiff could not have discovered this material information, which was in the exclusive control of Paul R. Briles, Inc., Robert Briles, and Richard Briles;

    c.  Plaintiff did not know that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA;

    d.  The Directors and shareholders of Paul R. Briles, Inc. intended to deceive Plaintiff by concealing that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets when Plaintiff entered into, amended, and closed on the APA; and

    e.  Had Plaintiff known that Paul R. Briles, Inc. did not own trade secrets relating to the SLEEVbolt® and/or had not taken reasonable measures to protect the secrecy of its trade secrets, Plaintiff reasonably would not have entered into, amended, or closed on the APA.

240.  As a direct and proximate result of this concealment, Plaintiff has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Lisi USA, Lisi Canada, and Lisi France only)

241.  PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

242.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

243.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

244.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

245.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

246.   In violation of PB Fasteners' rights, Lisi USA, Lisi Canada, and Lisi France (collectively "Lisi Aerospace") misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the hiring of a former employee with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Lisi Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Lisi Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

247.   As a direct and proximate result of Lisi Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

248.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

249.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## FIFTEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Lisi USA, Lisi Canada, and Lisi France only)

250.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

251.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.   This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

252.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

253.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.   These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality

agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

254.   In violation of PB Fasteners' rights, Lisi USA, Lisi Canada, and Lisi France (collectively "Lisi Aerospace") misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the hiring of a former employee with detailed knowledge of proprietary information to re-create the SLEEVbolt®, and (2) the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Lisi Aerospace's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.   Lisi Aerospace has attempted, and continues to attempt, to conceal its misappropriation.

255.   As a direct and proximate result of Lisi Aerospace's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

256.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Absent such relief, PB Fasteners will continue to suffer irreparable injury, including in connection with the RFP issued by Boeing in September 2018.

257.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## SIXHTHEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Space-Lok only)

258.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

259.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.   This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

260.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

261.   PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

262.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.   These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

263.   In violation of PB Fasteners' rights, Space-Lok misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.   Space-Lok's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.   Space-Lok has attempted, and continues to attempt, to conceal its misappropriation.

264.   As a direct and proximate result of Space-Lok's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

265.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Absent such relief, PB Fasteners will continue to suffer irreparable injury.

266.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## SEVENTEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Space-Lok only)

267.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

268.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.   This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

269.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

270.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.   These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

271.   In violation of PB Fasteners' rights, Space-Lok misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the

improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Space-Lok's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Space-Lok has attempted, and continues to attempt, to conceal its misappropriation.

272.   As a direct and proximate result of Space-Lok's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

273.   In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury.

274.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## EIGHTEENTH CAUSE OF ACTION

### Violation of Defend Trade Secrets Act,

### 18 U.S.C. §§ 1836 *et seq.*

### (Alleged against Montgomery Machine only)

275.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

276.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

277.   PB Fasteners' confidential, proprietary, and trade secret information relates to products and services, including the SLEEVbolt®, that are used, sold,

shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

278.  PB Fasteners' confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

279.  PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting access to proprietary information, and performing exit interviews with departing employees.

280.  In violation of PB Fasteners' rights, Montgomery Machine misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Upon information and belief, Montgomery Machine's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Upon information and belief, Montgomery Machine has attempted, and continues to attempt, to conceal its misappropriation.

281.  As a direct and proximate result of Montgomery Machine's conduct, PB Fasteners has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

282.  In addition, because PB Fasteners has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners seeks permanent injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, PB Fasteners will continue to suffer irreparable injury.

SECOND AMENDED COMPLAINT

283.   PB Fasteners has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## NINETEENTH CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act,

### Cal. Civ. Code §§ 3426 *et seq.*

### (Alleged against Montgomery Machine only)

284.   PB Fasteners incorporates all of the above paragraphs as though fully set forth herein.

285.   PB Fasteners owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes dimensions, formulae, and processes that are essential to the proper manufacture and function of the SLEEVbolt® system.

286.   These dimensions, formulae, and processes constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

287.   PB Fasteners has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting physical access to proprietary information, and performing exit interviews with departing employees.

288.   In violation of PB Fasteners' rights, Montgomery Machine misappropriated PB Fasteners' confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including the pursuit of qualifications from Boeing to manufacture the SLEEVbolt® system.  Upon information and belief, Montgomery Machine's misappropriation of PB Fasteners' trade secret information was intentional, knowing, willful, malicious, fraudulent, and

1  oppressive.  Upon information and belief, Montgomery Machine has attempted, and
2  continues to attempt, to conceal its misappropriation.

3       289.   As a direct and proximate result of Montgomery Machine's conduct, PB
4  Fasteners has sustained and will continue to sustain significant harm and damages in
5  an amount to be proven at trial.

6       290.   In addition, because PB Fasteners has sustained and will continue to
7  sustain irreparable injury for which it has no adequate remedy at law, PB Fasteners
8  seeks permanent injunctive relief to protect its confidential, proprietary, and trade
9  secret information and to protect other legitimate business interests.  Absent such
10 relief, PB Fasteners will continue to suffer irreparable injury.

11      291.   PB Fasteners has been damaged by all of the foregoing and is entitled to
12 an award of exemplary damages and attorneys' fees.

13                              **PRAYER FOR RELIEF**

14      WHEREFORE, PB Fasteners respectfully requests the following relief:

15      292.   Judgment in PB Fasteners' favor and against Defendants on all causes of
16 action alleged herein;

17      293.   For damages in an amount to be further proven at trial, including trebling
18 of all damages awarded with respect to the Third Cause of Action;

19      294.   For preliminary and permanent injunctive relief;

20      295.   For judgment that this is an exceptional case;

21      296.   For exemplary or punitive damages;

22      297.   For restitution;

23      298.   For costs of suit incurred herein;

24      299.   For prejudgment interest;

25      300.   For attorneys' fees and costs; and

26      301.   For such other and further relief as the Court may deem to be just and
27 proper.

28

# **DEMAND FOR JURY TRIAL**

PB Fasteners hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.


Dated: August 27, 2019

                                                    */s/ Matthew Donald Umhofer*
                                                    _____

WILLIAMS & CONNOLLY LLP          SPERTUS, LANDES & UMHOFER, LLP
Bruce R. Genderson (*pro hac vice*)    Matthew Donald Umhofer (SBN 206607)
Thomas H.L. Selby (*pro hac vice*)     Elizabeth A. Mitchell (SBN 251139)
Daniel P. Shanahan (*pro hac vice*)    1990 S. Bundy Drive, Suite 705
Edward C. Reddington (*pro hac vice*)  Los Angeles, CA 90025
Joseph Q. Wood (*pro hac vice*)        Telephone:  (310) 826-4700
Michelle L. Hood (*pro hac vice*)      Facsimile:  (310) 826-4711
William B. Snyderwine (*pro hac vice*) matthew@spertuslaw.com
Miranda R. Petersen (*pro hac vice*)   emitchell@spertuslaw.com
725 Twelfth Street, N.W.
Washington, DC  20005                  *Attorneys for SPS Technologies, LLC*
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
bgenderson@wc.com
tselby@wc.com
dshanahan@wc.com
ereddington@wc.com
jwood@wc.com
mhood@wc.com
wsnyderwine@wc.com
mpetersen@wc.com

SECOND AMENDED COMPLAINT